## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| CAROLYN L. DAVIS, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Case Number:  1:08CV00772 (HHK) |
|  | ) |
| MICHAEL B. MUKASEY, United States Attorney General, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

_____)

### MOTION TO DISMISS IN PART AND FOR SUMMARY JUDGMENT

Defendant, Michael Mukasey, Attorney General, by and through undersigned counsel, moves that plaintiff's complaint be dismissed in part pursuant to Fed. R. Civ. P. 12(b) and for summary judgment pursuant to Fed. R. Civ. P. 56.  Plaintiff seeks injunctive and declaratory relief pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000(e) et seq., and the Age Discrimination in Employment Act.  Specifically, plaintiff alleges that she has suffered discrimination based on her race, sex, and age, and reprisal.

In support of this motion, Defendant refers the Court to the supporting memorandum and exhibits thereto and Defendant's Statement of Material Facts as to Which There is No Genuine Dispute.  A proposed order is attached hereto.

Dated: August 18, 2008              Respectfully submitted,

_____.
 /s/
 JEFFREY A. TAYLOR, D.C. BAR # 498610
 United States Attorney

.

_____/s/_____.
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


_____/s/ Robin M. Meriweather_____.

ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198 Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| CAROLYN L. DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number:  1:08CV00772 (HHK) |
| | ) | |
| MICHAEL B. MUKASEY, United States | ) | |
| Attorney General, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

_____)

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS IN PART
AND FOR SUMMARY JUDGMENT**

**INTRODUCTION AND SUMMARY**

The anti-discrimination laws were not intended to "render the judiciary a super-personnel department that re-examines an entity's business decisions," and courts have repeatedly disclaimed that role.  *Adeyimi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008). Further, actionable claims of discrimination or retaliation "are limited to those where an employer causes '*material* adversity,' not 'trivial harms.'"  *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007) (emphasis in original).  Nonetheless, Plaintiff invites the Court to second-guess her supervisors' decisions regarding the role she should play on a specific antitrust investigation, the tasks she performed for a few weeks in 2007, and her supervisor's assessment of her performance in 2005-2006.  Plaintiff's dissatisfaction with those decisions does not transform them into a valid foundation for a race, sex, age, or retaliatory discrimination claim.

Plaintiff's challenge to her supervisors' decision that she should no longer hold the "lead attorney" role on a specific investigation (the Amsted/FMI investigation) must be dismissed for

failure to exhaust.  Plaintiff does not allege that she timely contacted an EEO counselor

regarding that decision.  *See* Compl. ¶ 11.  She first raised the issue with an EEO counselor more

than ten months later, which is well beyond the 45-day period in which a federal employee must

contact an EEO counselor regarding allegedly discriminatory acts.  Therefore, the race, sex, and

age discrimination claims premised upon Plaintiff's loss of the lead role on the Amsted/FMI

investigation are time-barred.

Further, none of the personnel decisions that Plaintiff has challenged are adverse actions.

To be "adverse" for purposes of Title VII and the Age Discrimination in Employment Act, an

employment decision must cause the plaintiff objectively tangible harm, *i.e.*, it must have

materially adverse consequences.  Plaintiff's replacement as lead attorney on the Amsted/FMI

investigation had no materially adverse consequences, because non-lead roles give trial attorneys

substantial responsibilities, and Plaintiff was given two other lead attorney roles in the next year.

Plaintiff's "minimally satisfactory" performance rating for the 2005-2006 rating period was not

adverse, because it did not change her eligibility for an award based upon superior performance,

and she had no reasonable expectation that she would receive any merit based awards that year.

Finally, Plaintiff cannot produce sufficient evidence to survive summary judgment on her

retaliation claim.  Plaintiff challenges her supervisor's decision that she should assist another

GS-15 attorney in reviewing forms regarding proposed mergers and acquisitions to determine

whether there were potential antitrust violations, and should assume those responsibilities while

the other attorney was on vacation.  That assignment lasted less than four weeks, and caused

Plaintiff no tangible, material harm.  Therefore, it is not an adverse action.  Even if it were,

Defendant had legitimate non-discriminatory reasons to assign that task to Plaintiff for a short

period of time.

## BACKGROUND

Plaintiff Carolyn Davis ("Davis") is a GS-15, step 10 trial attorney with the Litigation II ("LT II") Section of the Antitrust Division of the Department of Justice. *See* Compl. ¶ 6. She is an African American female, and was 55 years of age when she filed her administrative EEO complaint. *See id.*; Exh. 1, Declaration of Carolyn Davis ("Davis Decl."), at 1-4. Ms. Davis has been an Antitrust Division employee since 1994, and previously was employed with the division for approximately eight years in the 1980s. *See* Davis Decl. at 3.

LT II is responsible for the enforcement of the antitrust laws with regard to mergers and acquisitions in unregulated industries. *See* Exh. 2, Interrogatory for Maribeth Petrizzi ("Petrizzi Decl."), at 2. The Section reviews, investigates and litigates cases involving a large variety of industries including defense, banking, and heavy industrial equipment aggregate and waste industries. *See id.* at 2-3. Merger investigations typically begin when LT II receives notice of a potential acquisition, after which the Division has a statutorily defined time limit in which to conduct an investigation of a proposed acquisition that appears to be potentially anticompetitive, in violation of the antitrust laws. *See id.* at 4.

Maribeth Petrizzi (white female, age 42), Chief of LT II, supervises Ms. Davis and all other LT II attorneys. *See* Petrizzi Decl. at 2; Compl. ¶ 10. Ms. Petrizzi became Assistant Chief of LT II in February, 2002, and was promoted to Chief in 2003. *See* Petrizzi Decl. at 3. The Chief and Assistant Chief share supervision of the LT II attorneys. *See id.* Robert Tierney (white male, age 53) was Assistant Chief from 2003 until he left LT II in May 2006. *See* Petrizzi Decl. at 1-3; Exh. 3, Interrogatory of Robert Tierney ("Tierney Decl."), at 1-2. Following Mr.

Tierney's departure, Dorothy Fountain became the Assistant Chief of LT II, becoming one of Ms. Davis's supervisors. *See id.* at 3.

Like other LT II trial attorneys, Ms. Davis held different roles on the investigations to which she was assigned. *See* Davis Decl. at 23-24; Tierney Decl. at 3. She served as lead attorney on some investigations, and held different roles on other cases. *See* Davis Decl. at 23-24. During discussions regarding upcoming assignments for the 2005/2006 rating period, Ms. Davis told Ms. Petrizzi and Mr. Tierney that she would like the opportunity to serve as lead attorney on an investigation. *See* Petrizzi Decl. at 5. In response to that request, Ms. Petrizzi and Mr. Tierney assigned Ms. Davis as a lead attorney to the Amsted/FMI transaction in December 2005. *See* Petrizzi Decl. at 5. Between December 2000 and December 2005, Ms. Davis had served as lead attorney on two other investigations. *See* Davis Decl. at 23-24.

On May 12, 2006, Ms. Petrizzi and Mr. Tierney removed Ms. Davis from the role of lead attorney on the Amsted/FMI investigation. Ms. Davis was removed from that role because Ms. Petrizzi and Mr. Tierney were dissatisfied with her performance and had doubts about her ability to make an effective presentation to Amsted. *See* Petrizzi Decl. at 7-9. At her request, Ms. Davis remained on the Amsted investigation after being replaced as lead attorney. *See id*. at 7-8.

On December 12, 2006, Ms. Petrizzi issued Ms. Davis's annual performance appraisal, rating her performance as "Minimally Satisfactory." *See* Compl. ¶ 5; Exh. 4, Employee Rating Form, Oct. 1, 2005 to Sept. 30, 200 ("2006 Performance Rating"). Plaintiff was evaluated as "Successful" in the Critical Elements of Quality of Analysis and Representation of Division Interests, and as Minimally Satisfactory in Research, Investigation, and Litigation; Writing; Negotiations and Oral Presentations; and Diligence, Dependability and Adherence to Office Policies. *See id.* That rating was issued under a rating system with five performance levels:

"Unacceptable," "Minimally Satisfactory," "Successful," "Excellent," and "Outstanding." *See* 2006 Performance Rating. Ms. Davis received a "Successful" rating for the 2004-2006 rating period. *See* Exh. 5, Employee Rating Form, July 1, 2004 to Sept. 30, 2005.

Ms. Petrizzi based her 2005-2006 rating on her assessment of Ms. Davis's performance on the Amsted/FMI investigation. *See* Petrizzi Decl. at 7-10. Ms. Petrizzi found that Ms. Davis did not perform effectively in bringing the investigation to a close, nor did she perform at a level commensurate with the expectations of a GS-15 step 10 attorney. *See id.* at 8. Plaintiff had 30 days to appeal her performance rating, but did not file a timely appeal. *See* Exh. 6, Letter from Barnette to Davis Re: Performance Rating Appeal.

On or about January 12, 2007 Ms. Petrizzi assigned Plaintiff as lead attorney on a new matter, which concluded in February 2007. *See* Petrizzi Decl. at 18. On January 25, 2007, Plaintiff contacted an Equal Employment Opportunity ("EEO") counselor alleging that she was given a performance rating of minimally satisfactory because of her race, age and sex. *See* Exh. 7, EEO Counselor's Report, at 3.

During the week of March 11, 2007, LT II began to experience an increase in the number of Notification and Report Forms, filed pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (HSR Act). *See* Petrizzi Decl. at 18. These forms, filed with the Federal Trade Commission and the Antitrust Division give notice of certain proposed mergers tender offers, or other acquisition transactions. *See id.* at 17-18. The Antitrust Division reviews the forms, referred to as HSR filings, to ensure that the proposed transaction does not violate antitrust law. *See id.* at 17-18. LT II assigns an experienced attorney to review HSR filings to assess whether the proposed transactions violate the antitrust laws. *See* Tierney Decl. at 12. The

majority of LT II investigations are opened on the basis of information received in HSR filings. *See* Petrizzi Decl. at 18.

Suzanne Morris, a GS-15 attorney, was the LT II attorney assigned to review HSR filings. Due to the increase in HSR filings and because of an impending 10-day period of annual leave that was to occur in early April, Ms. Morris needed assistance reviewing the HSR filings. *Id.* at 19-20. As the matter to which Plaintiff had been assigned as lead attorney in January had concluded, she was available to assist in the review of HSR filings. *See id.*

On March 14, 2007, Plaintiff was assigned to assist in the review of HSR filings. *See* Petrizzi Decl. at 20. Ms. Petrizzi anticipated that at least one of the HSR transactions would lead to an investigation, to which she planned to assign Plaintiff as lead attorney. *See id*. Plaintiff's responsibilities for reviewing HSR filings concluded on April 16, 2007. *See id.*; Exh. 12, Electronic Mail Messages from Maribeth Petrizzi and Dorothy Fountain to Carolyn Davis. Ms. Petrizzi assigned Plaintiff as lead attorney to investigate a multi-billion dollar transaction on May 7, 2007. *See* Petrizzi Decl. at 19.

Plaintiff filed a formal complaint of discrimination on April 5, 2007, alleging that because of her race, age, and sex, she was removed as lead attorney on the Amsted/FMI investigation; that her performance rating for 2005/2006 was "Minimally Satisfactory;" and that in reprisal for her EEO activity, she was assigned HSR filings. *See* Exh. 8, Notice of Receipt of EEO Complaint; Exh. 9, Notice of Partial Acceptance of EEO Complaint. The DOJ Justice Management Division EEO Office issued a Notice of Partial Acceptance of the Complaint; it found that the claim regarding removal from the lead attorney position in Amsted was not timely brought to the attention of an EEO counselor, and was therefore not accepted for investigation. *See* Exh. 9.

Plaintiff filed her complaint with this Court on May 5, 2008. She alleges that she was discriminated against on the basis of her race, sex, and age when she lost the lead role on the Amsted/FMI investigation and received her 2006 performance rating. Plaintiff also contends that the HSR assignment was retaliation for her EEO activity.

## STANDARD OF REVIEW

### A.    Motion to Dismiss

Defendants move for dismissal under Rule 12(b)(1), because plaintiff's failure to exhaust administrative remedies deprives the Court of subject matter jurisdiction. See Fed. R. Civ. P. 12(b)(1). When reviewing a 12(b)(1) motion to dismiss, "the court must accept the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *Thompson v. Capitol Police Bd.*, 120 F. Supp.2d 78, 81 (D.D.C. 2000) (citations omitted); *see also Vanover v. Hantman*, 77 F. Supp.2d 91, 98 (D.D.C. 1999). "The court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), *aff'd*, 346 F.3d 192 (D.C. Cir. 2003). In addition, plaintiff bears the burden of persuasion, and must establish subject-matter jurisdiction "by a preponderance of the evidence." *Thompson*, 120 F.Supp.2d at 81; *Vanover*, 77 F.Supp.2d at 98. To determine the existence of jurisdiction, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence. *See Herbert v. Nat'l Academy of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992); *Rann*, 54 F. Supp. at 64

### B.    Summary Judgment (Fed.R.Civ.P. 56)

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995); *Molerio v. FBI*, 749 F.2d 815, 823 (D.C. Cir. 1984).  Where no genuine dispute exists as to any material fact, summary judgment is required.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A genuine issue of material fact is one that could change the outcome of the litigation. *Id.* at 247.  The party moving for summary judgment need not prove the absence of an essential element of the nonmoving party's case.  *Celotex*, 477 U.S. at 325.  "The burden on the moving party may be discharged by 'showing' –  that is, pointing out to the (Court) –  that there is an absence of evidence to support the non-moving party's case."  *Id.*  Once the moving party has met its burden, the non-movant may not rest on mere allegations, but must proffer specific facts showing that a genuine issue exists for trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Federal Rule of Civil Procedure 56 requires the party opposing summary judgment to go beyond the pleadings, and by affidavits, depositions, answers to interrogatories or admissions set forth "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Banks v. C & P Tel. Co.*, 802 F.2d 1416 (D.C. Cir. 1986).  To avoid summary judgment, the plaintiff must state specific facts or present some objective evidence that would enable the court to find an entitlement to relief.

Summary judgment is appropriate "if the evidence [the nonmoving party submits] is merely colorable . . . or is not sufficiently probative . . . (T)he mere existence of a scintilla of

8

evidence in support of the plaintiff's position will be insufficient; there must be evidence on

which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Even in

employment discrimination cases where elusive concepts such as motive or intent are at issue,

[the Rule 56] standard compels summary judgment if the non-moving party rests merely upon

conclusory allegations, improbable inferences and unsupported speculation." *Spiegel v. Leavitt*,

2005 WL 2402322, at 8 (D.D.C. Sept. 22, 2005). To defeat a summary judgment motion, the

existence of specific, material evidentiary facts must be shown. *See* Fed. R. Civ. P. 56(e) (the

nonmoving party may not rest on mere allegations but "must come forward with 'specific facts

showing there is a genuine issue for trial"); *see also Burke v. Gould*, 286 F.3d 513, 517-20 (D.C.

Cir. 2002) (requiring a showing of specific, material facts); *Hayes v. Shalala*, 902 F. Supp. 259,

263 (D.D.C. 1995) (opposition to summary judgment must consist of more than mere

unsupported allegations or denials).

## C.     Disposition of Discrimination Claims Under Title VII

In *Fogg v. Gonzales*, 492 F.3d 447 (D.C. Cir. 2007), the D.C. Circuit held, *inter alia*, that

the 1991 amendments to Title VII codified two alternative ways of establishing liability for

intentional discrimination: (1) a single motive theory requiring that the plaintiff establish that

discrimination was the "sole" or "but for" reason for the challenged employment action; and (2)

a "mixed-motive" theory requiring only that the plaintiff demonstrate that discrimination played

a "motivating part" or was a "substantial factor" in the employment decision. *Id.* at 451. Under

either theory, plaintiff must demonstrate discrimination by a preponderance of the evidence[1] and

---

1 "Preponderance of the evidence" means such evidence as, when weighed against that
opposing it, has the more convincing force that something is so. *Hopkins v. Price Waterhouse*,
737 F. Supp. 1202 (D.D.C. 1990), *aff'd* 920 F.2d 967 (D.C. Cir. 1990); *Metropolitan Stevedore*

may rely on direct or circumstantial evidence to meet that burden.  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92-102 (2003).

In the absence of direct evidence, Plaintiff may attempt to establish that she was the victim of intentional discrimination on the basis of her race and sex by relying on circumstantial evidence analyzed using the scheme first set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).[2]  Under that scheme, the plaintiff must first, by a preponderance of the evidence, establish a prima facie case of discrimination.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).  If the employee succeeds, the employer then must introduce evidence of a legitimate, nondiscriminatory reason for its action.  *See McDonnell Douglas*, 411 U.S. at 802.  Once it is established that both parties have met their respective burdens of production (*i.e.*, plaintiff by presenting a prima facie case and defendant by producing a non-discriminatory reason for its actions), the burden shifting scheme becomes irrelevant.  *Hicks*, 509 U.S. at 510.  Then, the plaintiff must establish, by a preponderance of the evidence, that "race, color, religion, sex, or national origin was a motivating factor for any employment practice."  *Desert Palace, Inc.*, 539 U.S. at 101 (citing 42 U.S.C. § 2000e-2(m)).

Alternatively, a plaintiff can meet the ultimate burden by demonstrating that the defendant's legitimate, non-discriminatory reason is a pretext and that discrimination is the "but for" reason for the challenged employment action.  *St. Mary's Honor Center*, 509 U.S. at 515-518.  This is a more difficult standard than the requirement under Section 2000e-2(m) to show that discrimination was a motivating factor.  In the single motive case *Reeves v. Sanderson*

---

*Company v. Rambo*, 521 U.S. 121, 137 n.9 (1997).  "[W]hen the evidence is evenly balanced, the [party with the burden of persuasion] must lose."  *Id.*

2   Reliance on the *McDonnell Douglas* scheme for testing the viability of plaintiff's circumstantial evidence is not limited to the "single-motive" theory of liability.  *See Fogg*, 492 F.3d at 445.

*Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000), Justice O'Connor recognized occasions

where summary judgment would be appropriate:

> Certainly there will be instances where, although the plaintiff has
> established a prima facie case and set forth sufficient evidence to
> reject the defendant's explanation, no rational factfinder could
> conclude that the action was discriminatory.  For instance, an
> employer would be entitled to judgment as a matter of law if the
> record conclusively revealed some other, nondiscriminatory reason
> for the employer's decision, or if the plaintiff created only a weak
> issue of fact as to whether the employer's reason was untrue
> and there was abundant and uncontroverted independent evidence
> that no discrimination had occurred.

*Accord Weigert v. Georgetown University*, 120 F.Supp.2d 1, 22 (D.D.C. 2000) (quoting same).

Whichever standard is employed, Ms. Davis fails to meet her burden of coming forward

with evidence to create a triable issue.  As explained *supra*, Plaintiff must present substantial and

credible evidence in order to survive a motion for summary judgment.  She cannot rely solely

upon conclusory allegations or speculation.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir.

1999) ("Accepting [some] conclusory allegations as true, therefore, would defeat the central

purpose of the summary judgment device, which is to weed out those cases insufficiently

meritorious to warrant the expense of a jury trial."); *Hastie v. Henderson*, 121 F.Supp.2d, 72, 77

(D.D.C. 2000) *aff'd*, No. 00-5423, 2001 WL 793715 (D.C. Cir. 2001)("To defeat a motion for

summary judgment, a plaintiff cannot create a factual issue of pretext with mere allegations or

personal speculation, but rather must point to 'genuine issues of material fact in the record.'").

## D.    Disposition of Claims Under the Age Discrimination in Employment Act

The Age Discrimination in Employment Act requires that "[a]ll personnel actions

affecting employees or applicants for employment who are at least 40 years of age . . . in

executive agencies . . . shall be made free from any discrimination based on age."  29 U.S.C.

§ 633a(a).  In the absence of direct evidence of age discrimination, ADEA claims are governed

by the burden-shifting analysis set forth in *McDonnell Douglas Corp.  See Barnette v. Chertoff*,

453 F.3d 513, 515 (D.C. Cir. 2006); *Carter v. George Washington Univ.*, 387 F.3d 872, 878

(D.C. Cir. 2004).  To establish a *prima facie* case of age discrimination, Ms. Davis bears the

burden of demonstrating, by a preponderance of the evidence, "facts sufficient to create a

reasonable inference that age discrimination was a determining factor in the employment

decision." *Short v. Chertoff*, 555 F. Supp. 166, 171 (D.D.C. 2008).  Specifically, a plaintiff must

show "(1) he belongs to the statutorily protected age group; (2) he was qualified for his position

and was  performing his job well enough to meet his employer's legitimate expectations; (3) he

suffered an adverse employment action despite his qualifications and performance; and (4) he

was disadvantaged in favor of similarly situated younger employees." *Id.*; *see also Reeves v.

Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

## ARGUMENT

I.     **PLAINTIFF'S  FAILURE TO TIMELY EXHAUST ADMINISTRATIVE
       REMEDIES BARS HER DISCRIMINATION CLAIMS PREMISED UPON
       BEING ASSIGNED A NON-"LEAD" ROLE IN THE AMSTED/FMI
       INVESTIGATION.**

Federal employees may file a civil action under Title VII concerning employment

discrimination only after exhausting their administrative remedies before the relevant federal

agency for each discrete alleged discriminatory act.  42 U.S.C. § 2000e-16(c); *National

Passenger R.R. Corp. v. Morgan*, 536 U.S. 101, 108-09, 113 (2002); *More v. Snow*, 480 F. Supp.

2d 257, 270 (D.D.C. 2007).  The exhaustion requirement is "not a mere technicality." *Park v.

Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995).  Instead, the "requirement is mandatory and

serves to allow the agency an opportunity to resolve the matter internally and avoid unnecessarily burdening the courts." *Bush v. Engleman*, 266 F. Supp. 2d 97, 101 (D.D.C. 2003) (*citing Wilson v. Pena*, 79 F.3d 154, 165 (D.C. Cir. 1996)).

Federal employees may choose one of two routes to pursue an age discrimination claim in federal court. An employee may proceed directly to court if (s)he provides the Equal Employment Opportunity Commission ("EEOC") notice of the intent to sue within 180 days of the alleged discriminatory act. *See* 29 U.S.C. § 633a(c), (d); *Rann v. Chao*, 346 F.3d 192, 195 (D.C. Cir. 2003); *Hunter v. Rice*, 531 F. Supp. 2d 185, 190 (D.D.C. 2008). Alternatively, the employee may file an administrative complaint, "and then sue if dissatisfied with the results." *Hunter*, 531 F. Supp. 2d at 190; *see* 29 U.S.C. § 633a(b).

Under rulemaking authority delegated by Title VII, *see* 42 U.S.C. § 2000e-16(b), the Equal Employment Opportunity Commission ("EEOC") has established "detailed procedures" and regulatory time limits that govern employees' pursuit of those administrative remedies for alleged race, sex, or age discrimination. *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997); 29 C.F.R. Part 1614 (Federal Sector Equal Employment Opportunity). The EEOC's regulations require that "aggrieved" employees consult an agency EEO Counselor within forty-five (45) days of the "matter alleged to be discriminatory or, in the case of personnel action, within forty-five (45) days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1); *see also Park,* 71 F.3d at 907; *More*, 480 F. Supp. 2d at 269-70. If an employee fails to contact an EEO counselor within that time period, her claims will be time-barred. *Bowden*, 106 F.3d at 437; *Park,* 71 F.3d at 907 (D.C. Cir. 1995); *Hunter*, 531 F. Supp. 2d at 190-91; *More*, 480 F. Supp. 2d at 270-71; *Williams v. Munoz*, 106 F. Supp. 2d 40, 42 (D.D.C. 2000).

13

There is conflicting authority within this District regarding whether a failure to properly exhaust administrative remedies is correctly brought in a 12(b)(1) motion, as a jurisdictional defect, or a 12(b)(6) motion. *See Rann v. Chao*, 346 F.3d 192, 195 (D.C. Cir. 2003) (recognizing that prior D.C. Cir. decisions have reached conflicting answers as to whether a failure to exhaust is jurisdictional, but declining to decide the matter); *Mianegaz v. Hyatt Corp.*, 319 F. Supp. 2d 13, 17 (D.D.C. 2004) (Urbina, J.) (same); *Marcelus v. Corr. Corp. of Am. / Corr. Treatment Facility*, 540 F. Supp. 2d 231, n.4 (D.D.C. Mar. 31, 2008) (Leon, J.) (noting that "courts in this district continue to grapple with the appropriate standard for failure to exhaust").   However, the distinction for purposes of this motion is academic, as dismissal is appropriate under either Rule 12(b)(1) or Rule 12(b)(6).  Defendant here cites the 12(b)(1) standard as he understands this Court considers a failure to exhaust to be a jurisdictional defect. *See Mills v. Billington*, Civ. A. No 04-2205 (HHK), 2006 WL 1371683, at *2 (D.D.C. May 16, 2006) ("It is well-settled that a plaintiff's failure to exhaust her administrative remedies will deprive a district court of subject matter jurisdiction[.]"

Ms. Davis's claim regarding her alleged removal from the lead role on the Amsted/FMI investigation must be dismissed because she did not comply with the forty-five (45) day administrative filing requirement.  Ms. Davis alleges that she was removed from "lead" attorney duties on that investigation on May 8, 2006. *See* Compl. ¶¶ 1, 11.  She does not allege that she contacted an EEO counselor within 45 days of that decision.  Instead, Ms. Davis first contacted an EEO counselor on January 25, 2007 — more than six months later. *See* Compl. ¶ 19; Exh. 7. Indeed, that initial EEO contact did not address the "lead" attorney duties.  The only "claim" discussed in the EEO counselor's report concerns Ms. Davis's December 13, 2006 performance appraisal. *See id.* (identifying the date of the most recent EEO activity as December 13, 2006,

14

and listing "performance appraisal" under the heading "claim"). Ms. Davis first challenged her loss of the lead role three months later, on April 5, 2007, when she filed a formal EEO Complaint. *See* Exh. 9, Notice of Partial Acceptance of EEO Complaint. The EEO staff properly rejected that claim as untimely. *See id.*

Ms. Davis appears to contend that her removal from the lead role is one of a series of allegedly discriminatory acts. *See* Compl. ¶ 13. However, even when "an employee alleges 'serial violations,' *i.e.*, a series of actionable wrongs, *a timely EEOC charge must be filed with respect to each discrete alleged violation*." *Ledbetter v. Goodyear Tire & Rubber*, 127 S. Ct. 2162, 2175 (2007) (emphasis added); *see also National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002); *More*, 480 F. Supp. 2d at 271. Thus Ms. Davis's discrimination claims must be limited to discrete acts that occurred within forty-five (45) days of when she contacted an EEOC counselor. To the extent the complaint involves discrete acts outside that time period, it must be dismissed. *See Patterson v. Johnson*, 505 F.3d 1296, 1297 (D.C. Cir. 2007) (concluding award of summary judgment to defendant on claims based on actions that took place more than 45 days prior to Ms. Davis's contact with EEO counselor was "clearly correct"). Accordingly, Ms. Davis's April 25, 2007 administrative complaint cannot reach back to include her supervisor's May 8, 2006 decision to assign Ms. Davis to a non-lead role on the Amsted/FMI investigation.

## II. PLAINTIFF HAS NOT ESTABLISHED A PRIMA FACIE CASE OF RACE, SEX, OR AGE DISCRIMINATION BECAUSE THE PERSONNEL DECISIONS THAT SHE CHALLENGES ARE NOT "ADVERSE ACTIONS."

### A. Plaintiff Must Demonstrate That She Suffered Adverse Actions.

The D.C. Circuit has recently clarified that in considering an employer's motion for summary judgment "[i]n a Title VII disparate-treatment suit where an employee has suffered an

15

adverse employment action and [the] employer has asserted a legitimate, [non-retaliatory/]non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*."  *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original); *see Pardo-Kronemann v. Jackson*, 541 F. Supp. 2d 210, 215-16 (D.D.C. 2008) (stating that the *Brady* principle applies to Title VII retaliation suits).  Instead, the district court should resolve only one question:  Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-retaliatory/non-discriminatory reason is a pretext for retaliation/discrimination.  *See Brady*, 520 F.3d at 494; *Pardo-Kronemann*, 541 F. Supp. 2d at 215-16.

    The instant case is a Title VII disparate-treatment suit.  Defendant has not yet asserted legitimate, non-discriminatory reasons for the actions challenged in Plaintiff's race, sex, and age discrimination claims, although such explanations were provided in the underlying EEO administrative proceeding.  Thus, under *Brady*, this Court must as an initial matter determine whether each claim of discrimination involves an adverse action.  *See Brady*, 520 F.3d at 494 (making clear that the *Brady* rule applies only "where an employee has suffered an adverse employment action"); *Brantley*, 2008 WL 2073913, at *4 ("[T]he Court must first determine whether any of the conduct underlying the claims constituted an adverse action.").  If a particular claim does not involve an adverse action, then it fails as a matter of law.  *See Brantley*, 2008 WL 2073913, at *4-*5 (finding that certain of the plaintiff's discrimination claims fail because they do not involve adverse actions).  If, on the other hand, a particular claim does involve an adverse action, then the *Brady* rule applies, and the burden will shift to Defendant to proffer legitimate non-discriminatory reasons , after which this Court must determine whether Plaintiff has

16

produced sufficient evidence for a reasonable jury to find that Defendant's asserted non-discriminatory reason for the action is a pretext for discrimination. *See id.* at *5.

### B. The Personnel Decisions Challenged Here Are Not Adverse.

Discrimination complaints may be advanced only by employees who are personally "aggrieved" by the particular alleged discriminatory "matter" or "personnel action." *See* 29 C.F.R. § 1614.105(a) ("aggrieved persons" may contact an Agency EEO counselor); *Brown v. Brody*, 199 F.3d 446, 455 (D.C. Cir. 1999) (federal employee "must first be 'aggrieved' in order to bring" a Title VII claim). Ms. Davis is not "aggrieved" unless she can show that she has "been subjected to some sort of adverse personnel or employment action." *Brown*, 199 F.3d at 452; *see also Mack v. Strauss*, 134 F.Supp.2d 103, 112 (D.D.C. 2001) (plaintiff "must demonstrate that an allegedly adverse personnel action had a tangible impact on the terms and conditions" of his or her employment).

"'[N]ot everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001); *see also Broderick v. Donaldson*, 437 F.3d 1226 (D.C. Cir. 2006). Otherwise, "[m]inor or even trivial employment actions that "an irritable, chip-on-the-shoulder employee did not like would . . . form the basis of a discrimination suit.'" *Russell*, 257 F.3d at 818 (citing *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) (quoting *Williams v. Bristol-Meyers Squibb*, 85 F.3d 270, 274 (7th Cir. 1996)). To be "adverse," the employment action must have "materially adverse consequences affecting the terms, conditions, or privileges" of the plaintiff's employment. *Brown*, 199 F.3d at 457 (emphasis added); *see also Patterson*, 505 F.3d at 1298; *Mack*, 134 F.Supp.2d at 112 (the touchstone is "'whether the plaintiff has suffered a materially adverse action'). The actions Ms. Davis challenges here do not meet that standard.

17

### 1.    Plaintiff's Loss of the "Lead" Role on the Amsted/FMI Investigation Was Not Adverse.

As explained *supra*, Ms. Davis's challenge to her loss of the "lead attorney" role on the Amsted/FMI investigation must be dismissed for failure to exhaust.  However, even if that claim had been exhausted, it could not form the basis of a race, sex, or age discrimination claim because it is not an "adverse action."

"[A] claim of an undesirable assignment, without any effect on salary, benefits, or grade, is similar to claims regarding lateral transfers, and thus does not constitute an adverse action." *Halcomb v. Office of Senate Sergeant-at-Arms of U.S. Senate*, __ F. Supp. 2d __, 2008 WL 2599836, *8 (D.D.C. July 2, 2008) (internal citations omitted); *see also Blackmon-Malloy v. United States Capitol Police Bd.*, 338 F. Supp. 2d 97, 106 (D.D.C. 2004) ("undesirable assignments . . . do not constitute adverse action").  Courts also have repeatedly recognized that an employee's general dissatisfaction with his or her job duties is a "purely subjective injury," which cannot support a discrimination claim.  *Patterson*, 505 F.3d at 1298; *see also Forkkio v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002).  Such personnel decisions simply do not cause the "objectively tangible harm" necessary to state a *prima facie* case of discrimination.  *Ginger v. District of Columbia*, 527 F.3d 1340, 1343 (D.C. Cir. 2008).

Ms. Davis's loss of the "lead" role on the Amsted/FMI investigation did not materially affect the terms, conditions, or privileges of her employment, and thus was not "adverse."  Ms. Davis does not allege that the assignment affected her salary or grade level — she remained a GS-15, step-10.  *See* Compl. ¶ 7.  The change also did not substantially change Ms. Davis's job duties.  Like other Antitrust Division trial attorneys, Ms. Davis held different roles on the

investigations to which she was assigned; she served as lead attorney on some investigations, and held different roles on other cases. *See* Davis Decl. at 23-24 (stating that in the five years prior to serving as lead on the Amsted/FMI investigation she had a lead attorney role on two investigations). As Ms. Davis has acknowledged, non-lead roles nonetheless could give an attorney "substantial responsibility" on a case. *See id.* at 24. Thus, Ms. Davis's job responsibilities and duties remained the same even after she lost the lead role on the Amsted/FMI investigation; the only thing that changed was her role on that particular investigation.

Further, Ms. Davis's loss of the "lead attorney" role was temporary, and did not impair her future opportunities to obtain "lead attorney" assignments and experience. Ms. Davis's supervisor gave her other opportunities to serve as a "lead attorney" within months of transferring lead attorney duties on the Amsted/FMI investigation to another attorney. *See* Petrizzi Decl. at 15-16. In January 2007, Ms. Davis was assigned to be the lead attorney role on an investigation, and in April 2007, she was assigned to lead the investigation of a high-profile multi-billion dollar transaction. *See id.* at 16. Thus, within less than one year of being removed from the lead role on the Amsted/FMI investigation, Ms. Davis had obtained lead attorney assignments which equaled the total number of lead attorney assignments she had received in the five preceding years. This further demonstrates that Ms. Davis's loss of the lead attorney role did not adversely impact her employment. *See Nichols v. Truscott*, 424 F. Supp. 2d 124 (D.D.C. 2006) (denial of opportunity to be acting branch chief on a temporary basis would not affect the terms of plaintiff's employment or her future opportunities and would not be adverse action).

### 2.    The "Minimally Satisfactory" Performance Rating Was Not Adverse.

Plaintiff's "minimally satisfactory" performance rating also was not materially adverse. "For a low-performance rating to amount to an adverse employment action the plaintiff must

present evidence 'such that a reasonable trier of fact could conclude that [she] has suffered objectively tangible harm' due to the poor rating." *Holcomb*, 2008 WL 2599836, at *9. For example, a plaintiff who has repeatedly received monetary awards due to high performance ratings may be able to show that a lower performance rating which makes her ineligible for those awards is an adverse action. *See Weber v. Batista*, 494 F.3d 179, 185-86 (D.C. Cir. 2007). In such cases, the "objective harm" is the loss of the award.

Although Ms. Davis received a lower performance rating in the 2005-2006 rating period than she received in the prior year, that rating is not adverse because it did not cause her to lose a cash award. Antitrust Division attorneys may receive two types of performance awards: Sustained Superior Performance ("SSP") awards, and Special Act ("SA") awards. *See* Exh. 10 at 1-2. Only employees that receive an "Excellent" or "Outstanding" rating are eligible for an SSP award. *See id.* SA awards are tied to specific acts, as opposed to an employee's overall performance; thus, employees with an "Excellent," "Outstanding," or "Successful" rating may receive that award if their performance on a specific act merits an award. *See id.* In 2006, supervisors were instructed that only the top seventy-five percent of employees should be nominated for any type of award. *See id.* at 3.

Ms. Davis's 2005-2006 performance rating did not change her eligibility for an SSP award. Her 2004-2005 performance rating of "Successful" was one level higher than the 2006 "Minimally Satisfactory" rating. However, both years' ratings were too low for an SSP award, which can only be awarded for "Outstanding" or "Excellent" performance. *See* Exh. 10.

Further, unlike the plaintiff in *Weber v. Batista*, Ms. Davis does not have a history of receiving performance-based awards. Before the 2004-2005 rating period, Ms. Davis was rated under a two-tier system, and received "Exceeds or Meets Expectations." *See* Compl. ¶ 9;

20

Petrizzi Decl. at 11.  But she did not receive any SSP awards for the 2003-2004, 2002-2003, or 2001-2002 rating period.  *See* Exh. 14, Declaration of Lhatoya Reed ("Reed Decl."), ¶ 3. Instead, the last award she received was in 2001.  *See id.*

The 2005-2006 rating did make Ms. Davis ineligible for an SA award.  However, from 2000 through 2006, she did not receive an SA award.  *See* Reed Dec. ¶ 3.  Therefore, she could not reasonably expect to receive such an award for any special act accomplished in the 2005-2006 rating period.  Moreover, although an employee needs at least a "Successful" rating to receive an SA award, those awards reward an employee's performance of a specific act, rather than the employee's overall performance.  *See* Exh. 11.

In sum, Ms. Davis does not have a history of being eligible for, and receiving, performance-based awards.  Accordingly, the fact that her 2005-2006 performance rating did not make her eligible for an SSP or SA award caused Ms. Davis no objectively tangible harm. Instead, after receiving that rating, she was in substantially the same position that she was in before.  While a "Minimally Satisfactory" rating may have harmed an employee who had received SSP and SA awards in recent years, and had a history of superior performance, it did not have that effect in this case.

## III.    PLAINTIFF'S RETALIATION CLAIM LACKS MERIT.

As explained *supra*, under *Brady*, the Court must first determine whether Ms. Davis suffered an adverse employment action.  If the retaliation claim does not involve an adverse action, then it fails as a matter of law, and the Court's analysis ends.  *See Brantley*, 2008 WL 2073913, at *4-*5 (finding that certain of the plaintiff's discrimination claims fail because they do not involve adverse actions); *Pardo-Kronemann*, 541 F. Supp. 2d at 215-16 (holding *Brady* principle applies to retaliation claims).  If, on the other hand, the retaliation claim does involve

an adverse action, then the *Brady* rule applies, and this Court must determine whether Ms. Davis

has produced sufficient evidence for a reasonable jury to find that Defendant's asserted non-

retaliatory/non-discriminatory reason for the action is a pretext for retaliation/discrimination.

*See id.* at *5.  In making that determination, this Court must consider whether a jury could infer

retaliation or discrimination from:  (1) Ms. Davis's *prima facie* case; (2) any evidence that she

may present to attack Defendant's stated non-retaliatory/non-discriminatory reason for the

action; and (3) any further evidence of retaliation/discrimination that may be available to Ms.

Davis.  *Short*, 2008 WL 2174856, at *3 (citing *Waterhouse v. District of Columbia*, 298 F.3d

989, 992-93 (D.C. Cir. 2002); *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir.

1998)).

### A.  The Four-Week Assignment To Review HSR Filings Was Not An "Adverse Action."

To establish a prima facie case of retaliation, Ms. Davis must demonstrate that (1) she has

engaged in a protected activity, which was known by the alleged retaliator, (2) she was subject to

an adverse action, and (3) there is a causal link between the adverse action and the protected

activity.  *See Paquin v. Federal National Mortgage Association*, 119 F.3d 23, 31 (D.C. Cir.

1997); *Passer v. American Chem. Soc'y*, 935 F.2d 322, 331 (D.C. Cir. 1991); *Mitchell v.

Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985); *Menna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir.

1984).  To qualify as adverse, the challenged action must be likely to dissuade a reasonable

worker in the plaintiff's position from engaging in protected activity.  *Burlington N. & Santa Fe

Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  Courts ask whether the challenged action would have

had that effect on a "reasonable employee."  *Id.*; *Gardner v. District of Columbia*, 448 F. Supp.

2d 70, 75 (D.D.C. 2006).

Here, Ms. Davis alleges that Defendant retaliated against her by assigning her to HSR tasks between March 14, and April 16, 2007.  To state an actionable claim for retaliation, Ms. Davis must demonstrate that this four-week assignment has sufficiently negative effects that it would be likely to dissuade a reasonable employee from filing an EEO complaint.  She cannot meet that burden.

Although case-specific facts may make a particular reassignment of duties adverse, a change in assignment "is not automatically actionable."  *Burlington*, 548 U.S. at 71.  Instead, the plaintiff  must provide evidence that tangible harm, *i.e.* adverse consequences, will flow from performing the new duties.  *See Sewell v. Chao*, 532 F. Supp. 2d 126, 136-37 (D.D.C. 2008) (concluding new assignments and transfer to another department were not adverse actions because plaintiff "offered no evidence of injury or harm resulting from her new assignments").  "Purely subjective injuries, such as dissatisfaction . . . public humiliation, or loss of reputation are not adverse actions."  *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006); *see also Patterson*, 505 F.3d at 1298.

Ms. Davis's temporary assignment to review HSR materials caused her no tangible harm. HSR review was typically handled by a GS-15 level attorney within the Litigation II unit, and thus was not a task below Ms. Davis's job level.  *See* Tierney Decl. at 12.  Indeed, the GS-15 attorney who previously performed HSR review affirmatively requested that responsibility.  *See* Davis Decl. at 18.  Performing HSR duties did not affect Ms. Davis's salary, benefits, or grade. It also did not impede Ms. Davis's future career opportunities.  *Compare* Exh. 13, Standard Form 50 Effective January 7, 2007 (showing Plaintiff is a GS-15 step 10 *with* Compl. ¶ 6.  To the contrary, she was assigned to be the lead attorney for the investigation of a multi-billion dollar transaction immediately *after* performing HSR review.  *See* Petrizzi Decl. at 19.  Ms. Davis may

23

have considered HSR review a "lesser" role, but that subjective assessment is not enough to make the assignment "adverse." *See Patterson*, 505 F.3d at 1298; *Mills v. Winter*, 540 F. Supp. 2d 178, 186-87 (D.D.C. 2008).

The short duration of Ms. Davis's review of HSR filings further undermines her attempt to characterize the assignment as an adverse action. The assignment lasted only four weeks, after which Ms. Davis became lead attorney on a new investigation, and resumed her prior role on LT II investigations. A reasonable employee would not consider that brief change in assigned tasks to be a hardship, let alone a deterrent to pursuing protected activity. *See Anderson v. The Foster Group,* 521 F. Supp. 2d 758, 780 (N.D. Ill. 2007) (one month assignment requiring plaintiff to work at jail once a week was not adverse even if plaintiff had nothing to do while there); *Burlington*, 548 U.S. at 68 (noting the importance of "separate[ing] significant from trivial harms").

### B. Defendant Had A Legitimate Non-Discriminatory Reason To Assign the HSR Review to Plaintiff.

Defendant had compelling non-discriminatory reasons to assign Ms. Davis to review HSR filings for four weeks. *Barnette v. Chertoff*, 453 F.3d 513, 516 (D.C. Cir. 2006). Suzanne Morris, a GS-15 Litigation II trial attorney, typically reviewed HSR filings, and had performed that role for approximately seven years. *See* Davis Decl. at 17-18; Petrizzi Decl. at 19. However, the workload for the review of HSR filings increased in March, 2007, and Ms. Morris needed temporary assistance to review those filings. *See* Petrizzi Decl. at 18-19. Ms. Morris also had scheduled a 10-day vacation in early April. *See id.* At that time, Ms. Davis was the only GS-15 attorney who was not assigned to an investigation, and therefore was available to assist with HSR filings. *See id.* As Ms. Petrizzi has explained, "Davis's assignment to review

HSR filings was a temporary assignment based on (1) an increase in the number of HSR filings and (2) the need for an experienced attorney to review HSR filings during Ms. Morris's planned vacation, in advance of which a transition period was helpful." *Id.* at 19. There is no basis to question the legitimacy of that decision.

To rebut Defendants' legitimate non-discriminatory reasons, Ms. Davis must proffer evidence sufficient to establish that Defendant's rationale was "not its true reason[ ], but w[as] a pretext for discrimination." *Barnette*, 453 F.3d at 516 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (internal quotation marks omitted)). It is "not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible[,] rather []he must show that the 'explanation given is a phony reason.'" *Fischbach v. D.C. Dept. of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citing *Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994)). Ms. Davis has not and cannot make any showing that Defendant's stated reasons are false and are intended to mask retaliatory discrimination.

## CONCLUSION

For the foregoing reasons, Defendant requests that the Court: (1) dismiss the discrimination claims involving Plaintiff's loss of the lead attorney role; (2) award summary judgment to Defendant on the discrimination claims involving Plaintiff's 2006 performance rating; and (3) award summary judgment to Defendant on Plaintiff's retaliation claim.

Dated: August 18, 2008                    Respectfully submitted,

                    _____/s/_____.
                    JEFFREY A. TAYLOR, D.C. BAR # 498610
                    United States Attorney

_____/s/_____.
 RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


_____/s/_____.
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198 Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| CAROLYN L. DAVIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case Number:  1:08CV00772 (HHK) |
| ) | |
| MICHAEL B. MUKASEY, United States ) | |
| Attorney General, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____ ) | |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rules 7(h) and 56.1, defendant Michael B. Mukasey, United States Attorney General, United States Department of Justice ("DOJ") hereby submits the following statement of material facts as to which there is no genuine dispute.

1.  Carolyn Davis ("Plaintiff") is a GS-15, step10 trial attorney with the Litigation II ("LT II") Section of the Antitrust Division of DOJ, located in Washington, DC.  Exh. 1, Affidavit of Carolyn Davis ("Davis Decl.") at 3.  Plaintiff is an African American, female, who was 55 years of age at the filing of her administrative EEO complaint.  *Id.* at 1-4.  Plaintiff was employed with the Antitrust Division from 1981-1984, and returned to the Division in 1994.  *Id.* at 3.

2.  LT II is responsible for the enforcement of the antitrust laws with regard to mergers and acquisitions in unregulated industries.  Exh. 2, Interrogatory of Maribeth Petrizzi ("Petrizzi Decl.") at 2.  The Section reviews, investigates and litigates a large variety of

industries including defense, banking, and heavy industrial equipment aggregate and waste industries. *Id.* at 2-3.

3. Merger investigations typically begin when LT II receives notice of a potential acquisition, after which the Division has a statutorily defined time limit in which to conduct an investigation of a proposed acquisition that appears to be potentially anticompetitive, in violation of the antitrust laws. Petrizzi Decl. at 4.

4. Plaintiff held different roles on the investigations to which she was assigned as a trial attorney in LT II. Davis Decl. at 23-24. She served as lead attorney on some investigations, and held different roles on other cases. *See id.*; Exh. 3, Interrogatory for James Tierney ("Tierney Decl.") at 3.

5. In February, 2002, Maribeth Petrizzi, (white female), became Assistant Chief of LT II. Petrizzi Decl. at 3. In 2003, Ms. Petrizzi became Chief of LT II. Davis Decl. at 3; Petrizzi Decl. at 2. James Tierney (white male) was Assistant Chief from November 2003 until he left LT II in May 2006. Petrizzi Decl. at 1-3; Tierney Decl. at 1-4. Following Mr. Tierney's departure, Dorothy Fountain became the Assistant Chief of LT II. The Chief and Assistant Chief shared supervision of the LT II attorneys, although Ms. Petrizzi was the rating official. Petrizzi Decl. at 3; Tierney Decl. at 4.

6. During discussions regarding upcoming assignments for the 2005/2006 rating period, Plaintiff told Ms. Petrizzi and Mr. Tierney that she would like the opportunity to serve as lead attorney on an investigation. Petrizzi Decl. at 5. In response to that request, Ms. Petrizzi and Mr. Tierney assigned Plaintiff as a lead attorney to the Amsted/FMI transaction in December 2005. *Id.*

7. Between December 2000 and the date on which Plaintiff was assigned to be the lead attorney to the Amsted/FMI transaction, Plaintiff had served as lead attorney on two other investigations.  Davis Decl. at 23-24; Tierney Decl. at 3.

8. On May 12, 2006, Ms. Petrizzi and Mr. Tierney removed Plaintiff from the role of lead attorney on the Amsted/FMI investigation.  Tierney Decl. at 7.

9. Ms. Petrizzi has testified, under penalty of perjury, that she removed Plaintiff from that role because she and Mr. Tierney were dissatisfied with Plaintiff's performance and had doubts about her ability to make an effective presentation to Amsted.  Petrizzi Decl. at 7-9.

10. At Plaintiff's request, she remained on the Amsted/FMI investigation, after being replaced as lead attorney.  Petrizzi Decl. at 7-8.

11. Prior to the 2004/2005 rating cycle, for non-bargaining unit employees, the Antitrust Division employed a two-tiered rating system with rating levels of Unacceptable and Exceed or Meets Expectations.  Petrizzi Decl. at 11.  In 2004/2005 a five-tiered system was instituted, with ratings of Unacceptable, Minimally Satisfactory, Successful, Excellent, and Outstanding.  *Id.*

12. On December 12, 2006, Ms. Petrizzi issued Plaintiff's annual performance appraisal, rating her performance as "Minimally Satisfactory."  Exh. 4, Employee Rating Form, Oct. 1, 2005 to September 30, 2006 ("2006 Rating").  Plaintiff was evaluated as "Successful" in the Critical Elements of Quality of Analysis and Representation of Division Interests, and as Minimally Satisfactory in Research, Investigation, and Litigation; Writing; Negotiations and Oral Presentations; and Diligence, Dependability and Adherence to Office Policies.  *Id.*

3

13. Ms. Petrizzi based her rating on her assessment of Plaintiff's performance on the Amsted/FMI investigation.  Petrizzi Decl. at 3, 8.  Ms. Petrizzi found that Plaintiff did not perform effectively in bringing the investigation to a close, nor did she perform at a level commensurate with the expectations of a GS-15 step 10 attorney.  *Id.*

14. On or about January 12, 2007 Ms. Petrizzi assigned Plaintiff as lead attorney on a new matter.  Petrizzi Decl. at 18.  The matter concluded in February 2007.  *Id.*

15.  On January 25, 2007, Plaintiff contacted an Equal Employment Opportunity ("EEO") counselor alleging that she was given a performance rating of minimally satisfactory because of her race, age and sex. Exh. 7, EEO Counselor's Report.  Plaintiff's December 13, 2006 performance rating was the only employment action identified as a "claim" in the EEO Counselor's report.  *Id.*

16. During the week of March 11, 2007, LT II  began to experience an increase in the number of Notification and Report Forms, filed pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (HSR Act).  Petrizzi Decl. at 17-18.  These forms, filed with the Federal Trade Commission and the Antitrust Division give notice of certain proposed mergers tender offers, or other acquisition transactions. *Id.*  The Antitrust Division reviews the forms, referred to as HSR filings, to ensure that the proposed transaction does not violate antitrust law.  *Id.*

17. LT II assigns an experienced attorney to review HSR filings to assess whether the proposed transactions are violative of the antitrust laws.  Petrizzi Decl. at 18.  Within LT II, review of HSR filings was typically done by GS-15 level attorneys.  Tierney Decl. at 12.  The majority of LT II investigations are opened on the basis of information received in HSR filings.  Petrizzi Decl. at 18.

4

18. Suzanne Morris, a GS-15 attorney (white female) was the LT II attorney primarily assigned to review HSR filings. Petrizzi Decl. at 19. Due to the increase in HSR filings and because of an impending 10-day period of annual leave that was to occur in early April, Ms. Morris needed assistance reviewing the HSR filings. *Id.* at 19-20.

19. As the matter to which Plaintiff had been assigned as lead attorney in January had concluded, she was available to assist in the review of HSR filings. Petrizzi Decl. at 18-19. On March 14, 2007, Plaintiff was given the temporary assignment of assisting in the review of HSR filings. *Id.* at 19-20. Ms. Petrizzi anticipated that at least one of the HSR transactions would lead to an investigation, to which she planned to assign Plaintiff as lead attorney. *Id.* at 20; Exh. 12, Electronic Mail Message from Maribeth Patrizzi to Carolyn Davis dated April 16, 2007.

20. Plaintiff's responsibilities for reviewing HSR filings concluded on or about April 16, 2007. Exh. 12; Petrizzi Dec at 20**.**

21. Plaintiff's salary, benefits, and position title did not change while she was assigned responsibilities for reviewing HSR filings. *Compare* Exh. 13, Standard Form 50 Effective January 7, 2007 (showing Plaintiff is a GS-15 step 10 *with* Compl. ¶ 6.

22. Plaintiff filed a formal complaint of discrimination on April 5, 2007, alleging that because of her race, age, and sex, she was removed as lead attorney on the Amsted/FMI investigation and given a performance rating for 2005/2006 of "Minimally Satisfactory;" and that in reprisal for her EEO activity, she was assigned HSR filings. *See* Exh. 8, Notice of Receipt of Formal Complaint; Exh. 9, Notice of Partial Acceptance of EEO Complaint. The DOJ Justice Management Division EEO Office issued a Notice of Partial Acceptance of the Complaint; it found that the claim regarding removal from the

lead attorney position in Amsted was not timely brought to the attention of an EEO counselor, and was therefore not accepted for investigation. *See* Exh. 9.

23. Ms. Petrizzi assigned Plaintiff as lead attorney for the investigation of a multi-billion dollar transaction on May 7, 2007. Petrizzi Decl. at 19.

24. For the rating cycle ending on June 30, 2004, Plaintiff received a performance rating of "Exceeds or Meets Expectations." Exh. 11, Employee Rating Form, July 1, 2003 to June 30, 2004.

25. For the rating cycle ending on September 30, 2005, Plaintiff received a performance rating of Successful. Exh. 5, Employee Rating Form, July 1, 2004 to September 30, 2005.

26. For the rating cycle ending on September 30, 2006, Plaintiff received a performance rating of "Minimally Satisfactory." 2006 Rating at 3.

27. In 2006, supervisors in the Antitrust Division received a memorandum regarding incentive awards. Exh. 10, Memorandum RE: Incentive Awards. Employees whose ratings were Excellent or Outstanding were eligible for Sustained Superior Performance Awards ranging from $500 to $5,000. *See id.*

28. Special Act Awards, which required specific nominations, allowed supervisors to nominate employees for specific acts, and could be awarded even if the employee's overall performance did not warrant a Sustained Superior Performance Award. Exh. 10 at 2-3. Special Act Awards could not be proposed for employees with "Minimally Satisfactory "or "Unacceptable" ratings. *See id.* Supervisors were instructed that only the top three-fourths of employees should be nominated for any type of award. *Id.* at 2.

29. Plaintiff received a Sustained Superior Performance Award in the amount of $2000 in

   2001.  Exh. 14, Declaration of Lhatoya Reed, ¶ 3.  She has not received any performance

   awards since that time.  *Id.*

Dated: August 18, 2008                      Respectfully submitted,


   _____/s/_____.
   JEFFREY A. TAYLOR, D.C. BAR # 498610
   United States Attorney


   _____/s/_____.
   RUDOLPH CONTRERAS, D.C. BAR #434122
   Assistant United States Attorney


   _____/s/_____.
   ROBIN M. MERIWEATHER, D.C. Bar. # 490114
   Assistant United States Attorney
   555 Fourth St., N.W.
   Washington, D.C.  20530
   Phone: (202) 514-7198 Fax: (202) 514-8780
   Robin.Meriweather2@usdoj.gov

EXHIBIT 1

| EQUAL EMPLOYMENT OPPORTUNITY PROGRAM | | Case No. | OBD-2007-00155 | | | Exhibit No. D-1 |
|---|---|---|---|---|---|---|
| **AFFIDAVIT** | | Name of Complainant: Carolyn Davis | | | | |

| PERSON MAKING STATEMENT | | | | | | |
|---|---|---|---|---|---|---|
| Name: | Position: | | | | | |
| Employer (organization and address): United States Department of Justice | Place of Interview: Telephonic | Race African American | Color Black | Sex F | Age 55 | Religion |
| | | National Origin: | | | | |
| | | Physical or mental handicap: | | | | |
| | Date: 6/27/2007 | Time: | | | | |

EXAMINATION BY EEO INVESTIGATOR ROBERT W. STAMER, JR.:

Q:    Ms. Davis, on April 5, 2007, you filed an EEO complaint alleging discrimination against you by Mary Beth Petrizzi, the Chief of the Litigation II Section and Mr. James Tierney, the Assistant Chief. You claimed you were discriminated against because of your race, which is black, your sex, which is female, and your age, which is 55, when you received a minimally satisfactory rating on your 2005/2006 annual performance appraisal. This rating period covered October 1, 2005 through September 30, 2006. You maintained that you received your minimally satisfactory rating on December 12, 2006 and then management discussed the rating with you on December 13, 2006. You also alleged that management retaliated against you for initiating the EEO process on January 25, 2007 when your duties were changed on or about March 14, 2007 to include the review of HSR filings. You need to respond as accurately and truthfully as possible. I need to notify you that although your statement is going to be confidential to a certain degree and it will be maintained in its

**AFFIDAVIT OF CAROLYN DAVIS- continued**

investigative file, individuals with the legal right to know will have access to your statement. Are you aware of that?

A:    Yes.

Q:    Also, since this is a telephone affidavit, I need to notify you that I am recording this statement to be transcribed by legal typist. Are you aware of that?

A:    Yes.

Q:    Please provide your full name for the record and spell it.

A:    CAROLYN L. DAVIS.

Q:    Do you swear or affirm that the information you will provide in this interview will be true and correct to the best of your recollection, knowledge and belief?

A:    Yes.

Q::   Do you wish to have an Attorney or representative present with you for this interview?

Q:    No.

**AFFIDAVIT OF CAROLYN DAVIS- continued**

Q:    Please provide the name of the agency you are employed with, your title and grade, and the period of time you worked for that agency.

A:    I work for the United States Department of Justice, Antitrust Division. I'm a Trial Attorney, my Grade 15, Step 10. I worked there from 1981 to 1984. I graduated from law school in 1981 and came there then. Then I came back in 1994, and I've been in this position since 1994.

Q:    Who is your first- and second-line supervisors and for which periods of time have they been your supervisors?

A:    Currently, Maribeth Petrizzi is the Chief of the Litigation II Section of the Antitrust Division to which I am assigned. Maribeth Petrizzi has been in that position for three and a half years, maybe a little bit more. Dorothy Fountain is the Assistant Chief and she's been Assistant Chief I believe since July of 2006 and before she was Assistant Chief, James Tierney was Assistant Chief of the Litigation II Section for three and a half years.

Q:    Mr. Tierney was your first-line supervisor?

A:    I think Maribeth Petrizzi is considered first line, and Assistant Chiefs assist chiefs such as Ms. Petrizzi, but I'm not sure about that. As far as I know, Mr. Tierney was delegated day to day supervision of the AMSTED/FMI investigation.

**AFFIDAVIT OF CAROLYN DAVIS- continued**

Q:    For what period of time was Mr. Tierney your supervisor?

A;    For approximately three years and a half until he left last year.

Q:    When did he leave?

A:    I believe it might have been, I might have the month wrong, but I was thinking he left in July and Dorothy Fountain took his position in July.

Q:    And that would be July of 2006?

A:    July of 2006.

Q:    What is your race?

A:    Black.

Q:    What is your sex?

A:    Female.

Q:    And what is your age?

**AFFIDAVIT OF CAROLYN DAVIS- continued**

A:      55.

Q:      You claim you were discriminated against because of your race, sex, and age when you received a minimally satisfactory rating on your 2005/2006 annual performance appraisal. Why do you think this rating was an act of discrimination?

A:      Well the overall rating of minimally satisfactory, the rating of job elements as minimally satisfactory and the comments to those elements really are a pretext for Ms. Petrizzi's and Mr. Tierney's attempt to justify their earlier race, sex, and age discrimination against me when they removed me from the Lead Position of the AMSTED/FMI investigation and replaced me with a young, white, male Attorney. The investigation record demonstrates that I developed, managed and led this important investigation understaffed and virtually without supervision and that my leadership, management and development of the investigation to point when the parties initiated discussions of possible remedies in lieu of litigation far exceeded minimally satisfactory. Section management rejected my attempts to discuss important aspects of the investigation and generally treated me in a dismissive manner creating a hostile working environment. Younger , white attorneys, particularly male, who perform as I did in leading the AMSTED/FMI investigation receive overall ratings and ratings on individual job elements that far exceed minimally satisfactory. The discriminatory rating and removal of me from the Lead Position of the AMSTED/FMI investigation were not based on my performance, but on differences in my race, sex and age. I provide more detail to these claims in Attachment I to my complaint.

**AFFIDAVIT OF CAROLYN DAVIS- continued**

Q:    Which specific management officials are you alleging are responsible for this act of discrimination you allege and what specific role did they each have in the discriminatory act?

A:    Ms. Petrizzi and Mr. Tierney both were my supervisors during the 2005/2006 rating period and so they were both responsible for supervising my work during that period and for giving me the performance evaluation for that period.

Q:    You're claiming that your performance was better than minimally satisfactory, is that correct?

A:    Yes.

Q:    Which elements of your appraisal do you take issue with, specifically, if you can explain that generally.

A:    I take issue with the overall rating, which was a minimally satisfactory. I also take issue with the rating of job elements 1, 3, 6, and 4 as minimally satisfactory, as well as the comments that were made to job elements 1, 3, 6, and 4.

Q:    Are these issues discussed in your attachment that you submitted along with your complaint?

**AFFIDAVIT OF CAROLYN DAVIS- continued**

A:    Yes, they are in detail.

Q:    In May 2006, you were removed from the Lead Attorney position on the AMSTED/FMI investigation. Do you feel this was a factor related to the rating you were given in December 2006, and if so, what impact do you feel it had on your rating?

A:    Well I believe that the removal was discriminatory in and of itself and the rating is an attempt to justify the removal, and I go into great detail in my complaint and the attachment to my complaint explaining why I believe this. I also respond to this question on page 5 of this affidavit.

Q:    What were you told was the reason you were being removed as the Lead Attorney from the AMSTED/FMI investigation?

A:    I was told that they didn't like my work on the investigation, but they provided no rational justification for that.

Q:    How long had you been the Lead Attorney on this AMSTED/FMI investigation before you were removed?

A:    Since December 2005. I developed the case from a complaint that came in from an outside complainant and so I developed, when I say I developed it, I took in the complaint, did

AFFIDAVIT OF CAROLYN DAVIS- continued

research on it, found that there was an issue, and presented that issue to management and worked the case up until the parties began to raise with me possible remedies to avoid litigating this matter.  It was at that time that they removed me from the Lead Position.

Q:    When you say they removed you, who specifically removed you?

A:    It was the decision of Maribeth Petrizzi, the Chief of the Litigation II Section, and I assume that the Assistant Chief had some input into that.

Q:    The Assistant Chief...

A:    Mr. Tierney.

Q:    What, specifically how were you notified of this, were you, was there a meeting, called into their office?

A:    How was I notified of what?

Q:    That you were removed as the Lead Attorney.

A:    Ah yes, there was a meeting in Ms. Petrizzi's office, and she informed me that she was removing me from the Lead Position.

**AFFIDAVIT OF CAROLYN DAVIS- continued**

Q:    And was that when she told you the reason she was removing you?

A:    She gave me a reason, but she didn't provide any detail as to the reason.  The reason she gave was that she wasn't satisfied with my work, but she didn't provide any detail as to that dissatisfaction.

Q:    After you were removed from the Lead Attorney position and that investigation, what was your new assignment?

A:    I did not have, I was not given any other assignment during the 2005/2006 rating period.

Q:    So you continued working on the AMSTED/FMI investigation?

A:    I was still assigned to the AMSTED/FMI investigation, but I did not personally receive another assignment so I did what I could do on that case and that included taking a deposition in September of 2006 of ███████████████████████████████████████. I volunteered to take this deposition.

Q:    Who was given the Lead Attorney position in this investigation?

A:    A person named C. Scott Hataway.

**AFFIDAVIT OF CAROLYN DAVIS- continued**

Q:     What is his sex, race, and age?

A:     He is a male and his race is white, his age at the time was 31, and he was six years out of law

       school.

Q:     Was it unusual to put someone in that position with his experience in a Lead Attorney

       position?

A:     I wouldn't say unusual. What was unusual was that they removed me from the Lead Position

       and replaced me with Mr. Hataway.

Q:     Have you ever seen anyone removed from a Lead Attorney position in circumstances similar

       to yours?

A:     I have not.

Q:     Do you feel that your work on the AMSTED/FMI case was the sole issue that affected your

       appraisal, and if so, please explain.

A:     I don't. I actually don't feel that it was my work. My work was exemplary on that case. I

       feel that there were other reasons, unlawful reasons for my having been removed from the

       AMSTED case. They were interested in advancing Mr. Hataway's career. The rating was,

AFFIDAVIT OF CAROLYN DAVIS- continued

the minimally satisfactory rating, was an attempt to justify that discriminatory behavior.

Q:    So you feel that the reasoning that Ms. Petrizzi and Mr. Tierney used in removing you from the Lead Attorney position, they used that information in your appraisal which resulted in a minimally satisfactory, is that correct?

A:    Could you ask me that question again please?

Q:    They removed you from the Lead Attorney position because they weren't happy with your work is what you were told.  Do you feel that reasoning from them was the basis for your minimally satisfactory rating?

A:    I state again they told me that they were not satisfied with my work but that was not a rational decision; it was not rationally based because my work on that case was far above minimally satisfactory, but they were attempting to justify their having removed me from the Lead Position by giving me this minimally satisfactory rating.

Q:    Were you working on any other cases at the same time as the FMI/AMSTED case?

A:    No.

Q:    How many cases were you working on during the 2005/2006 rating year?

**AFFIDAVIT OF CAROLYN DAVIS- continued**

A:      Just AMSTED/FMI.


Q:      Do you or any Senior Attorney just work on one case at a time or is there sometimes more

        than one case being pursued by an Attorney?


A:      The typical situation is for an Attorney, a Lead Attorney, to be working on only one active

        case at a time.


Q:      Approximately what percent of the Attorney staff in your office are Senior Attorneys?


A:      At the time, could we go off the record on for a second?


A:      Yes.


Q:      I'll rephrase the question.  Approximately how many Attorneys work in your office?


A:      Approximately, at the time of the time of the AMSTED/FMI investigation and of the rating,

        I would say approximately 25 Attorneys.


Q:      Do you all have the same title and what is that title?


A:      We all have the same title and that title is Trial Attorney.

**AFFIDAVIT OF CAROLYN DAVIS- continued**

Q:    What percentage of the Trial Attorney staff would be Senior or have a greater amount of experience?

A:    I would say that about 10 attorneys including myself have over 25 years of experience.

Q:    Have you ever been told by either Ms. Petrizzi or Mr. Tierney that your performance was not up to expectations within the past three rating years, which would include the 2005/2006 rating year, and if so, when and what was discussed and/or decided if they ever discussed your performance in the past?

A:    The years prior to the 2005/2006 rating period I was not told, never told that my performance was not what was expected.  The 2005/2006 rating year I was told when they removed me from the Lead Position that they were not satisfied with my performance on that case and that was immediately before, within days before, they removed me from the position.

Q:    Had they discussed your performance or the way you were handling the case before that?

A:    No.  No, I mean the decision, the discussion and the removal all occurred within I would say 10 days of one another.

Q:    So you were never given a performance improvement plan or written up or your performance was documented by management in one way or the other during the?

**AFFIDAVIT OF CAROLYN DAVIS- continued**

A:    That is correct, I was never given such.

Q:    Were the performance elements for the 2005/2006 rating year different than from previous years?

A:    Not to my knowledge.

Q:    Did you hold the same position, description, had that changed?

A:    I held the same position.

Q:    As Trial Attorney?

A:    Yes.

Q:    Why do you feel that this rating that you're alleging is an act of discrimination was because of your race?

A:    On this investigation as I discussed with you, I developed the case and I led the case virtually without supervision. The investigation was understaffed with only one other attorney with two years experience assisting me. Moreover, Ms. Petrizzi and Mr. Tierney treated me in a dismissive and disrespectful manner as Lead Attorney on the case. When Ms. Petrizzi added

**AFFIDAVIT OF CAROLYN DAVIS- continued**

attorneys to the case about one week before she removed me from the Lead Position, she did not bother to inform me by telephone, email or face to face that additional attorneys had been added to the investigation. I learned of this development through a paralegal, which Ms. Petrizzi subsequently confirmed. Even with these handicaps, my leadership and management and development of the case were I would say exemplary; certainly it far exceeded minimally satisfactory. The details of what I did on the case are laid out on Pages 2 to 8 of Attachment I to my complaint. White, particularly male Attorneys who lead, develop, and mange investigations as I did on the AMSTED/FMI investigation are given the attention and respect from section management that facilitates the Lead Attorney's role in carrying out the responsibilities of that position. Moreover, they receive ratings on overall performance and individual job elements that far exceed minimally satisfactory. I was not given such.

Q:    Why do you feel the alleged act of discrimination, which was the rating, was because of your sex, your gender?

A:    Male Attorneys who lead, develop, and manage investigations as I did on the AMSTED/FMI investigation receive ratings on overall performance and individual job elements that far exceed minimally satisfactory, and as I did in answering the previous question, I refer you to Pages 2 through 8 of Attachment I to my complaint.

Q:    Why do you feel that the alleged action by management was because of your age?

**AFFIDAVIT OF CAROLYN DAVIS- continued**

A:    Even young Attorneys who have been given the opportunity to lead cases such as Mr.

Hataway, who had six years prior experience, who perform as I did are not treated as I was

and receive ratings that far exceed minimally satisfactory and again, I refer you to Pages 2

though 8 of my Attachment I to the complaint.


Q:    Other than your present EEO complaint, have you ever been involved in a prior protected

activity or filed an EEO complaint?


A:    No. In almost 30 years of working, I never initiated the EEO process. But the AMSTED/FMI

performance evaluation (2005/2006) and removal was so egregious that I felt as if I had been

beaten without cause into a corner and had to defend myself. Removing me from the Lead

Position of the AMSTED/FMI investigation was outrageous enough. Section Management

could not point to anything I did wrong on the investigation that would be supported by the

investigation record. I knew they unlawfully removed me from the Lead Position to advance

the career of this young, white, man. But then to try to justify the removal with what amounts

to a pack of lies in my 2005/2006 performance evaluation was too much to take. I have

worked hard to develop my knowledge base and skills as an attorney and to protect my

reputation and opportunities for advancement. And while it is clear that Ms. Petrizzi and Mr.

Tierney are not interested in or may even disdain the careers of African-American women, at

this point this suit gives me the best chance of being returned whole.


Q:    You have alleged that management retaliated against you for initiating the EEO process on

**AFFIDAVIT OF CAROLYN DAVIS- continued**

January 25, 2007, when your duties were changed on or about March 14, 2007, to include the review of HSR filings. What are HSR filings?


A:    HSR filings, HSR stands for the name of an act, which is Hart- Scott- Rodino-Act. That Act requires companies who want to acquire other companies that meet certain tests to file with the Department of Justice and the Federal Trade Commission (FTC) for approval to actually acquire the company. We receive HSR filings on a regular basis. The filings are reviewed to determine if a particular acquisition or merger presents an issue and if the acquisition or merger does present an issue, then management is notified and an investigation is opened. That is how an investigation starts through that route. I discussed one other route, when a complaint comes in, but this is another route that can initiate an investigation. That's what's known as a HSR filing.


Q:    Who normally reviews HSR filings?


A:    In the Litigation II Section, one person volunteered years ago to review HSR filings and that is the attorney responsible for reviewing the HSR filings. Suzanne Morris is her name. She has been assisted by Stephanie Fleming, an attorney with about 4 years of experience who has reviewed numerous HSR filings.


Q:    Is that all that she does?

**AFFIDAVIT OF CAROLYN DAVIS- continued**

A:    Yes. Well Ms. Morris handles the HSR filings and the processes involved in HSR filings. That's her main job.

Q:    The process is, that would be steps after the initial review?

A:    And also the steps involved in what is called contested filings. When I said the FTC also reviews these filings, often times when the Department of Justice and the Federal Trade Commission have concurrent jurisdiction over a matter, the Department of Justice and the FTC contest to get the investigation. She handles that process. That's also part of her job.

Q:    And she is a Trial Attorney?

A:    She is, but she volunteered for that position years ago.

Q:    Does the review of HSR filings require less experienced or less expertise than the work you had been doing previously?

A:    Well the review of HSR filings does not involve an investigation, which involves gathering evidence, interviewing, deposing, identifying and preparing witnesses for a possible trial. HSR review involves reviewing papers that the parties to a transaction have submitted relating to an acquisition or merger. You review the parties' filings, and if the transaction does not raise antitrust concern, then you indicate that it does not on a short form called a Premerger

Notification Analysis No Interest Form ("No Interest Form"). The form asks for certain information, including the name of the attorney completing it. It also requires a brief statement as to the reason the transaction does not raise an issue. See Exhibit I, attached. If the transaction being reviewed presents an issue, then the Chief assigns it to someone else to investigate and that's the difference. Ms. Morris reviews the filings and fills out No Interest Forms for those transactions that do not present an issue, which is the vast majority of HSRs reviewed. Only a fraction of the HSRs reviewed presents an issue that leads to an investigation. When a transaction does raise an antitrust issue, Ms. Morris advises Ms. Petrizzi of such and Ms. Petrizzi then assigns the investigation to an attorney to lead. So that is the difference, you are not leading an investigation or working on an investigation when you are assigned to review HSRs. Most attorneys want to lead investigations because of the experience and recognition one gets from leading. Even if not leading an investigation, most attorneys prefer the experience gained on an investigation to that of HSR review. You don't get the same level of experience that you get from leading or participating in an investigation when you are reviewing HSR filings filling out No Interest forms.

Q:    So the person does HSR reviews, they refer their findings to the Chief, which would be Ms. Petrizzi?

A:    Yes, if one of the reviewed transactions warrants investigation, the Chief, Ms. Petrizzi, assigns it to a lead attorney for investigation.

**AFFIDAVIT OF CAROLYN DAVIS- continued**

Q:    And if some, and if a case warrants investigation, Ms. Petrizzi would assign it.

A:    Yes.

Q:    You've claimed that your being assigned to review HSR filings was an act of retaliation. Explain why you feel that being assigned to review HSR filings was an act of retaliation.

A:    Well let me just refer you to Page 10 of my Attachment I to the complaint, and I go into detail as to why I believe it was an act of retaliation, but I will summarize and say that I had never been given the assignment of HSR review since Ms. Petrizzi became Chief and frankly, in Litigation II, Senior Attorneys, in particular those who lead or have a substantial role on investigations, generally are not given the assignment of reviewing a series of HSR filings. They may review an occasional one here and there, but not filing after filing. That has been the practice in the Litigation II Section. My male peers with 25 years experience or more might have occasionally reviewed HSR filings; but they have not been assigned the responsibility of reviewing one after the other as I was in March and April, 2007. Outside of the Banking Unit of Litigation II where attorneys regularly review HSR filings, Suzanne Morris has been responsible for review of HSR filings. She has been assisted recently by Stephanie Fleming. I understand from the EEO counselor that some time in February, I believe February 8, management became aware of my consultation with the EEO counselor. In March 2007, Ms. Petrizzi assigned me review of HSR filings for the first time.

**AFFIDAVIT OF CAROLYN DAVIS- continued**

Q:    You say that management became aware that you filed the EEO process.  Specifically who in management found and how do you feel or know that they were aware that you had filed an EEO complaint?


A:    I asked the EEO officer if management had been notified.  She said they had.  And she gave me the date.


Q:    So you feel that you being assigned to work HSR filings, review HSR filings, was somewhat a demotion from the type of work you had been doing?


A:    From the type of work I had been doing which was working on actual investigations, yes. Instead of being assigned to an investigation, I was put in a position of having to review HSR filing after filing and fill out No Interest forms.  And yes, I believe that assignment was in retaliation for my having initiated the EEO process.


Q:    Who notified you of your assignment to review HSR filings?


A:    Ms. Petrizzi did, along with Dorothy Fountain, who is the new Assistant Chief.


Q:    Which management officials are you alleging are responsible for this retaliatory act of discrimination?

**AFFIDAVIT OF CAROLYN DAVIS- continued**

A:    Ms. Petrizzi.

Q:    What did they tell you was the reason for this assignment?

A:    When they first gave me the assignment, they said it was so that I could be the first one to find an investigation, which they would then assign to me to lead.  Later, they said it was to relieve Suzanne Morris while she went on vacation.  An then later, Ms. Petrizzi announced in a Lititgation II Section Staff meeting that I had volunteered to review the HSRs.  I later made clear to Ms. Petrizzi in an email that I had not volunteered to review the HSRs, but completed the assignment upon her request.

Q:    So if you were going to be doing reviewing HSR filings and found the case warranted investigation, would you have had to refer that to Ms. Petrizzi?

A:    Yeah and I did.  I referred two of them to her when I was reviewing the HSRs.  And that's what I'm saying proves my point.  Even though they said initially that they gave me the assignment so that I could find an investigation which they then would assign to me, that did not happen.  Reviewing HSRs is not the typical way attorneys in the Section who lead investigations get them.  Typically, Ms. Petrizzi assigns an investigation to an attorney.  You get investigations by the Chief assigning you investigations whether they come in through a complaint, HSR filing or otherwise.  And what proves my point is that in the process of reviewing the HSR filings, I found two transactions that required investigation and Ms.

**AFFIDAVIT OF CAROLYN DAVIS- continued**

Petrizzi assigned them to other people.  The process of reviewing HSR filings was not as she

said to get cases; instead it was in retaliation for my having initiated the EEO process.

Q:    How many cases have you worked, for example, within the past five years approximately,

where you have been the Lead Attorney?

A:    Five years...

Q:    Or whichever time frame you have information on that you can recall?

A:    Are you asking how many cases prior to my having filed the EEO or to my having initiated

the EEO process?  Or are you asking me up to now?

Q:    Up to now.  Prior to the AMSTED/FMI investigation, how many cases had you been lead

investigation on?

A:    Before AMSTED/FMI?

Q:    Yes.

A:    Ok.  I think two.

**AFFIDAVIT OF CAROLYN DAVIS- continued**

Q:    Over what period of time?

A:    Well you said five years...

Q:    Five years.

A:    It was two cases. Ms. Petrizzi assigned me only one of the two.  The other case came before
she was made Chief of the Litigation II Section.  I worked on other cases and had substantial
responsibility on a few others, but not as Lead Attorney.  Even though I was qualified to lead,
the Antitrust Division and Ms. Petrizzi in particular has denied me opportunities I should have
had to lead investigations.  This denial, including the removal of me from the Lead Position
of the AMSTED/FMI investigation, the 2005/2006 Rating and the failure to give me any
monetary awards which often accompany leading cases, is part of a continuing pattern of
discrimination against me in favor of white, male attorneys.

Q:    What remedy are you seeking in this EEO matter?

A:    The remedy that I am seeking is stated pretty clearly in Attachment II to my complaint.  And
to summarize, I want my rating changed and upgraded.  I would like an agreement that
management will provide a favorable reference when requested by potential employers.  I
would like for management to cease and desist in race, sex, and age discrimination.  I am
seeking compensatory and punitive damages for pain and suffering resulting from intentional

**AFFIDAVIT OF CAROLYN DAVIS- continued**

infliction of emotional distress when they unlawfully discriminated against me in providing the rating and removing from the Lead Position of the AMSTED investigation to advance the career of a young, white, male attorney.

In addition, I have lost employment opportunities and the respect of my peers inside and outside the Department of Justice as a result of the rating and the removal. As a direct result of these actions, I have endured severe stress, including stress-induced balding and hair loss, anxiety and depression. Attached as Exhibit II is a photograph taken contemporaneous to the discriminatory actions discussed herein depicting the beginning of the balding I experienced as a direct result of the distress inflicted upon me by Ms. Petrizzi and Mr. Tierney during the 2005/2006 rating period. I had never experienced stress-induced baldness or baldness or hair loss of any type prior to the incidents described herein.

Q:    Do you have any witnesses you wish to name that you feel can provide testimony to support your allegations in this matter? If so, please provide their names.

A:    This is not an exhaustive list but at this time, Karen Douglas.

Q:    And what's her title.

A:    I'm sorry. Her name is Karen Philips-Savoy.

Q:    And what is her title?

**AFFIDAVIT OF CAROLYN DAVIS- continued**

A:    Well she is an Attorney but she was, at the time of these actions during the 2005/2006 rating

period, a Trial Attorney in the Litigation II Section of the Antitrust Division, but she has since

left because of similar concerns.

Q:    And are there other witnesses you'd like to name at this point?

A:    Yes.  Thomas J. Horton

Q:    Is there any information that you'd like to add to this statement that you feel is relevant to the

issues that we've discussed that we haven't touched on, until this point?

A:    No I don't think so.  I would just would like to include as an attachment, the information that

I gave to the EEO office, EEO counselor but that may be included anyway.

Q:    Very well.  Is there any additional information that you'd like to add to this statement?

A:    Not at this time, but I'd like to reserve the opportunity to add information if I think of

something that I missed.

Q:    That's fine, you'll have an opportunity to review your affidavit and make modifications if

necessary.

**AFFIDAVIT OF CAROLYN DAVIS- continued**

A:          I'd like to add that after initiating the EEO process, I stated to the EEO counselor, Ms.

Gray-Flowers, that I was willing to meet with management to resolve this matter.  That

discussion took place in March and included Ms. Petrizzi, Mr. Tierney and Dorothy Fountain,

but no one above Litigation II Section management.  There was no attempt made on the part

of management to resolve this matter in the discussion.  Ms. Petrizzi attempted to defend the

rating by stating that I was slow in leading the case and referenced the month of March 2006

in particular.

          There is no factual basis for her statement that I was slow in leading the case.  In March

2006, I issued subpoenas/Civil Investigative Demands ("CID's) for documents and information

to the parties, Amsted, Progress Rail and FMI.  As discussed more fully in Attachment I to the

Complaint, ███████ slow, improper or lack of response to the CID hampered the

investigation.  We did not receive information from Amsted sufficient for Dr. Pittman to begin

his economic analyses of the issues until early May 2006 when I was removed from the Lead

Position.  The investigation record shows that I made numerous attempts to obtain a fully

compliant response from ███████ and while waiting for the response I addressed the issues of

the case by conducting appropriate interviews of suppliers, customers and the industry trade

association; conducting and reviewing research; addressing third-party issues; conducting a

plant tour; and engaging the team in projects involving the issues in the case.  Ms. Petrizzi's

statement that I was slow in handling the investigation is an attempt to fabricate a justification,

which is not borne out by the facts of the investigation, for the discriminatory removal and

performance evaluation.  In fact, Ms. Petrizzi and Mr. Tierney's failure to attend to and discuss

the investigation with me so that Staff would know whether the investigation would proceed

**AFFIDAVIT OF CAROLYN DAVIS- continued**

or close, among other things, slowed down my ability to engage the parties when they initiated discussions of a remedy in lieu of litigation and the discussions Dr. Pittman would undertake with his superiors.

I might add that Amsted never complied with the CID even after I was removed from the Lead Position and replaced by Mr. Hataway.


Q:    If there's nothing else that concludes the interview.



(conclusion of interview)

-o0o-

Pursuant to Title 28 U.S.C. Section 1746, I declare, under penalty of perjury, that the foregoing statement is true and correct to the best of my recollection.

I have read the above statement consisting of 11 pages and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to interested parties.


_____        7/30/07
Affined's signature                                Date signed

_____        8-1-07
EEO Investigator                                   Date signed



**Page 28 of 28**

## PRIVACY ACT NOTICE TO COMPLAINANT
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview in derived from one or more of the following:  Title 5, Code of Federal regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5 United States Code, Section 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted for federally conducted programs or services.  This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination.  The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to EEO Commission activities, to the intelligence agencies of the Federal Government or to others for uses as published in the Federal register.

### EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary.  However, failure to furnish the information will result in your complaint being returned without action and being recommended for cancellation for failure to prosecute.

_____          _____
Signature of Investigator                Signature of Affiant

                                         8/27/07
                                         Date

29

EXHIBIT 2

EX D-2

UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION

| | | |
|---|---|---|
| Carolyn Davis | * | |
| | * | |
| Complainant, | * | |
| | * | |
| | * | Agency Case Number: OBD-2007-00155 |
| | * | |
| U.S. Department of Justice (DOJ) | * | |
| Antitrust Division | * | |
| Litigation II Section | * | |
| 1401 H Street N.W., Suite 8802 | * | |
| Washington, DC 20005 | * | |
| | * | |
| Agency. | * | |

---

### INTERROGATORY FOR MARIBETH PETRIZZI, RMO

---

Question:    Please provide your full name for the record.

Answer:    Maribeth Petrizzi

Question:    You have been named as a Responsible Management Official in an EEO complaint filed by Carolyn Davis, a Trial Attorney under your supervision based on her allegation that you discriminated against her because of her race, sex and age. Do you swear or affirm that the information you will provide in this interview will be true and correct to the best of your recollection, knowledge, and belief?

Answer:    I do.

Question:    Please provide your race, sex and age.

Answer:    Caucasian, Female, 42

1

Question:    Have you previously been involved in the EEO process, either as a responding management official, complainant or witness?

Answer:      No.

Question:    Please state your present job title, grade, the period of time you have been in that position, the agency you work for, and your specific duty location.

Answer:      Chief, Litigation II; SES; September 5, 2003 to present (three years, 10 months); U.S. Department of Justice, Antitrust Division; Washington, DC.

Question:    How long have you worked for the Antitrust Division?

Answer:      Approximately nine years (July 20, 1998 to present).

Question:    How long have you worked for the federal government?

Answer:      My official service computation date is May 27, 1993; thus, I have worked for the federal government for fourteen years in total. However, this service is not continuous service–I worked for the Federal Trade Commission from October 1990 until November 1995, and I have worked for the Department of Justice from July 1998 to the present.

Question:    What are your areas of responsibility and who do you supervise?

Answer:      Please see the description of all of my areas of responsibility in my Employee Performance Work Plan, attached as *Petrizzi Exhibit 1*.

             I supervise all of the attorneys who are employed in the Litigation II Section (Lit II). I also supervise the head secretary, a program information specialist and a financial analyst. I assist in the supervision of six other secretaries in the section, the paralegal supervisor and the paralegals who work in Lit II. A list containing all of the names of the aforementioned individuals is attached as *Petrizzi Exhibit 2.*

Question:    What type of work is conducted by the Litigation II Section under your supervision?

Answer:      Under my supervision, Lit II is responsible for the enforcement of the antitrust laws with regard to mergers and acquisitions in unregulated industries. It also handles some civil non-merger work in its assigned industries. Lit II reviews, investigates, and litigates matters in a large variety of industries, including the defense industry, banking industry, heavy industrial equipment, aggregate, and

2

waste industries. Lit II reviews its defense industry mergers in conjunction with the Department of Defense and with the applicable military branch affected by the proposed transaction or joint venture. In its review of banking mergers, Lit II works with the Federal Reserve Board, Federal Deposit Insurance Corporation, and the Office of the Comptroller of the Currency. In any review of transactions affecting regional economies, the Lit II Section works closely with the relevant State Attorneys General.

Question:    Do you know Carolyn Davis, Trial Attorney? If so, for how long and in what capacity have you been associated with her during your period of acquaintance?

Answer:    I have known Ms. Davis since July 1998, when I began my tenure at the Antitrust Division. As staff attorneys employed in the Merger Task Force, Ms. Davis and I were colleagues. In addition, Ms. Davis and I both worked on the first investigation to which I was assigned as a staff attorney in the Merger Task Force. In July 1999, the Merger Task Force was merged into Lit II. Ms. Davis and I remained colleagues as staff attorneys in Lit II from July 1999 until February 2002. In February 2002, I was promoted to the position of Assistant Chief of Lit II. At that time, I became one of Ms. Davis's supervisors, along with the Chief of Lit II, J. Robert Kramer. In September 2003, I became the Chief of Lit II; in that capacity, I continue to be one of Ms. Davis's supervisors.

Question:    What are Ms. Davis' job responsibilities and who is his immediate supervisor?

Answer:    For a full description of Ms. Davis's responsibilities, please see her 2005-2006 Employee Performance Work Plan, which is attached as *Petrizzi Exhibit 3*.

Currently, I supervise Ms. Davis, as does Dorothy B. Fountain, Assistant Chief of Lit II. From November 2003 to May 2006, I supervised Ms. Davis in conjunction with James J. Tierney, the former Assistant Chief of Lit II.

Question:    Who was Ms. Davis' immediate supervisor for the rating period 2005-2006?

Answer:    I supervised Ms. Davis during the entire 2005/2006 rating period. From October 1, 2005 until May 31, 2006, as Assistant Chief of Lit II, James J. Tierney also supervised Ms. Davis. From June 2006 through July 2006, the position of Assistant Chief for Lit II was vacant; therefore, during that period I was Ms. Davis's only immediate supervisor. In August 2006, Ms. Fountain assumed the position of Assistant Chief of Lit II, becoming one of Ms. Davis's supervisors.

Question:    Did Mr. Tierney serve as a supervisor of Ms. Davis during the 2005/2006 rating period, and if so, during what time period?

3



Answer:        Yes, Mr. Tierney served as a supervisor of Ms. Davis from October 1, 2005 (the first day of the 2005/2006 rating period) through May 31, 2006.

Question:      Ms. Davis alleges that because of her race (black), sex (female), and age (55), she received a "minimally satisfactory" rating on her 2005/2006 annual performance appraisal (rating period October 1, 2005 - September 30, 2006). Are you aware of that?

Answer:        Yes, I became aware of that after Ms. Davis filed an informal EEO complaint.

Question:      As Ms. Davis' Rating Official for her 2005/2006 appraisal, please explain the factors that led you to give Ms. Davis a minimally satisfactory rating for the 2005/2006 rating year?

Answer:        When preparing an employee's annual performance appraisal, a rating official considers several factors, including the employee's work plan (Ms. Davis's 2005/2006 Employee Performance Work Plan is attached as *Petrizzi Exhibit 3*); ATR Directive 1430.1–Performance Appraisal (attached as *Petrizzi Exhibit 4*); the criteria for evaluation for the relevant grade level of the attorney (see discussion of GS-15 criteria in ATR Directive 1335.2, attached as *Petrizzi Exhibit 5*); and the employee's performance on all of the matters to which she was assigned. The rating official reviews the employee's performance throughout the rating year, not just at the end of the year in the written performance appraisal. As the rating official, I gauge the employee's performance through my own review of her written work and her oral presentations and briefings. In addition, the assessment of an employee's performance reflects input from the Assistant Chief and from the employee's colleagues who have worked with the employee on an investigative team during the rating period.

               Ms. Davis is a GS-15 attorney; as such, she is expected to assume responsibility for the most difficult matters in the section, and she is expected to "perform with no more than minimal supervision as to the strategy and tactics adopted in the course of fulfilling such as assignment." *See* ATR Directive 1335.2, attached as *Petrizzi Exhibit 5*. All of the factors considered for Ms. Davis's 2005/2006 performance appraisal including, in large part, her inability to perform effectively at the GS-15 level, resulted in a Minimally Satisfactory rating for Ms. Davis's overall performance.

               Typically, a merger investigation begins when the Antitrust Division–Lit II, specifically–receives notice of a potential acquisition through the Hart-Scott-Rodino (HSR) premerger notification process (for a description of this process, see below), after which the Division has a statutorily defined time in which to conduct an investigation of a proposed acquisition that appears to be potentially

anticompetitive, in violation of the antitrust laws. Though it does not receive prior notification of them, the Division also may investigate acquisitions that are not subject to the premerger notification process. The Amsted/FMI transaction was not subject to premerger reporting requirements and, when Lit II received notice of that transaction, the acquisition already had been consummated—the parties already had merged and had begun to commingle their assets. Investigations of consummated transactions must be conducted more rapidly because, if the transaction was anticompetitive, the anticompetitive effects have begun and they continue during the pendency of the investigation. Equally important, the longer the investigation of the transaction, the more likely the commingling of assets, making separation of the assets more difficult in the event that the investigation finds that the transaction indeed was anticompetitive.

Although, prior to the 2005/2006 rating year, I had given Ms. Davis opportunities to lead investigations, those investigations were short-lived, as the Division concluded relatively quickly that the subject transactions did not violate the antitrust laws. During the discussion with Ms. Davis of her 2004/2005 performance appraisal, in response to Mr. Tierney's and my inquiry about the type of work she would like to do during the upcoming 2005/2006 rating year, Ms. Davis indicated that, because she had not previously had the opportunity to lead an investigation, she would like that opportunity. Mr. Tierney and I responded that we would look for lead opportunities for Ms. Davis. When we received a customer complaint regarding the Amsted/FMI transaction, we immediately thought to offer the investigation of that transaction to Ms. Davis. Analytically, the Amsted/FMI investigation was quite simple. Prior to the merger of these two companies, they were the only two companies manufacturing a particular product; after their merger, a single company would be manufacturing that product. Thus, the acquisition was a merger resulting in a monopoly. As such, the acquisition was the easiest type of transaction to analyze, and the applicable legal and economic theories could not have been more straightforward.

The initial aspects of most investigations are similar. Typically, the lead attorney develops an investigative plan and works with her team to execute the plan. All lead attorneys, from new lead attorneys at the GS-12 level to experienced GS-15-level attorneys, begin an investigation in this manner. The critical difference between most GS-15 attorneys and most GS-12 attorneys is how they conduct the investigation once the investigation progresses beyond the preliminary phase. For the first two months of the Amsted/FMI investigation, Ms. Davis conducted a satisfactory investigation. Although the investigation did not advance as quickly as an investigation of a consummated transaction should have, Ms. Davis and her team conducted interviews of the critical industry participants, and they started gathering relevant information from Amsted and FMI and from customers and other industry participants.

5

The problems with Ms. Davis's leadership of the Amsted/FMI investigation appeared when she clearly was unable to bring the investigation to a successful conclusion. For example, Ms. Davis's investigative plan identified a need for a case recommendation memorandum to be submitted to Mr. Tierney and myself no later than April 30, 2006. By the beginning of May 2006, Ms. Davis had not provided Mr. Tierney or me with a recommendation; rather, Ms. Davis's practice was to provide us with a brief outline of her case that was no different than the outline she could have presented in January 2006, prior to conducting a three-month investigation. When we questioned Ms. Davis about the points in her outline, Ms. Davis often could not answer our questions. More often, she was unable to answer questions that she should have resolved much earlier in the investigation. One critical example of this problem occurred after one of the many meetings that Mr. Tierney and I had with Ms. Davis. At that meeting, Ms. Davis suggested that perhaps the Antitrust Division should seek rescission of the transaction, or at least asset divestitures to remedy the anticompetitive effects of the transaction. This type of generalized recommendation is obvious for any consummated transaction, even prior to an investigation of the transaction. After mentioning this generalized remedy, Mr. Tierney and I asked her about the availability of assets for possible divestiture; Ms. Davis was unable to answer the question. Ms. Davis should have known this critical piece of information within weeks of opening her investigation, and certainly prior to suggesting the possibility of a divestiture four months into the investigation. As an even more glaring failure, after this discussion with Mr. Tierney and myself, when Ms. Davis asked Amsted about its assets and the assets acquired from FMI, she learned for the first time that Amsted no longer possessed any of the assets acquired from FMI and that, therefore, rescission of the acquisition or divestiture of the FMI assets would be impossible. Indeed, Amsted sold the FMI assets in April 2006, during the course of Ms. Davis's investigation.

These developments are some of the factors that triggered our concern that Ms. Davis did not have control of her investigation or an understanding of which direction the investigation should take. At this time, it had become obvious to Mr. Tierney and me that Ms. Davis had not been engaging Amsted in regular substantive meetings to discuss the status of her investigation and the concerns the Division had with the anticompetitive effects of the transaction. Engaging with the parties that are subject to an investigation is standard Antitrust Division practice, as formalized in the Division's Merger Review Process Initiative that was instituted in 2001 and revised in 2006. A copy of the Merger Review Process Initiative is included as *Petrizzi Exhibit 6.* Ms. Davis, and all other Division attorneys, have received a copy of these practices and procedures, which also have been discussed at numerous meetings and briefings. When Mr. Tierney and I raised the issue of conducting a substantive review of the investigation with Amsted, Ms. Davis indicated that she had been talking to Amsted. We learned,

6

however, that she merely had raised with Amsted various procedural issues, but not the substantive competitive issues. On the numerous occasions that Mr. Tierney and I have noted this failure to Ms. Davis, she has stated that she was not aware that this was a practice in Lit II. As a GS-15 Antitrust Division attorney, Ms. Davis should have known that this practice was routine for all merger investigations not just in Lit II, but in the entire Antitrust Division. We informed Ms. Davis that, if the information she had received and reviewed warranted a recommendation to seek divestitures from Amsted, she should engage with Amsted in a discussion of her concerns about the transaction.

When we have discussed this shortcoming with Ms. Davis, she has given a variety of responses. One response was that she was engaging with Amsted regarding its compliance with a Civil Investigative Demand (CID) and that the other members of her team were responsible for the development of the theory of the case. As lead attorney, Ms. Davis had overall responsibility for all aspects of the investigation, most critically, developing a theory. Without a theory, the investigative plan likely will be flawed and the investigation will lack direction. Furthermore, for a GS-15 attorney to recommend seeking a remedy in the absence of a theory for the case is inconceivable. And, as stated above, the Amsted/FMI transaction presented the easiest, most obvious theory in merger law and economics. On the other hand, enforcement of CIDs is an elementary task typically assigned to more junior GS-12 and GS-13 attorneys. For the attorney leading an investigation of a consummated transaction to focus her energies on CID compliance four months into the investigation in which there is direct evidence of an anticompetitive price effect is utterly inappropriate. Because of her misdirected focus, Ms. Davis failed to use significant evidence from customers and other industry participants to build a case.

As a result of the series of events stemming from Ms. Davis's failure to engage in substantive discussions with Amsted; her proposal to seek asset divestitures while lacking knowledge about available assets; and her failure to present a written case recommendation, Mr. Tierney and I became concerned that Ms. Davis was incapable of being an effective advocate for the Division in any discussions with Amsted. When we informed Ms. Davis that we did not have confidence that she would present effectively to Amsted the evidence of an antitrust violation because she had not yet presented it us in a clear, concise, and persuasive manner, Ms. Davis asked for an opportunity to present her case to us as if we were counsel for Amsted. We concurred with this request and scheduled a "mock" briefing.

Although the first written outline that Ms. Davis presented to Mr. Tierney and me in advance of the first mock briefing was generally satisfactory, it did not contain the type of information that would be useful in making Amsted understand the Division's competitive concerns with the Amsted/FMI transaction. Further, Ms.

Davis's oral presentation of this information flat and unpersuasive. Her presentation confirmed for Mr. Tierney and me that Ms. Davis was not capable of making an effective presentation to Amsted. Following her presentation, Mr. Tierney and I identified several shortcomings in the written and oral presentations. Ms. Davis requested a second opportunity to conduct a mock briefing; Mr. Tierney and I concurred with this request. Ms. Davis's second written outline was more appropriate for the type of briefing she was conducting, but her oral presentation continued to be flat and uninspired and lacking in direction. Although Ms. Davis had compelling evidence to present to Amsted, she failed to present it effectively. More importantly, when Mr. Tierney and I engaged her in a series of substantive questions, she was unable to respond with any confidence about the evidence or the applicable law.

Ms. Davis is a GS-15 attorney who should be able to lead large, complicated matters with minimal supervision. Those aspects of the Amsted investigation—conducting interviews and preparing CID memoranda and schedules—that she conducted in a satisfactory manner were aspects of the investigation that a GS-12 or GS-13 attorney would be expected to perform at a level of skill and effectiveness equal to that demonstrated by Ms. Davis. Those aspects of the investigation expected of GS-15 attorneys—knowing the facts and circumstances of the transaction and the parties involved; preparing effective written and oral recommendations; conducting effective presentations and briefings; and making appropriate and timely case recommendations—were performed by Ms. Davis at a minimally satisfactory level in most instances; in some instances, however, they were performed at an unsatisfactory level. For all of the reasons discussed above, we determined that Ms. Davis should receive an overall rating of Minimally Satisfactory.

Question:    How were you in a position to observe Ms. Davis' performance during the 2005/2006 rating period? Do you work closely with all Trial Attorneys under your supervision?

Answer:    As the Chief of Lit II, my Assistant Chief and I supervise a range of attorneys, from GS-12 through GS-15, with varying degrees of experience. We spend more time engaging and supervising our GS-12 attorneys than our GS-15 attorneys. For all investigations, we review the majority of the written work product that is submitted to the companies under investigation, and we review all written work product that is submitted to our "Front Office," which includes the Director of Operations, the Deputy Assistant Attorney General, and the Assistant Attorney General. After we review a document, we will discuss our comments and revisions with the attorneys. In all investigations, we have periodic status meetings with each of our investigation teams and informal briefings with each lead attorney. The frequency of these briefings depends on the skill level of the

8



lead attorney. In some instances, we may have daily interaction with the lead attorney; in other instances, such as investigations led by experienced GS-15 attorneys, the informal briefings occur less frequently, sometimes even infrequently. In addition to these more formal, scheduled meetings with each investigative team, we have many informal discussions with each lead attorney regarding the investigative plan, results of interviews and meetings the team has conducted, development of evidence, development of theories of the case, and planned next steps in the investigation. Only rarely does a GS-15 attorney give a "mock" briefing in preparation for a meeting with the company subject to the investigation. A GS-15 attorney is expected to be able to conduct an investigation with minimal supervision. In most instances, a GS-15 attorney would submit her briefing papers to my Assistant Chief and me in advance of a significant meeting and, although we would discuss the briefing papers with the attorney, we would not hold a mock briefing with a GS-15 attorney before she engaged in a significant, substantive meeting with the subject of the investigation.

As with all of our other attorneys, during the 2005/2006 rating period, my Assistant Chief, James Tierney, and I reviewed documents drafted by Ms. Davis, including those to be sent to counsel for Amsted, for form and substance. During this time, we reviewed Ms. Davis's several attempts to draft a CID compliance letter (which later was completed by a junior attorney on the team); draft investigative plans; and draft briefing outlines. On the Amsted/FMI investigation, Ms. Davis required my Assistant Chief and I to meet with her as if she was a GS-13 lead attorney, rather than a GS-15 lead attorney who should require minimal supervision. We had several informal discussions with Ms. Davis in which she discussed an outline of her case and we asked her questions regarding the information she presented. In these meetings, Ms. Davis did not demonstrate a strong command of her investigation or the underlying facts; consequently, we had indicated to Ms. Davis that we were considering removing her from the lead attorney role. Ms. Davis then requested and received the opportunity to conduct a "mock" briefing with Mr. Tierney and myself, to demonstrate her knowledge of her case and her ability to conduct a significant meeting with counsel for the company she was investigating. A mock briefing is a meeting designed to give an attorney, i.e., Ms. Davis, an opportunity to hold a meeting with a practice audience, i.e., Mr. Tierney and myself, in order to test her presentation skills and the substance of her case. Ms. Davis did a less-than-satisfactory job during her mock briefing, which Mr. Tierney and I told her. She then requested the opportunity to present a second mock briefing, to which we agreed. Although the materials she prepared for the second mock briefing were more to the point, Ms. Davis's presentation skills again were sorely lacking for a GS-15 attorney.

9



In sum, Mr. Tierney and I had numerous opportunities to review Ms. Davis's written work, here investigation skills, her theory development, and her presentation skills throughout the 2005/2006 rating year.

Question:    Do you serve as the Rating Official for all Trial Attorneys in the LT2 section? If not, why did you rate Ms. Davis?

Answer:    Yes, I serve as the Rating Official for all Lit II Trial Attorneys.

Question:    Has Ms. Davis' performance declined during any of the past three years, and if so, was it noted in her previous ratings? Provide examples of how her performance declined during any of the past three rating years.

Answer:    I have not noticed a specific decline in Ms. Davis's overall performance; rather, we noticed a less-than-satisfactory performance on an investigation on which Ms. Davis was given the opportunity to lead.

Question::    Did Mr. Tierney provide you any input that influenced your 2005/2006 rating of Ms. Davis? If so, what information did he provide.

Answer:    Mr. Tierney reviewed Ms. Davis's work–both written work and oral presentations–during the 2005/2006 rating year. He conferred with me throughout the rating year regarding all Lit II attorneys, and he provided valuable feedback– positive and negative–regarding all Lit II attorneys. His input regarding Ms. Davis's work occurred throughout the rating year and was similar to my own observation of Ms. Davis's work throughout the rating year. To say that Mr. Tierney provided input that influenced Ms. Davis's 2006/2006 performance appraisal would not be completely accurate; rather, observation of Ms. Davis's performance was the greatest influence on her performance appraisal. Mr. Tierney and I conferred regarding our independent observations of Ms. Davis's performance, and her performance appraisal reflects those observations.

Question:    Did Ms. Davis receive any notification or counseling from management to indicate to her that her performance was not up to expectations at any time during the 2005/2006 rating year? If so, what was she told and when?

Answer:    As noted above, Mr. Tierney and I notified Ms. Davis during several informal briefings, as well as after her two "mock" briefings during the period in and around May 2006, that her performance was not up to expectations. Also, as previously noted, Ms. Davis requested the opportunity to conduct the "mock briefings" after Mr. Tierney and I informed her that we did not think her performance as the lead of the Amsted investigation was up to the standards of a GS-15 attorney. Again after she conducted her first mock briefing, Mr. Tierney

10

and I had a post-briefing session with Ms. Davis wherein we noted the problems with the briefing. To Ms. Davis's credit she requested a second opportunity to demonstrate that she could perform at the level expected of a GS-15 attorney. Regrettably, Ms. Davis's performance during the second mock briefing was not much improved from the first mock briefing, which we told Ms. Davis at that time.

Question:     Are you aware of, or did you receive any complaints regarding Ms. Davis' performance from any source that affected her last performance rating? If so, please provide that information.

Answer:     The complaints that I received during the 2005/2006 rating year did not affect Ms. Davis's rating; they were merely confirmatory of my independent observation of Ms. Davis's work. After the end of the rating year, I received a complaint from Ms. Davis's opposing counsel on the Amsted investigation but, because that complaint occurred after the rating year, it also did not affect Ms. Davis's last performance rating.

Question:     Did Ms. Davis did not receive any commendations during the 2005/2006 rating year?

Answer:     No, I am unaware of any commendations that Ms. Davis received, either from within or outside the Lit II section.

Question:     Have you given a minimally satisfactory rating to any Trial Attorney within the past three years? If so, how many?

Answer:     Prior to the 2004/2005 rating cycle, the Antitrust Division employed a two-tiered rating system, with rating levels of Unacceptable and Meets or Exceeds Expectations. The current five-tiered rating system was reinstituted for the 2004/2005 rating cycle. The five-tiered rating system uses rating levels of Unacceptable, Minimally Satisfactory, Satisfactory, Excellent and Outstanding. Because of the recent change in the rating system, the Minimally Satisfactory level has been available only for the past two rating cycles. During that time, we have given one other trial attorney a Minimally Satisfactory rating in at least one critical element; that trial attorney, a Caucasian male, received an overall rating of Unacceptable.

Question:     Ms. Davis has alleged that she was removed from the lead attorney position concerning the Amsted/FMI investigation. Who decided that she should be removed from that position? Who notified her of that decision?

11

Answer:       Mr. Tierney and I decided that she should be removed from the lead attorney position of the Amsted/FMI investigation. We both notified her of that decision during a meeting in my office.

Question:     Why was Ms. Davis removed as the lead attorney for the Amsted/FMI investigation? What change took place in her performance from the time she was assigned as lead attorney until her removal from that position?

Answer:       As discussed above, the initial aspects of most investigations are similar. Typically, the lead attorney develops and investigative plan and works with her team to execute the plan. All lead attorneys, from new lead attorneys at the GS-12 level to experienced GS-15-level attorneys, begin an investigation in this manner. The critical difference between most GS-15 attorneys and most GS-12 attorneys is how they conduct the investigation once the investigation progresses beyond the preliminary phase. For the first two months of the Amsted/FMI investigation, Ms. Davis conducted a satisfactory investigation. Although the investigation did not advance as quickly as an investigation of a consummated transaction should have, Ms. Davis and her team conducted interviews of the critical industry participants, and they started gathering relevant information from Amsted and FMI and from customers and other industry participants.

The problems with Ms. Davis's leadership of the Amsted/FMI investigation appeared when she clearly was unable to bring the investigation to a successful conclusion. For example, Ms. Davis's investigative plan identified a need for a case recommendation memorandum to be submitted to Mr. Tierney and myself no later than April 30, 2006. By the beginning of May 2006, Ms. Davis had not provided Mr. Tierney or me with a recommendation; rather, Ms. Davis's practice was to provide us with a brief outline of her case that was no different than the outline she could have presented in January 2006, prior to conducting a three-month investigation. When we questioned Ms. Davis about the points in her outline, Ms. Davis often could not answer our questions. More often, she was unable to answer questions that she should have resolved much earlier in the investigation. One critical example of this problem occurred after one of the many meetings that Mr. Tierney and I had with Ms. Davis. At that meeting, Ms. Davis suggested that perhaps the Antitrust Division should seek rescission of the transaction, or at least asset divestitures to remedy the anticompetitive effects of the transaction. This type of generalized recommendation is obvious for any consummated transaction, even prior to an investigation of the transaction. After mentioning this generalized remedy, Mr. Tierney and I asked her about the availability of assets for possible divestiture; Ms. Davis was unable to answer the question. Ms. Davis should have known this critical piece of information within weeks of opening her investigation, and certainly prior to suggesting the possibility of a divestiture four months into the investigation. As an even more



glaring failure, after this discussion with Mr. Tierney and myself, when Ms. Davis asked Amsted about its assets and the assets acquired from FMI, she learned for the first time that Amsted no longer possessed any of the assets acquired from FMI and that, therefore, rescission of the acquisition or divestiture of the FMI assets would be impossible. Indeed, Amsted sold the FMI assets in April 2006, during the course of Ms. Davis's investigation.

These developments are some of the factors that triggered our concern that Ms. Davis did not have control of her investigation or an understanding of which direction the investigation should take. At this time, it had become obvious to Mr. Tierney and me that Ms. Davis had not been engaging Amsted in regular substantive meetings to discuss the status of her investigation and the concerns the Division had with the anticompetitive effects of the transaction. Engaging with the parties that are subject to an investigation is standard Antitrust Division practice, as formalized in the Division's Merger Review Process Initiative that was instituted in 2001 and revised in 2006. A copy of the Merger Review Process Initiative is included as *Petrizzi Exhibit 6.* Ms. Davis, and all other Division attorneys, have received a copy of these practices and procedures, which also have been discussed at numerous meetings and briefings. When Mr. Tierney and I raised the issue of conducting a substantive review of the investigation with Amsted, Ms. Davis indicated that she had been talking to Amsted. We learned, however, that she merely had raised with Amsted various procedural issues, but not the substantive competitive issues. On the numerous occasions that Mr. Tierney and I have noted this failure to Ms. Davis, she has stated that she was not aware that this was a practice in Lit II. As a GS-15 Antitrust Division attorney, Ms. Davis should have known that this practice was routine for all merger investigations not just in Lit II, but in the entire Antitrust Division. We informed Ms. Davis that, if the information she had received and reviewed warranted a recommendation to seek divestitures from Amsted, she should engage with Amsted in a discussion of her concerns about the transaction.

As a result of the series of events stemming from Ms. Davis's failure to engage in substantive discussions with Amsted; her proposal to seek asset divestitures while lacking knowledge about available assets; and her failure to present a written case recommendation, Mr. Tierney and I became concerned that Ms. Davis was incapable of being an effective advocate for the Division in any discussions with Amsted. When we informed Ms. Davis that we did not have confidence that she would not effectively present to Amsted the evidence of an antitrust violation because she had not yet presented it us in a clear, concise, and persuasive manner, Ms. Davis asked for an opportunity to present her case to us as if we were counsel for Amsted. We concurred with this request and scheduled a "mock" briefing.

13



Although the first written outline that Ms. Davis presented to Mr. Tierney and me in advance of the first mock briefing was generally satisfactory, it did not contain the type of information that would be useful in making Amsted understand the Division's competitive concerns with the Amsted/FMI transaction. Further, Ms. Davis's oral presentation of this information flat and unpersuasive. Her presentation confirmed for Mr. Tierney and me that Ms. Davis was not capable of making an effective presentation to Amsted. Following her presentation, Mr. Tierney and I identified several shortcomings in the written and oral presentations. Ms. Davis requested a second opportunity to conduct a mock briefing; Mr. Tierney and I concurred with this request. Ms. Davis's second written outline was more appropriate for the type of briefing she was conducting, but her oral presentation continued to be flat and uninspired and lacking in direction. Although Ms. Davis had compelling evidence to present to Amsted, she failed to present it effectively. More importantly, when Mr. Tierney and I engaged her in a series of substantive questions, she was unable to respond with any confidence about the evidence or the applicable law.

As previously noted, for a section chief and assistant chief to conduct a mock briefing with a GS-15 attorney, is not common. To conduct a second mock briefing for a GS-15 attorney on the same investigation is rare; indeed, I cannot recall another instance in which I have done so. Moreover, during the same period when Ms. Davis was requesting and conducting her mock briefings, Mr. Tierney and I were supervising the management of numerous other investigations, including one in which the investigative team was preparing for litigation following the cessation of settlement negotiations and another in which the investigative team was trying to reach a settlement within two weeks because of circumstances relating to the transaction that required an expeditious resolution. Thus, the fact that Mr. Tierney and I were spending a significant amount of time on a straightforward, uncomplicated investigation with a GS-15 attorney who should be able to lead the most complex investigation with minimal supervision, is notable.

Question:    Was she given an opportunity to improve her performance prior to her removal as the lead attorney?  If so, what opportunity was she given?

Answer:    As noted above, Ms. Davis was given multiple opportunities to improve her performance and after each "mock" briefing, Mr. Tierney and I discussed with Ms. Davis the shortcomings of her presentation with an expectation that she would incorporate the constructive criticism into her revised presentation, but this was not the case.

Question:    Who was given the lead attorney position of the Amsted/FMI investigation following Ms. Davis?  Had this person been working on that investigation and



what qualifications or experience did they have that resulted in their selection as the lead attorney?

Answer:    C. Scott Hataway was assigned as lead attorney of the Amsted/FMI investigation after Ms. Davis was removed as the lead attorney. At the time Ms. Davis was removed as the lead attorney of the Amsted/FMI investigation, three other attorneys were assigned to the investigation: C. Scott Hataway, Robert W. Wilder and Raven Ducker (now Norris). Ms. Norris had been assigned to work on the case from the outset, but she was a second-year attorney who had not led a case through settlement or litigation. Mr. Wilder is an experienced GS-15 attorney, but Mr. Wilder was splitting his time between Amsted/FMI and a second, complex matter in which settlement negotiations were ongoing; therefore, Mr. Wilder was unavailable to lead the Amsted/FMI investigation. Of the attorneys assigned to the Amsted/FMI investigation, Mr. Hataway was the only possibility to take over as the lead attorney.

Mr. Tierney and I assigned Mr. Hataway the position of lead attorney on the Amsted/FMI investigation because he was already assigned to the investigation; he was an experienced lead attorney with a demonstrated ability to conduct expeditious investigations in even the most analytically complex industries, including the defense industry; he had an outstanding ability to quickly familiarize himself with the facts of a case; he was able to establish and execute an effective investigative plan within weeks, rather than months; he had comprehensive knowledge of the antitrust laws; he had outstanding oral presentation skills; and he had experience in preparing cases for litigation, both at the Division and as an attorney in private practice. At a time when the investigation sorely needed a lead attorney who could take control of the investigation, rapidly learn the materials, establish a dialogue with Amsted, and quickly make a recommendation as to how to proceed, Mr. Hataway was particularly well suited for the role.

Question:    What assignment was given to Ms. Davis immediately following her removal as the lead attorney of the Amsted/FMI investigation for the remainder of the 2005/2006 rating year?

Answer:    After Ms. Davis was removed as the lead, Mr. Tierney and I discussed the available assignment options with Ms. Davis. Ms. Davis requested to remain on the Amsted/FMI investigation. She remained on the Amsted/FMI investigation for the remainder of the 2005/2006 rating year.

Question:    Do you feel that Ms. Davis is no longer qualified to serve as a lead attorney of an investigation? If not, under what conditions do you feel she could serve as a lead attorney in the future?

15



Answer:    As we discussed with Ms. Davis during her performance review for the 2005/2006 rating year, Ms. Fountain and I plan to continue to work with Ms. Davis to help her in the development of her skills as an effective lead attorney for Lit II and for the Antitrust Division. Following up on this discussion, Ms. Fountain and I assigned Ms. Davis as the lead attorney on an investigation in January 2007. See *Petrizzi Exhibit 7*. This assignment was made after our discussion with Ms. Davis of her rating and prior to learning that she had filed an informal EEO complaint. See *Petrizzi Exhibit 8*. Again in April 2007, we assigned Ms. Davis to lead the investigation of a high-profile, multi-billion dollar transaction. We have given these assignments to Ms. Davis in an effort to continue to work with her in developing her skills and to assist her in becoming an effective lead attorney.

Question:    Did Ms. Davis' performance as the lead attorney of the Amsted/FMI investigation influence your evaluation of Ms. Davis for her 2005/2006 performance appraisal that resulted in a minimally satisfactory rating?

Answer:    Yes, Ms. Davis's performance as the lead attorney of the Amsted/FMI investigation was the primary factor that resulted in her Minimally Satisfactory rating in her 2005/2006 performance appraisal.

Question:    Was Ms. Davis' performance as the lead attorney of the Amsted/FMI investigation the only factor used in determining her performance rating for the 2005/2006 rating year? If not, what other factors influenced her appraisal?

Answer:    No, as with any attorney's performance appraisal, every assignment and the attorney's performance on every assignment were considered when determining the rating for each critical element, as well as the overall performance rating. However, while Ms. Davis achieved a successful level of performance on her non-Amsted assignment, her level of performance on the Amsted/FMI investigation was so unsatisfactory that it could not be overcome as to critical elements 1, 3, 4, and 6 and, thus, on her overall performance rating.

Question:    How many cases were assigned to Ms. Davis during the 2005/2006 rating year?

Answer:    Ms. Davis was assigned to work on two cases in the 2005/2006 rating year. She worked on one matter from October 1, 2005 through early December 2005 and then on the Amsted/FMI investigation from early December 2005 through the end of the rating period, September 30, 2006.

Question:    Have you removed, or have there been any removals of, trial attorneys from the lead attorney position of an investigation for poor performance within the past three years? If so, how many?

Answer:         I have removed only one attorney from the lead attorney position of an investigation for poor performance in the past three years.

Question:     Did you discriminate against Ms. Davis because of her race, age or sex in the 2005/2006 performance rating you gave her?

Answer:         No, I did not discriminate against Ms. Davis because of her race, age or sex in her 2005/2006 performance rating. Moreover, I believe that Ms. Davis initiated her EEO complaint because, after having failed to timely appeal her 2005/2006 performance appraisal, Ms. Davis's request for extension of time within which to submit an appeal was rejected by the Assistant Attorney General. A copy of the January 26, 2007 memorandum from Thomas O. Barnett to Ms. Davis is attached as *Petrizzi Exhibit 9.*

Question:     Are the efforts and accomplishments of African Americans, females and individuals over age 40 recognized less that those of others working under your supervision? If so, why is that so?

Answer:         No, the efforts and accomplishments of African Americans, females and individuals over age 40 are not recognized less than those of others working under my supervision.

Question:     Ms. Davis also alleges that management retaliated against her for initiating the EEO process on January 25, 2007, when her duties were changed on or about March 14, 2007, to include "the review of HSR filings." Are you aware of that, and if so, when did you become aware that Ms. Davis had filed an EEO complaint?

Answer:         Yes, I am aware of Ms. Davis's allegation of retaliation. I became aware of that allegation on May 22, 2007, when I learned that she had filed a formal EEO complaint. See *Petrizzi Exhibit 10.*

Question:     What are HSR filings and what is involved in the review of them?

Answer:         The Hart-Scott-Rodino Antitrust Improvements Act of 1976 (HSR Act), 15 U.S.C. § 18a, is a set of amendments to the U.S. antitrust laws, principally the Clayton Antitrust Act. The HSR Act provides that, before certain mergers, tender offers, or other acquisition transactions can close, the parties must file a "Notification and Report Form" with the Federal Trade Commission (FTC) and the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice. The filing requirement is triggered only if the value of the transaction and, in some cases, the size of the parties, exceeds certain dollar thresholds, which are adjusted over time. The HSR filing describes the proposed

17

transaction and the parties to it. Upon receipt of the filing, a thirty-day waiting period then ensues during which time the FTC or the Antitrust Division may request further information in order to help in the assessment of whether the proposed transaction violates the antitrust laws. It is unlawful for the partes to the transaction to close the transaction during the waiting period. Although the waiting period generally is thirty days, the FTC or the Antitrust Division may request additional information the merging parties. If a "second request" for information is issued to the parties, the waiting period is extended for an additional thirty days following the parties' certification of substantial compliance with the second request. Second request investigations typically last for several months.

In any given year, Lit II receives HSR filings for approximately 400 transactions pursuant to the HSR Act. More than 90% of Lit II investigations are opened on the basis of the information received in HSR filings. Most investigations are "preliminary," meaning that they are resolved during the initial thirty-day waiting period prior to the issuance of second requests. Second requests are issued in a few investigations each year; these investigations typically are complex and lengthy, and the investigative work requires a team of attorneys, economists, and support staff.

In order to assess accurately whether transactions may present competitive issues such that they are violative of the antitrust laws, an attorney reviewing HSR filings must have knowledge of the antitrust laws, an understanding of economic theory, analytical abilities, and the ability to conduct industry research to obtain all necessary relevant factual information.

Question:    Did you assign, or have any part in assigning, Ms. Davis to review HSR filings? If not, who made the assignment?

Answer:     Ms. Fountain and I assigned Ms. Davis to review HSR filings.

Question:    Why was this assignment given to Ms. Davis?
Answer:     During the week of March 11, 2007, the number of HSR filings received in Lit II had increased. Ordinarily, one Lit II attorney is responsible for reviewing HSR filings, unless the volume of filings is high. Ms. Davis had been assigned to lead a new investigation in January 2007; that matter concluded in February 2007. At that time, several investigations were ongoing in Lit II. Those investigations began either when Ms. Davis still was on the Amsted/FMI investigation or when she was leading the investigation in January and February 2007. Suzanne Morris, the GS-15 attorney assigned to review HSR filings needed assistance on a temporary basis to review the additional HSR filings. See *Petrizzi Exhibit 11*. Ms. Davis was the only GS-15 attorney who was not assigned to an investigation

18



and therefore was available to provide this assistance. In addition, Ms. Morris had scheduled a ten-day vacation in early April, during which time another attorney would have to be assigned to review HSR filings. See *Petrizzi Exhibit 12*. GS-15-level attorneys often are assigned to review HSR filings, as they are experienced in the review of multiple transactions and they require minimal supervision to review the large volume of transactions for which filings may be received on a weekly basis. In addition, the attorney who reviews HSR filings essentially has the first look at all potential new Lit II matters, thus having the opportunity to identify a new investigation and to seek the role of lead attorney for the new investigation. Ms. Davis's assignment to review HSR filings was a temporary assignment based on (1) an increase in the number of HSR filings and (2) the need for an experienced attorney to review HSR filings during Ms. Morris's planned vacation, in advance of which a transition period was helpful. See *Petrizzi Exhibit 13*. Ms. Davis's responsibilities for the review of HSR filings ended, as anticipated, once she had completed the review of all of the HSR filings received in Lit II during Ms. Morris's absence. See *Petrizzi Exhibit 14*. Ms. Davis subsequently was assigned to lead the investigation of a multi-billion dollar transaction, an assignment that was given to Ms. Davis on May 7, 2007, prior to my receiving notice on May 22, 2007 that Ms. Davis had alleged that her assignment to review HSR filings was in retaliation for her filing an EEO complaint. See attached *Petrizzi Exhibit 15*.

Question:    Had the workload for that task increased prior to Ms. Davis' assignment to that task?

Answer:    Yes, the workload for the review of HSR filings had increased prior to Ms. Davis's assignment to review HSR filings.

Question:    Who reviewed HSR filings prior to Ms. Davis being given that assignment and what was their title? For how long had that individual been assigned to review HSR filings? What percentage of time did that individual require to perform that task during each week?

Answer:    Suzanne Morris, a GS-15 trial attorney, is the primary reviewer of all HSR filings assigned to Lit II. She has been responsible for the review of HSR filings for approximately seven years. For most of the weeks during this approximately seven-year period, Ms. Morris has devoted at least 90% of her time to the review of HSR filings.

Question:    After Ms. Davis was assigned to review HSR filings, was she the only person performing that task, or were there others assigned to that task? If she worked with others, who were they and what was their title?



Answer:    During the first two weeks of the four-week day period in March and April 2007 when Ms. Davis was assigned to review HSR filings, Suzanne Morris, a GS-15 trial attorney, also reviewed HSR filings. During Ms. Morris's nearly two-week absence from the office while on vacation, Ms. Davis was the only person performing that task.

Question:    Was Ms. Davis assigned other duties during the same time she was assigned to review HSR filings? If so what were those assignments and did they involve conducting investigations?

Answer:    Ms. Davis was not assigned other duties during the same time she was assigned to review HSR filings. Ms. Fountain's and my expectation had been that, during the course of reviewing the HSR transactions for this period, at least one of the proposed mergers would require additional scrutiny. Had that been the case, we had intended to assign Ms. Davis to lead any such investigation. See *Petrizzi Exhibit 16*.

Question:    Are the skills necessary to review HSR filings the same as they would be for an attorney to conduct or lead an investigation, or is it a lower level task that requires less effort or involvement than would be necessary to conduct an investigation?

Answer:    The skills necessary to review HSR filings are not the same as they would be for an attorney to lead an investigation. As stated above, in order to accurately assess whether transactions may present competitive issues such that they are violative of the antitrust laws, an attorney reviewing HSR filings must have knowledge of the antitrust laws, an understanding of economic theory, analytical abilities, and the ability to conduct industry research to obtain all necessary relevant factual information. To lead an investigation, an attorney needs these skills and more, including, among others, the ability to formulate and execute an investigative plan for the conduct of an expeditious investigation; strong written and oral communication skills; the ability to lead a team of attorneys, economists, and support staff and to delegate responsibilities appropriately among them; an ability to engage with outside parties regarding the analysis of a transaction; the ability to devise an effective remedy for an anticompetitive transaction; advocacy skills to present a case recommendation to Division decision makers; and the ability to prepare a case for litigation.

Question:    Was assigning Ms. Davis to review HSR filings a reflection of your feelings that she was no longer able to conduct investigations?

Answer:    Ms. Fountain and I assigned Ms. Davis to review HSR filings because, at the time of her assignment, Ms. Davis was not working on an investigation and we needed an attorney to review HSR filings for a finite period of time. As noted above, our



expectation was that at least one of the proposed mergers that were subject to HSR notification would require investigation and, had that been the case, we had intended to assign Ms. Davis to lead the investigation.

Question:    Did your involvement in assigning Ms. Davis to review HSR filings have any relation to the fact that she had filed an EEO complaint? If so, please explain.

Answer:    Ms. Fountain's and my assignment of Ms. Davis to review HSR filings had absolutely no relation to the fact that she had filed an EEO complaint.

Question:    Are there any witnesses you wish to be interviewed to support your position in this EEO matter?

Answer:    Maribeth Petrizzi, James J. Tierney, Dorothy B. Fountain, Raven Ducker Norris, John Ziegler, J. Robert Kramer.

Question:    Is there any information you would like to add to this statement that is relevant to the issues discussed?

Answer:    No.


Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury, that the foregoing statement is true and correct.

7/18/07 - originally signed
7/20/07 - signed on bottom right hand corner

_____
Maribeth Petrizzi,                          Date
Chief
Litigation II Section

_____
EEO Investigation
7-19-07

21

# PRIVACY ACT NOTICE TO INTERVIEW WITNESSES
## (OTHER THAN COMPLAINANT)
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

## GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

## AUTHORITY

The authority to collect the information requested by this interview in derived from one or more of the following: Title 5, Code of Federal regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5 United States Code, Section 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

## PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted for federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to EEO Commission activities, to the intelligence agencies of the Federal Government or to others for uses as published in the Federal register.

## EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary, however, failure on the part of Department of Justice employees to furnish the information will result in a direction by the Attorney General or designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment. Disclosure of information by present or perspective contractors is also voluntary, although failure to furnish the above requested information where the contract so provides, may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____
Signature of Investigator

_____
Signature of Affiant

7/18/07
Date

22

EXHIBIT 3

UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION


Carolyn Davis                              *
                                           *
          Complainant,                     *
                                           *
                                           *        Agency Case Number: OBD-2007-00155
                                           *
U.S. Department of Justice (DOJ)           *
Antitrust Division                         *
Litigation II Section                      *
1401 H Street N.W., Suite 8802             *
Washington, DC 20005                       *
                                           *
          Agency.                          *


---

INTERROGATORY FOR JAMES TIERNEY, RMO

---


Question:    Please provide your full name for the record.

Answer:      James J. Tierney

Question:    You have been named as a Responsible Management Official in an EEO
             complaint filed by Carolyn Davis, a Trial Attorney under your supervision based
             on her allegation that you discriminated against her because of her race, sex and
             age. Do you swear or affirm that the information you will provide in this
             interview will be true and correct to the best of your recollection, knowledge, and
             belief?

Answer:      I do.

Question:    Please provide your race, sex and age.

Answer:      White; male; 53.

Question:    Have you previously been involved in the EEO process, either as a responding

management official, complainant or witness?

Answer:        No.

Question:     Please state your present job title, grade, the period of time you have been in that position, the agency you work for, and your specific duty location.

Answer:        Current position (June 2006 - present):

      Title:  Chief, Networks and Technology Section

      Grade: 15-08

      Period of time in position: 13 months

      Agency: USDOJ, Antitrust Division

      Duty station: Washington, D.C.

Position during events relevant to complaint (November 2003 - May 2006):

      Title: Assistant Chief, Litigation II Section

      Grade: 15-07

      Period of time in position: 2 years, 7 months

      Agency: USDOJ, Antitrust Division

      Duty station: Washington, D.C.

Question:     How long have you worked for the Antitrust Division?

Answer:        15 years, 7 months

Question:     How long have you worked for the federal government?

Answer:        15 years, 7 months

Question:     What are your areas of responsibility and who do you supervise?

Answer:        I currently supervise the Networks and Technology Section which is responsible for enforcing the Federal antitrust laws and promoting competition policy in its

2

assigned industries, including computer hardware and software, high technology component manufacturing, payment networks, financial services, and the securities industry. The Section is responsible for merger enforcement as well as the civil enforcement of the antitrust laws. I supervise 24 attorneys and 6 support staff.

Question:    Do you know Carolyn Davis, Trial Attorney? If so, for how long and in what capacity were you associated with her during your period of acquaintance?

Answer:    I have known Ms. Davis for approximately 3½ years, although I likely had earlier contact with her at various Division-wide social and/or professional events. All my dealings with Ms. Davis have been in my capacity as Assistant Chief of the Litigation II Section.

Question:    What are Ms. Davis' job responsibilities and for what period of time did you serve as her supervisor?

Answer:    As a trial attorney in the Litigation II Section, Ms. Davis was primarily responsible for investigating the merger and civil conduct cases to which she assigned by Section management. Ms. Davis' specific responsibilities varied depending on whether she was assigned the role of "lead" attorney or "staff" attorney on a particular matter. As a lead attorney, Ms. Davis would be responsible for all aspects of the investigation. Her primary responsibility would be to identify and develop sound legal and economic theories and to clearly and persuasively present those theories orally and in writing. Ms. Davis would also be responsible for developing and implementing the investigation plan, including setting the investigation agenda; implementing the investigation agenda (*e.g.*, issuance of Second Requests and party and third-party Civil Investigative Demands, customer and competitor interviews, obtaining declarations, taking depositions); assigning tasks to other team members and supervising their performance; coordinating the work of the staff economist and any expert economist retained to testify at trial; coordinating document review; and conducting meetings with the parties and Section and Division management. A lead attorney has discretion to retain certain tasks or assign them to other team members. Ultimately, the lead attorney would make an enforcement recommendation to Section and Division management, and if the recommendation was to challenge the conduct, to support that recommendation with relevant, admissible evidence. As a staff attorney on an investigation, Ms. Davis would be responsible for a variety of investigative tasks, as assigned by the lead attorney. For example, a staff attorney might be assigned responsibility for developing customer or competitor testimony, coordinating document review, or handling experts.

3

I supervised Ms. Davis from November 2003 to May 2006.

Question:    Were you Ms. Davis' supervisor for any of the 2005/2006 rating period?  If so, for what period of time was that and what level of supervisor were you for Ms. Davis?

Answer:    I supervised Ms. Davis from the beginning of the rating period on October 1, 2005, through the time of my departure from the Litigation II Section in late May 2006.  The rating period ended on September 30, 2006.  As Assistant Chief of the Litigation II Section, I was a second-level supervisor for Ms. Davis.

Question:    Who else supervised Ms. Davis during the same time period that you supervised her?  Provide their name, title, and the level of supervision they provided for Ms. Davis.

Answer:    Maribeth Petrizzi also supervised Ms. Davis during the period I supervised her. Ms. Petrizzi is Chief of the Litigation II Section.  As Chief, Ms. Petrizzi has ultimate responsibility for the management of the Litigation II Section and is Ms. Davis' first-level supervisor and her rating official.  Although Ms. Petrizzi has first-level supervisory responsibility for Ms. Davis, Ms. Petrizzi and I jointly supervised Ms. Davis' work and we closely collaborated in reaching a consensus judgment regrading her performance.

Question:    Ms. Davis alleges that because of her race (black), sex (female), and age (55), she received a "minimally satisfactory" rating on her 2005/2006 annual performance appraisal (rating period October 1, 2005 - September 30, 2006).  Are you aware of that?

Answer:    Yes.

Question:    Did you provide any information or input to the Rating Official relating to Ms. Davis' 2005/2006 appraisal at any time during?  If so,  please provide any information you provided that related to Ms. Davis' performance during that rating period and describe her level of performance during that same rating period.

Answer:    I provided Ms. Petrizzi my observations regarding Ms. Davis' performance and, based on her minimally satisfactory performance on the Amsted/FMI investigation, recommended that she be removed as lead.  The information I provided to Ms. Petrizzi is discussed in response to the questions below.

Question:    Do you feel that a minimally satisfactory rating for Ms. Davis for the 2005/2006 rating period was appropriate?  If so, why?

4

Answer:     Although I did not supervise Ms. Davis for the full rating period, for the period I
was her supervisor I believe her ratings for each individual job elements and her
overall rating of minimally satisfactory were appropriate. Given the poor quality
of her work through May 2006, in my judgment it is unlikely that Ms. Davis'
work as a staff attorney on Amsted/FMI for the balance of the rating period would
have justified any change in her rating.

During the 2003/2004 and 2004/2005 rating periods, Ms. Davis was lead attorney
on one or two non-substantial investigations (investigations where the Division
did not issue Second Requests or CIDs) or was a staff attorney on other
investigations. For the most part her assignments as a staff attorney were of the
type that could be handled by less experienced attorneys, for example third-party
interviews and Second Request negotiations. While there were performance
issues, for example poorly drafted memos, she earned successful ratings as her
work on assigned tasks met our basic expectations. Following her 2004/2005
performance evaluation, Ms. Davis said she had the ability to lead a substantial
investigation and asked for the opportunity to do so. Ms. Petrizzi and I agreed to
give her the chance to lead a substantial investigation. The Amsted/FMI matter
was a moderately complex matter and appeared to be a good fit for Ms. Davis.
We had a credible complainant, the products were straight-forward, and there
were very few customers and competitors.

At the beginning, I had some issues with Ms. Davis' performance. For example,
Ms. Davis issued voluntary requests letters to the parties almost three weeks after
the PI was opened. Typically voluntary request letters would be issued within
days of opening the PI. Ms. Davis' performance, however, was generally
acceptable for the first several months. By mid-April 2006, Ms. Petrizzi and I had
become concerned about both the pace and direction of the investigation. In order
to monitor developments and to ensure that we were all on the same page, Ms.
Petrizzi and I scheduled weekly update meetings with Ms. Davis.

In late April, the staff economist and his manager told Ms. Petrizzi and me that
there was sufficient evidence to suggest a change in investigative approach. This
was highly unusual. Typically, the attorneys steer the investigation and set
strategy, not the economists. This event was also troubling because Ms. Davis
had not told me of these developments or the need to adjust strategy. I became
further concerned when on or about May 3, 2006, Ms. Davis, for the first time
informed Ms. Petrizzi and me that certain assets had been sold and that a
divestiture remedy was not be possible. Previous to this time, Ms. Davis had been
arguing for a divestiture remedy – a remedy that Ms. Davis should have known
was not possible.

Throughout the late April early May time period, Ms. Davis was also drafting a

CID compliance letter. As discussed in more detail below, Ms. Davis' work on this letter was minimally satisfactory, at best. Finally, as outlined in more detail below, Ms. Davis was unable to coherently and persuasively argue the merits of the case in a meeting with Ms. Petrizzi and me and in two moot presentations.

Ms. Davis is a GS-15/10 attorney. A GS-15 attorney must have the ability to "assume complete responsibility for the most difficult projects assigned to the section . . . perform effectively with no more than minimal supervision . . . and [handle] the most complex antitrust, economic, or financial issues of major significance for which little if any precedent is available." Directive 1335.2(6)(d). Ms. Davis was evaluated based on this standard. Applying this standard to Ms. Davis' work plan, and based on my observations of her performance, I believe the ratings she received for each individual job elements and her overall rating were appropriate.

Question:    Did Ms. Davis' performance declined during any of the past three years, and if so, was it noted in her previous ratings? Provide examples of how her performance declined during any of the past three rating years.

Answer:    Ms. Davis' overall performance declined from successful during the 2004/2005 rating period to minimally satisfactory during the 2005/2006 rating period. It is difficult to compare her rating in 2003/2004 to the last two years because the Division in 2003/2004 used the acceptable/exceeds or meets expectations rating system. Nonetheless, Ms. Davis' performance declined in certain key respects. For example, in 2003/2004 we did not note any significant problems with her writing. In 2004/2005 she received a satisfactory rating for her writing, but we noted that her writing had fallen below the level expected of an GS-15/10 attorney. And in 2005/2006, as reflected by her work on the Amsted compliance letter, her writing had declined to the minimally satisfactory level.

Ms. Davis' performance in the area of negotiations and oral presentations also declined. In previous years, her performance was rated as meets/exceeds expectations or as excellent. In 2005/2006, however, her performance was minimally satisfactory. This decline may be attributable in part to the fact that in the previous two years Ms. Davis did not have substantial lead attorney responsibilities, and that in 2005/2006 her duties as lead attorney on a substantial investigation pushed her beyond her abilities.

Question:    To the best of your knowledge, did Ms. Davis receive any notification or counseling from management to indicate to her that her performance was not up to expectations at any time during the 2005/2006 rating year? If so, what was she told?

6

Answer:    Ms. Davis should not have been surprised when she received a minimally unsatisfactory rating. Ms. Petrizzi and I promptly notified Ms. Davis whenever we observed unsatisfactory work and provided guidance on how she could improve her performance. For example, in late April 2006, Ms. Davis forwarded to me for review a draft letter to Amsted's counsel regarding CID compliance. The letter was very poorly drafted. I met with Ms. Davis to discuss problems with the letter and suggested revisions. The re-draft was also poorly done and Ms. Davis failed to follow my instructions. To minimize any misunderstandings, I gave Ms. Davis written comments and prepared an outline of the letter for her to follow. The third draft was better, but still fell far short of the work expected of a GS-15/10 attorney. Ultimately, I gave the draft to a junior staff member with oral instruction on how to revise the letter. This attorney produced a draft that required only minor edits before it was sent to counsel under Ms. Davis' signature.

With respect to Ms. Davis' removal as lead, on or about May 8, Ms. Petrizzi and I met with Ms. Davis and expressed our concerns about how she was leading the investigation. When we raised concerns about her ability to present the case to the parties, Ms. Davis asked for the opportunity to argue the case. Ms. Davis' presentation was disorganized and unpersuasive. Ms. Petrizzi, however, recognized that Ms. Davis may have been put on the spot and in order to give her a fair opportunity to demonstrate her command of the case suggested that Ms. Davis make a formal presentation on May 10. Ms. Petrizzi and I both offered suggestions on how she could improve her performance. Ms. Davis' May 10 presentation was lackluster. After discussing the weakness in her presentation, Ms. Davis requested a third opportunity to argue the case. Ms. Petrizzi and I agreed to give her this opportunity and we again made suggestions on how she could improve her performance. Ms. Davis, on or about May 12, made her third presentation. Again her performance was ineffective. For example, Ms. Davis was unable to effectively respond to arguments the parties would likely raise, failed to incorporate newly received information and data into her argument, and was ineffective in the use of "hot" documents. When Ms. Davis after three attempts failed to demonstrated a command of the issues, Ms. Petrizzi and I made the decision to remove her as lead.

Question:    Are you aware of, or did you receive any complaints regarding Ms. Davis' performance from any source that affected her last performance rating? If so, please provide that information.

Answer:    No.

Question:    Did Ms. Davis receive any commendations during the 2005/2006 rating year?

Answer:      No.

Question:    Have you given or recommended a minimally satisfactory rating to any Trial
             Attorney within the past three years?  If so, how many?

Answer:      I don't have access to Litigation II records, but don't recall giving any other trial
             attorney an overall rating of minimally satisfactory.  However, Ms. Petrizzi and I
             gave one GS-15 attorney an overall rating of unacceptable.

Question:    Ms. Davis has alleged that she was removed from the lead attorney position
             concerning the Amsted/FMI investigation.  Who decided that she should be
             removed from that position?  Who notified her of that decision?  What role did
             you have in her removal from the lead attorney position?

Answer:      Ms. Petrizzi decided that Ms. Davis should be removed from the lead attorney
             position.  Ms. Petrizzi informed Ms. Davis of her decision.  Following Ms. Davis'
             presentation on or about May 12, 2006, Ms. Petrizzi and I met to discuss Ms.
             Davis performance and whether she should continue as lead.  The discussion
             covered her performance throughout the course of the investigation with a focus
             on her moot presentations.  At the end of the discussion, Ms. Petrizzi asked for
             my recommendation and I recommended that Ms. Davis be removed as lead.

Question:    Why was Ms. Davis removed as the lead attorney for the Amsted/FMI
             investigation?  What change took place in her performance from the time she was
             assigned as lead attorney until her removal from that position?

Answer:      Ms. Davis was removed as the lead attorney for the Amsted/FMI investigation
             because she was unable to demonstrate a solid grasp of the legal and economic
             theories of the case and would have been unable to bring the investigation to a
             successful conclusion.  The investigation was at a critical stage when Ms. Davis
             was removed as lead.  The investigation had been going on for 5 months and the
             evidence developed to that point suggested the need to shift tactics.  Ms. Davis
             was given three opportunities to demonstrate her ability to move the investigation
             in this new direction.  Her presentations were flat and ineffective.  It became clear
             to me that Ms. Davis could not improve to the level where she could effectively
             present the case to the parties or Division management and therefore a change was
             necessary to bring the investigation to a successful conclusion.

Question:    Was Ms. Davis given an opportunity to improve her performance prior to her
             removal as the lead attorney?  If so, what opportunities was she given?

Answer:      Ms. Davis was given numerous opportunities to improve her performance before
             she was removed as lead.  For details, see response to questions above.

Question:       Who was given the lead attorney position of the Amsted/FMI investigation
                following Ms. Davis? Had this person been working on that investigation and
                what qualifications or experience did they have that resulted in their selection as
                the lead attorney?

Answer:         Scott Hataway. Mr. Hataway joined the Amsted/FMI staff on or about May 3,
                2006, and assumed the position of lead attorney on or about May 15, 2006. Mr.
                Hataway is an exceptionally skilled attorney with a strong antitrust background,
                solid investigation skills and outstanding judgment. He joined the Division from
                one of the premier antitrust law firms and while at the Division led several merger
                investigations and was responsible for substantive tasks on some of the Section's
                most high-profile and complex investigations. I met with Mr. Hataway to discuss
                his views on the theory of the case and on moving the investigation to a
                conclusion. Although Mr. Hataway had only been on the investigation for about
                two weeks, he demonstrated an exceptional command of the theories and facts
                and the ability to obtain a settlement or prepare the case for litigation.

Question:       What assignment was given to Ms. Davis immediately following her removal as
                the lead attorney of the Amsted/FMI investigation?

Answer:         After Ms. Davis was replaced as lead, Ms. Petrizzi gave her the option to remain a
                member of the Amsted/FMI staff or to be assigned to a new matter. Ms. Davis
                decided to remain on the Amsted/FMI staff.

Question:       Did Ms. Davis' performance as the lead attorney of the Amsted/FMI investigation
                influence Ms. Davis' 2005/2006 performance appraisal that resulted in a
                minimally satisfactory rating?

Answer:         I did not prepare or review Ms. Davis' 2005/2006 performance appraisal and did
                not supervise Ms. Davis for the full rating period. In my judgment, however, Ms.
                Davis' performance as lead attorney on the Amsted/FMI investigation through
                May 2006 was minimally satisfactory and her performance on that investigation
                would have been the most important factor in her rating for the full rating period.

Question:       Was Ms. Davis' performance as the lead attorney of the Amsted/FMI
                investigation the only factor used in determining her performance rating for the
                2005/2006 rating year? If not, what other factors influenced her appraisal?

Answer:         I did not prepare or review Ms. Davis' 2005/2006 performance appraisal and did
                not supervise Ms. Davis for the full rating period. However, the Amsted/FMI
                investigation was Ms. Davis' most significant assignment during the rating period
                and in my judgment would have been the most important factor in determining her
                performance rating for the 2005/2006 rating year. Other factors would include her

9

performance as a staff attorney on Amsted/FMI and one other investigation, and the criteria set out in her work plan.

Question:    How many cases was Ms. Davis assigned to work on during the 2005/2006 rating year?

Answer:    I don't have access to Litigation II records, but believe Ms. Davis worked on two investigations.

Question:    Are you aware of any removals of trial attorneys from the lead attorney position of an investigation for poor performance within the past three years at the Litigation II Section? If so, how many?

Answer:    I do not believe any other lead attorney was removed for poor performance in the past three years at the Litigation II Section. Ms. Petrizzi and I continually monitored the performance of lead attorneys and, where improvement was necessary, we discussed the issue with the lead and provided guidance on improving performance. Ms. Davis was the only lead attorney who failed to respond to the guidance provided and whose performance threatened the successful completion of the investigation.

Question:    Were any of your actions relating to Ms. Davis' 2005/2006 performance appraisal that resulted in a minimally satisfactory rating because of her race, age or sex?

Answer:    My input to Ms. Davis' minimally satisfactory rating was based strictly on her performance as measured against the job description of a GS-15 attorney and the standards set out in her work plan.

Question:    Ms. Davis also alleges that management retaliated against her for initiating the EEO process on January 25, 2007, when her duties were changed on or about March 14, 2007, to include "the review of HSR filings." Are you aware of that, and if so, when did you become aware that Ms. Davis had filed an EEO complaint?

Answer:    Ms. Petrizzi, Ms. Fountain and I met with Ms. Davis on March 14, 2007, to discuss her performance during the Amsted/FMI investigation and her 2005/2006 performance evaluation. At that meeting, Ms. Davis did not mention her assignment to review HSRs or suggest that the assignment was made as retaliation for initiating an EEO complaint. I first became aware of this allegation on or about April 5, 2007, when I received a copy of her complaint.

Question:    What are HSR filings and what is involved in the review of them?

10

Answer:    The Hart-Scott-Rodino (HSR) Act requires parties to certain mergers to notify both the Department of Justice and the Fedeal Trade Commission before consummating the proposed transaction and to submit certain information to both agencies. After notification, the parties must wait a specified period, usually 30 days, before the transaction can be consummated. Each civil litigation section in the Antitrust Division is assigned responsibility for certain industries and HSR filings are assigned to Sections based on industry expertise. Before expiration of the waiting period, staffs must decide whether the filing raises competitive issues that need to be investigated. The primary basis for this determination is the HSR forms and its attachments, public information, and the accumulated industry knowledge of the staff. If staff determines that the transaction does not warrant an investigation, staff completes a "no-interest" memo explaining why it recommends that no investigation be initiated. If staff determines the transaction may raises competitive concerns, it prepares a Preliminary Inquiry ("PI") Request Memo seeking authority to conduct an investigation. Since both the DOJ and FTC share enforcement jurisdiction for mergers, the Division must also obtain "clearance" from the FTC before it can begin an investigation.

Generally, in the Litigation II Section the HSR review attorney is responsible for reviewing HSR filings, determining whether or not the transaction presents competitive issues, and drafting the no-interest or PI memos, and handling the Section's response on clearance issues.

Question:    Did you have any part in assigning Ms. Davis to review HSR filings? If not, who made the assignment?

Answer:    I was not in Litigation II when Ms. Davis was assigned to review HSRs and have no personal knowledge about the assignment.

Question:    Do you know why this assignment was given to Ms. Davis?

Answer:    I was not in Litigation II when Ms. Davis was assigned to review HSRs and have no personal knowledge about the assignment.

Question:    Had the workload for HSR review increased prior to Ms. Davis' reassignment to that function?

Answer:    I was not in Litigation II when Ms. Davis was assigned to review HSRs and have no personal knowledge about the HSR workload in the Litigation II Section.

Question:    Who reviewed HSR filings prior to Ms. Davis being given that assignment and what was their title? For how long had that individual been assigned to review HSR filings? What percentage of their time did they require to perform that task

during each week?

Answer:     During the period I was Assistant Chief of Litigation II, Suzanne Morris had
            primary responsibility for HSR review and she was backed-up by Stephanie
            Fleming. Ms. Morris was assigned to other matters in addition to her HSR
            responsibilities. It is difficult to provide the percentage split between HSR and
            non-HSR review as Ms. Morris' weekly workload varied depending on the
            number of HSRs received and her other assignments, but I would estimate that on
            average 70-75% of her time was devoted to HSR work and the balance to other
            investigations. Because Ms. Fleming performed a back-up function, the vast
            majority of her time was devoted to non-HSR review work.

Question:   After Ms. Davis was assigned to review HSR filings, was she the only person
            performing that task, or were there others assigned to that task? If she worked
            with others, who were they and what was their title?

Answer:     I was not in Litigation II when Ms. Davis was assigned to review HSRs and have
            no personal knowledge about the assignment.

Question:   Was Ms. Davis assigned other duties during the same time she was assigned to
            review HSR filings? If so what were those assignments and did they involve
            conducting investigations?

Answer:     I was not in Litigation II when Ms. Davis was assigned to review HSRs and have
            no personal knowledge about her other assignments.

Question:   Are the skills necessary to review HSR filings the same as they would be for an
            attorney to conduct or lead an investigation, or is it a lower level task that requires
            less effort or involvement than would be necessary to conduct an investigation?

Answer:     Attorneys responsible for both HSR review and leading investigations must have
            sound judgment and extensive industry expertise, although attorneys performing
            HSR review do not conduct complete investigations or use the full set of
            investigative tools available to a lead attorney conducting a merger investigation.
            Nonetheless, HSR review requires considerable judgement and experience
            because the HSR review attorney must make an up or down decision based on
            limited information and the consequences of a wrong call can be severe. In the
            Litigation II Section, HSR review is assigned to a GS-15 attorney. Similarly,
            during my tenure in the Networks and Technology Section, the three attorneys
            responsible for coordinating HSR review were GS-15 attorneys.

Question:   Do you believe the assignment of Ms. Davis to review HSR filings had any
            relation to the fact that she had filed an EEO complaint?

Answer:     I was not in Litigation II when Ms. Davis was assigned to review HSRs and have no personal knowledge about the assignment.

Question:   Are there any witnesses you wish to be interviewed to support your position in this EEO matter?

Answer:     No.

Question:   Is there any information you would like to add to this statement that is relevant to the issues discussed?

Answer:     No.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury, that the foregoing statement is true and correct.

_____        _7/26/07_____

James Tierney,                                              Date
Former Assistant Chief
Litigation II Section

*EEO Investigator*
*July 26, 2007*

13

APR-28-2006 11:20A FROM:                                      TO:8175820055        P.1/1

## PRIVACY ACT NOTICE TO INTERVIEW WITNESSES
## (OTHER THAN COMPLAINANT)
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview in derived from one or more of the following: Title 5, Code of Federal regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5 United States Code, Section 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted for federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to EEO Commission activities, to the intelligence agencies of the Federal Government or to others for uses as published in the Federal register.

### EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary, however, failure on the part of Department of Justice employees to furnish the information will result in a direction by the Attorney General or designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment. Disclosure of information by present or perspective contractors is also voluntary, although failure to furnish the above requested information where the contract so provides, may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____
Signature of Investigator

_____
Signature of Affiant

2/30/07
Date

14

EXHIBIT 4

## U.S. DEPARTMENT OF JUSTICE EMPLOYEE RATING FORM - ATTORNEY  EXE-3

**RATING PERIOD FROM** October 1, 2005_ **TO:** September 30, 2006_

**POSITION TYPE:**

| ☐ SUPERVISORY | ☒ ATTORNEY | ☒ RATING OF RECORD |
|---|---|---|
| ☒ NONSUPERVISORY | ☐ NON-ATTORNEY | ☐ INTERIM RATING |

| NAME OF EMPLOYEE:<br>Davis, Carolyn L. | SOCIAL SECURITY NUMBER: | GRADE/STEP/SALARY:<br>15/10 |
|---|---|---|
| POSITION:<br>Attorney | ORGANIZATION:<br>Antitrust Division<br>Litigation II Section | DUTY STATION:<br>Washington, DC |

Performance Elements and Achievements:

C    JOB ELEMENT 1: <u>RESEARCH, INVESTIGATION AND LITIGATION</u>

During this rating period, Ms. Davis worked on the ▓▓▓▓▓▓▓ and the ▓▓▓▓ investigations. In ▓▓▓▓ Ms. Davis was called upon to review GSW documents. Ms. Davis started out as the lead attorney of the ▓▓▓▓▓ investigation, but was later made a team member when a new lead was assigned to the investigation. On ▓▓▓▓▓ Ms. Davis drafted the preliminary investigation memorandum, prepared CIDs, drafted the initial declarations of potential witnesses and initiated the review of the parties' ˻ ̶ ̶liance of the CIDs.

Ms. Davis is aware of the appropriate investigative tools and appropriately uses them, but quite often her efforts need more supervision than should be required of a grade 15/10 attorney.

| OUTSTANDING | EXCELLENT | SUCCESSFUL | X | MINIMALLY<br>SATISFACTORY | UNACCEPTABLE |
|---|---|---|---|---|---|

C    JOB ELEMENT 2: <u>QUALITY OF ANALYSIS</u>

Ms. Davis exercises good judgment in formulating recommendations for action. Usually her recommendations analyze the appropriate legal and economic issues and reflect a good understanding of the Division's objectives and policies.

| OUTSTANDING | EXCELLENT | X | SUCCESSFUL | MINIMALLY<br>SATISFACTORY | UNACCEPTABLE |
|---|---|---|---|---|---|

C    JOB ELEMENT 3: <u>WRITING.</u>

Ms. Davis' writing is generally clear and concise and significant facts and issues are covered. Her ▓liance letters in ▓▓▓▓▓ did not demonstrate the type of drafting that Ms. Davis is capable of doing - they were not appropriate for the task at hand and they often did not take into consideration the documents that the parties had previously provided to Ms. Davis and her staff. The Section's efforts to send the compliance letters out to the parties took several meetings and drafts between Ms. Davis and section management.

*1*

| OUTSTANDING | EXCELLENT | SUCCESSFUL | X | MINIMALLY SATISFACTORY | UNACCEPTABLE |
|---|---|---|---|---|---|

C    JOB ELEMENT 4:  <u>NEGOTIATIONS AND ORAL PRESENTATIONS</u>

Ms. Davis has a strong command of the facts underlying her cases, but this does not always show in her verbal presentations to section management.  During this rating period, Ms. Davis' efforts on█████ and her "moot sessions" with section management to assist in her presentations to the parties were particularly ineffective and showed a lack of command of relevant theories that would be applied to her facts.  Her written materials that she provided section management were clear, but when Ms. Davis was asked questions during her presentation, she often misstated the law and she did not seem to have a firm grasp on the theories of her case.  To Ms. Davis' credit she worked hard in preparing for a follow-up "moot session," but many of the same errors occurred during her presentation.

These minimally satisfactory efforts were countered by Ms. Davis' successful efforts during the deposition of a key witness in████████ Her line of questioning was appropriate and her demeanor with outside counsel was effective.  She exercises the appropriate degree of tact, courtesy and discretion in her dealings with superiors, staff and outside counsel.

During this upcoming year, we will continue to give Ms. Davis' assignments wherein she will be pressed to make presentations and verbal recommendations which are appropriate for an attorney who has achieved a grade of 15/10.

| OUTSTANDING | EXCELLENT | SUCCESSFUL | X | MINIMALLY SATISFACTORY | UNACCEPTABLE |
|---|---|---|---|---|---|

C    JOB ELEMENT 5: <u>REPRESENTATIONS OF DIVISION INTERESTS.</u>

Ms. Davis understands the Division's mission and she is usually able to  further those interests in dealings with people inside and outside the Division.

| OUTSTANDING | EXCELLENT | X | SUCCESSFUL | MINIMALLY SATISFACTORY | UNACCEPTABLE |
|---|---|---|---|---|---|

C    JOB ELEMENT 6:  <u>DILIGENCE, DEPENDABILITY AND ADHERENCE TO OFFICE POLICIES</u>

Ms. Davis has been a diligent and dependable member of the Section.  During this rating year she was given the opportunity to lead a consummated transaction where the evidence of post-consummation competitive effects was strong.  She spent an inordinate amount of time dealing with potential compliance issues rather than focusing on the effects of the transaction and how to remedy those effects.  While she understands the Section's overall goals, policies and procedures, and works to achieve them, she requires far more supervision in achieving these goals than should be required of an attorney at her grade level.

| OUTSTANDING | EXCELLENT | SUCCESSFUL | X | MINIMALLY SATISFACTORY | UNACCEPTABLE |
|---|---|---|---|---|---|

2

C       JOB ELEMENT 7:  <u>SERVICES TO VICTIMS AND WITNESSES</u>

pplicable in rating period.

| | OUTSTANDING | | EXCELLENT | | SUCCESSFUL | | MINIMALLY SATISFACTORY | | UNACCEPTABLE |
|---|---|---|---|---|---|---|---|---|---|

OVERALL PERFORMANCE RATING:  Please check the block which best characterizes the employee's overall performance during the rating cycle.  Refer to instructions to insure that the rating assigned is in accord with the rating level descriptions in the order.

| | OUTSTANDING | | EXCELLENT | | SUCCESSFUL | X | MINIMALLY SATISFACTORY | | UNACCEPTABLE |
|---|---|---|---|---|---|---|---|---|---|

RATING OFFICIAL (Signature and Date)
_Ma Bttltz_      _11/7/06_

REVIEWING OFFICIAL (Signature and Date)

EMPLOYEE (Signature and Date) Acknowledges that the final rating has been discussed.

The rating was given in hard copy to Ms. Davis on 12/12/06 and discussed on 12/13/06. Ms. Davis has not signed her rating.

**3**

EXHIBIT 5

# U.S. DEPARTMENT OF JUSTICE EMPLOYEE RATING FORM - ATTORNEY

**RATING PERIOD FROM:** July 1, 2004 __ **TO:** September 30, 2005 __

**POSITION TYPE:**

[ ] SUPERVISORY [✖] ATTORNEY [✖] RATING OF RECORD
[✖] NONSUPERVISORY [ ] NON-ATTORNEY [ ] INTERIM RATING

| NAME OF EMPLOYEE:<br>Davis, Carolyn L. | SOCIAL SECURITY NUMBER: | GRADE/STEP/SALARY:<br>15/10 |
|---|---|---|
| POSITION:<br>Attorney | ORGANIZATION:<br>Antitrust Division<br>Litigation II Section | DUTY STATION:<br>Washington, DC |

Performance Elements and Achievements:

C    JOB ELEMENT 1: <u>RESEARCH, INVESTIGATION AND LITIGATION</u>

During this rating period, Ms. Davis was detailed to the TEL Section where she worked on the ▮▮▮▮ and the ▮▮▮▮▮ investigations. In addition to these matters, she worked on Lit II's ▮▮▮ and ▮▮▮▮▮▮ investigations. In Ms. Davis' investigations, all major issues of fact, law and economics are adequately considered and analyzed. Her requests for information are appropriately drafted to obtain relevant information and minimize the production of extraneous material. Ms. Davis was ⸳icularly effective in her detail in TEL and she was thorough in her review of the documents and she quickly ⸳ified key documents for the investigative team.

| | OUTSTANDING | | EXCELLENT | X | SUCCESSFUL | | MINIMALLY<br>SATISFACTORY | | UNACCEPTABLE |
|---|---|---|---|---|---|---|---|---|---|

C    JOB ELEMENT 2: <u>QUALITY OF ANALYSIS</u>

Ms. Davis exercises good judgment in formulating recommendations for action. Her recommendations analyze the appropriate legal and economic issues and reflect a good understanding of the Division's objectives and policies.

| | OUTSTANDING | | EXCELLENT | X | SUCCESSFUL | | MINIMALLY<br>SATISFACTORY | | UNACCEPTABLE |
|---|---|---|---|---|---|---|---|---|---|

C    JOB ELEMENT 3: <u>WRITING.</u>

Ms. Davis' writing is generally clear and concise and significant facts and issues are covered. Her ⸳⸳rtion of the ▮▮▮▮ closing memo was not as clear or as well-organized as would be expected from an ⸳ney with Ms. Davis' experience.

| | OUTSTANDING | | EXCELLENT | X | SUCCESSFUL | | MINIMALLY<br>SATISFACTORY | | UNACCEPTABLE |
|---|---|---|---|---|---|---|---|---|---|

4

JOB ELEMENT 4: NEGOTIATIONS AND ORAL PRESENTATIONS

Ms. Davis has demonstrated sound negotiation skills and her demeanor with outside counsel is appropriate and effective. Ms. Davis' oral presentations are articulate and persuasive, and she addresses satisfactorily questions raised by others. She exercises the appropriate degree of tact, courtesy and discretion in her dealings with superiors, staff and outside counsel.

| | OUTSTANDING | X | EXCELLENT | | SUCCESSFUL | MINIMALLY SATISFACTORY | | UNACCEPTABLE |
|---|---|---|---|---|---|---|---|---|

C       JOB ELEMENT 5: REPRESENTATIONS OF DIVISION INTERESTS.

Ms. Davis understands the Division's mission and she is able to effectively further those interests in all dealings with people inside and outside the Division.

| | OUTSTANDING | | EXCELLENT | X | SUCCESSFUL | MINIMALLY SATISFACTORY | | UNACCEPTABLE |
|---|---|---|---|---|---|---|---|---|

C       JOB ELEMENT 6: DILIGENCE, DEPENDABILITY AND ADHERENCE TO OFFICE POLICIES

Ms. Davis is a diligent and dependable member of the Section. She understands the Section's overall goals, policies and procedures, and works to achieve them. She keeps supervisors informed of important developments, and her matters are handled in compliance with all policies and procedures.

| | OUTSTANDING | X | EXCELLENT | | SUCCESSFUL | MINIMALLY SATISFACTORY | | UNACCEPTABLE |
|---|---|---|---|---|---|---|---|---|

C       JOB ELEMENT 7: SERVICES TO VICTIMS AND WITNESSES

Not applicable in rating period.

| | OUTSTANDING | | EXCELLENT | | SUCCESSFUL | MINIMALLY SATISFACTORY | | UNACCEPTABLE |
|---|---|---|---|---|---|---|---|---|

OVERALL PERFORMANCE RATING: Please check the block which best characterizes the employee's overall performance during the rating cycle. Refer to instructions to insure that the rating assigned is in accord with the rating level descriptions in the order.

| | OUTSTANDING | | EXCELLENT | X | SUCCESSFUL | MINIMALLY SATISFACTORY | | UNACCEPTABLE |
|---|---|---|---|---|---|---|---|---|

RATING OFFICIAL (Signature and Date)

5

REVIEWING OFFICIAL (Signature and Date)

_11/7/05_

EMPLOYEE (Signature and Date) Acknowledges that the final rating has been discussed.

_11/14/05_

6

EXHIBIT 6



**DEPARTMENT OF JUSTICE**
Antitrust Division

**THOMAS O. BARNETT**
Assistant Attorney General

Main Justice Building
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001
(202) 514-2401 / (202) 616-2645 (Fax)
E-mail: antitrust@usdoj.gov
Web site: http://www.usdoj.gov/atr

JAN 26 2007

To: Carolyn L. Davis
    Trial Attorney
    Litigation II Section

From: Thomas O. Barnett *TaB*
      Assistant Attorney General
      Antitrust Division

Subject: <u>Performance Rating Appeal</u>

Your request for an extension of time within which to submit a performance rating appeal is denied.

Pursuant to Antitrust Directive 1430.1, Section 10, Performance Rating Appeals, an appeal may be rejected upon submission if it is not filed within 30 calendar days of receipt of the rating, and there are insufficient grounds for extending the time limit. Your rating was received on December 12, 2006, and the request for an extension was not submitted until January 18, 2007, which is 37 calendar days later. As a trial attorney in the Division for over 12 years, it is reasonably expected that you are aware of the Division's policies and procedures for contesting a performance rating, which are addressed in Directive 1430.1 and are readily available at your desktop. The fact that you previously filed a timely performance rating appeal suggests that you are familiar with the time frame for preserving your appeal rights. Your belief that an employee statement would serve in lieu of the formal appeal process is not sufficient cause for granting an extension.

If you have any questions concerning the procedures governing this decision, you may direct them to Michelle Ackley, Human Resources Specialist, by electronic mail or on (202) 514-2990.

**U. S. Department of Justice**

Antitrust Division

*Patrick Henry Building*
*601 D. Street, NW*
*Washington, DC 20530*

JAN 2 6 2007

TO:   Thomas O. Barnett
      Assistant Attorney General
      Antitrust Division

FROM: Thomas D. King
      Executive Officer
      Antitrust Division

SUBJECT: Performance Rating Appeal

    The Executive Office received a request for an extension of the deadline in which to file a performance rating appeal from Carolyn Davis on January 18, 2007. I recommend that the request be rejected on the basis that it was not submitted within the required 30 calendar days, and there is insufficient cause for granting an extension. Attached for your signature is a memorandum to Ms. Davis denying her request for an extension.

Attachment

# Memorandum



| Subject | Request for Extension of Time Within Which to Appeal 2005/2006 Rating | Date | 1/18/2007 |
|---------|-----------------------------------------------------------------------|------|-----------|

| To | Thomas O. Barnett | From | Carolyn L. Davis |
|----|-------------------|------|------------------|
|    | Assistant Attorney General | | Attorney |
|    |                   |      | Litigation II |

I request an extension of time within which to appeal my 2005/2006 rating (Rating"), which I received on December 12, 2006 and section management discussed with me on December 13, 2006. Antitrust Division Directive 1430.1, 10(a) provides that an appeal may be made within 30 calendar days of a rating. Therefore, under the directive, the appeal period for my Rating expired on January 13, 2007.

I did not appeal the Rating within the 30-day time period because my intention was to attach a statement to the Rating in lieu of appealing it through the grievance procedure. It was my understanding that my statement would be incorporated in the Rating. However today, Michelle Ackley, Personnel Manager, informed me that her research indicates that the statement may not be attached to and incorporated in the Rating. Given this information, I request an extension of two weeks, until January 26, 2007, to appeal the Rating through the grievance procedure.

EXHIBIT 7

Ex B-2

**Department of Justice**
**Equal Employment Opportunity Staff**
**Justice Management Division**

**EEO COUNSELOR'S REPORT (29 C.F.R. § 1614.105)**
**AGENCY DOCKET NO.: OBD-2007-00155**

| | |
|---|---|
| **Name:**<br>**Home Address:**<br>**Home Telephone Number:** | Ms. Carolyn L. Davis |
| **Work Address:**<br>**Work Telephone Number:** | U.S. DOJ, Antitrust Division<br>Litigation II Section<br>1401 H Street, N.W., 8th Floor, Suite 8802<br>Washington, D.C. 20530<br>(202) 514-5815 |
| **Employee/Former Employee/ Applicant:** | Employee |
| **Position Title/Series/Grade:**<br>**Type of Appointment: Probationary/**<br>**Career/Temp/ Term/Work Schedule:**<br>**FT or PT:**<br>**Length of Employment with DOJ:** | Trial Attorney, GS-15<br>Permanent Employee<br><br>Gov't Service from 1994 to Present<br>15 years w/ Antitrust Division |
| **Office/Board or Division:**<br>**Section:**<br>**Telephone #:** | U.S. DOJ, Antitrust Division<br>Litigation II Section<br>(202) 307-0924 |
| **Name and Address of Responsible**<br>**Facility:** | Thomas O. Barnett, Assistant Attorney General<br>U.S. DOJ, Antitrust Division<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530<br>(202) 514-2401 |
| **Date of Most Recent Discriminatory Event:**<br>    December 13, 2006 | **Date/Initial Interview:**  January 30, 2007 |
| **Date /Initial Contact with EEO:**<br>    January 25, 2007 | **Date/Final Interview:**   March 2, 2007 |
| **Number of Days from Discriminatory Event to**<br>**Initial Contact:   43 days** | **Date/Notice of Right to File Rec'd;**  March 21, 2007 |
| **Date/Issued Notice of Right to File:**<br>    March 16, 2007 | **Number of Days from NFI Rec'd  to Date Complaint**<br>**Filed/Faxed/PM/HD:  15 days** |
| **Date /Notice of Rights & Responsibilities/Rec'd;**<br>    January 30, 2007 | **Date Formal Filed:**   April 5, 2007  (Hand Delivered) |
| **Date Referred to ADR:  None.** | **Date Counseling Extension Granted:  None.** |

1

-2-

| Basis(es) | Claim(s) | Date(s) | ADR/ Resolution |
|---|---|---|---|
| Age:    (55)<br>D.O.B.: ████1951<br>Race:   (Black)<br>Sex:    (Female) | Performance Appraisal | December 13, 2006 | 1) Change Performance Rating<br>2) Removal of Negative and<br>    Erroneous comments in<br>    Performance Rating<br>3) Compensatory Damages |

**Name of Aggrieve Person (AP):**    Carolyn L. Davis

| | | |
|---|---|---|
| **Name of AP's Representative:** | ( ) Yes | (X) No |
| **AP's Representative's Address/ Telephone:** | | |
| **Did Aggrieved Person Choose to Remain Anonymous?** | ( ) Yes | (X) No |
| **Did Aggrieved Person Choose to Participate in ADR?** | ( ) Yes | (X) No |
| **Mixed Case Complaint:** | ( ) Yes | (X) No |
| **MSPB Filed:** | ( ) Yes | (X) No |
| **Negotiated Grievance Filed:** | ( ) Yes | (X) No |
| **If yes, when?** | | |

**Initial Interview/Background Information:**

The EEO Counselor on January 30, 2007, conducted an initial interview with AP. The EEO Counselor explained to AP her right to remain anonymous and her right to representation during the counseling process. The AP was informed of her rights and responsibilities in the EEO Process. In addition, the EEO Counselor informed the AP that she has 15 calendar days to file a formal complaint after she receives written notice of her right to file a complaint.

**The Aggrieved Party's Rights and Responsibilities were Discussed on:  January 30, 2007**

2

-3-

**Below is a Description of the Allegations and Resolutions as Presented by the Aggrieved Person:**

Claims:    Age (55), Race (Black) and Sex (Female)

AP claims she was discriminated against based on her age (55), race (black) and sex (female), on December 13, 2006, when she received a "minimally satisfactory" on her 2005/2006 performance rating (October 1, 2005 - September 30, 2006) from her immediate supervisor Maribeth Petrizzi, Chief and second line supervisor, James J. Tierney, Chief, Networks and Technology Enforcement Section (former Assistant Chief of the Litigation II Section).

Issue # 1:    Performance Rating

AP stated that on December 12, 2006, she received an e-mail from her immediate supervisor and in that e-mail, she was notified of a meeting scheduled for December 13, 2006, with her immediate supervisor and Dorothy B. Fountain, Assistant Chief, to discuss her 2005/2006 performance rating. AP stated that on December 12, 2006, she requested a copy of her 2005/2006 performance rating before the meeting and she became aware of the "minimum satisfactory" rating. Also, AP stated that on December 13, 2006, management discussed the rating with her.

AP stated that she would like the erroneous, negative statements in the comments to job elements 1, 3, 4, and 6 to be removed from her 2005/2006 performance rating.

AP stated that in December 2005, she requested and received authority to open the Amsted/FMI investigation. AP stated that she was the lead attorney and that she developed and managed the investigation without supervision and that her efforts far exceeded "minimally satisfactory." AP stated that on or around May 8, 2006, she was removed from the lead attorney position in the Amsted/FMI investigation and replaced by a young, white male trial attorney. AP stated that on May 4, 2006, a young, white male trial attorney and a senior trial attorney were added to the Amsted/FMI investigation team.

AP stated management treated her in a dismissive manner and that she was not informed when new trial attorneys were assigned to the investigation team. AP felt management had not responded to her on the management matters of the case. AP stated that for each meeting she conducted, she prepared an agenda, a to do list and case status updates.

AP stated that younger, white attorneys, particularly males, who performed as she did in leading the Amsted/FMI investigation received overall ratings and ratings on individual job elements that far exceeded "minimally satisfactory."

AP stated that the race, sex and age discrimination inflicted upon her by management have caused her severe emotional distress and have precluded her from pursing career opportunities with other branches of the Federal Government.

3

-4-

AP stated that the following individuals are presently assigned to the Amsted/FMI investigation team:

C. Scott Hataway, Lead Trial Attorney
Robert Wilder, Trial Attorney
Raven Ducker, Trial Attorney
Thomas Horton, Trial Attorney
Dr. Russel Pittman, Senior Economics
John Ziegler, Paralegal
Kenyana Flakes, Paralegal  (transferred to another section)

## Responding Officials:

The EEO Counselor contacted the following responding officials on February 8 and 12, 2007:

Thomas D. King                  Latoya Reed
Executive Officer               Human Resource Specialist
(202) 514-4005                  (202) 305-8996

## Results of the RMO interviews:

Management stated that AP had 30 days to appeal her performance rating.  Management stated that on the 37th day, AP requested an extension to appeal her performance rating and it was denied.

Management stated there had been discussions regarding AP's performance throughout the period.  Also, management stated that AP was removed from the Amsted/FMI investigation team due to deficiencies in her performance and that her performance rating was based on facts.

In addition, management stated they would review AP's submission of documentation in regards to her 2005/2006 performance rating.

## Response to resolution sought by aggrieved:

Informal Resolution Attempt - Unsuccessful.

On March 15, 2007, management met with AP to go over her submission of documentation and to discuss her 2005/2006 performance rating.

## Additional Information:    None.

4

-5-

## Claims and Issues outside of the 45 day Time Period:  None.


## Documents Reviewed and Attached:

The EEO Counselor received the following documents from AP:

> Tab 1  -  Facsimile (17 pages) dated February 22, 2007, Re:  List of Documents
> Tab 2  -  AP's Summary of Documents to support claim
> Tab 3  -  E-mail dated December 12, 2006, Subj:  Re: Rating Discussion
> Tomorrow
> Tab 4  -  U.S. Department of Justice Employee Rating Form - Attorney
> (Rating Period from October 1, 2005 to September 30, 2006)

## Witnesses Identified:

AP stated that a co-worker, Ms. Karen Phillips-Savoy was experiencing the same discrimination.

## Final Interview:

On **March 2, 2007,** the results of resolution efforts and the claim(s) were discussed with the aggrieved.  All claims presented during counseling were addressed and the response provided by management was relayed to the Aggrieved Person (AP).

Consequently, Carolyn L. Davis received her Notice of Right to File a Complaint of Discrimination and the appropriate form (DOJ 201A) on **March 21, 2007.**

Donna Gray-Flowers
EEO Counselor
Justice Management Division
1425 New York Avenue, N.W.
Suite 10001
Washington, DC 20530
(202) 616-4820

April 5, 2007
Date

EXHIBIT  8

**U.S. Department of Justice**

Justice Management Division

*Equal Employment Opportunity Staff*

*Washington, D.C. 20530*

APR 1 2 2007

<u>Sent via Certified Mail # 7005 0390 0004 4547 4033</u>

Ms. Carolyn L. Davis
9215 Crosby Road
Silver Spring, Maryland 20910

<strong>RE: NOTICE OF RECEIPT OF COMPLAINT OF DISCRIMINATION<br>
OF CAROLYN L. DAVIS, AGENCY DOCKET NUMBER: OBD-2007-00155</strong>

Dear Ms. Davis:

This notice acknowledges receipt of your Formal Complaint of Discrimination against the Antitrust Division, U. S. Department of Justice. Your Formal Complaint was received (Hand Delivered) on April 5, 2007.

Your complaint has been assigned Agency Docket Number: **OBD-2007-00155**. Please include this docket number on all future correspondence or other documents regarding this complaint. Enclosed is a copy of the EEO Counselor's Report in your case.

If your complaint is accepted, it will be investigated. The Department of Justice is required to conduct a complete and fair investigation of all complaints within **180 days** of the filing date, unless the parties agree in writing to extend the investigation. You will receive a copy of the investigative file and you will have an opportunity to request a final agency decision or a hearing before an Equal Employment Opportunity Commission (EEOC) Administrative Judge.

If your entire complaint is dismissed, you may appeal the Department's decision to the EEOC's Office of Federal Operations within **30 days** of your receipt of the Department's dismissal. Partial dismissals of complaints are not immediately appealable to the EEOC. However, a partial dismissal is reviewable by an EEOC administrative judge if a hearing is requested on the remainder of the complaint. The Department's decision to dismiss a portion of a complaint is not appealable until the Department takes final action on the remainder of the complaint. If settlement of the complaint is reached, the terms of the settlement will be stated, in writing, and you will be given a copy.

-2-

If, within **30 days** after your receipt of the investigative file, you fail to request a final agency decision or a hearing, your complaint will be forwarded to the Department's Complaint Adjudication Officer for a final agency decision.

If you are dissatisfied with the final agency decision, you may file a Notice of Appeal with the EEOC, Office of Federal Operations, within **30 calendar days** after receiving the final decision. The appeal should be mailed to the:

> Director
> Office of Federal Operations
> Equal Employment Opportunity Commission
> P.O. Box 19848
> Washington, D.C. 20036

At the same time, you must furnish a copy of the appeal to this office. In or attached to the appeal to the EEOC, you must certify the date and method by which service was made on the Department of Justice. You may submit a brief or statement to support your appeal to the Office of Federal Operations, EEOC, within **30 calendar days** after filing the Notice of Appeal. At the same time, you must furnish a copy of the supporting brief or statement to the Department of Justice.

Instead of an appeal, you have the right to file a civil action in Federal District Court on matters raised in the administrative process:

a.   Within **90 days of receipt** of the final action on an individual or class complaint if no appeal has been filed;

b.   After **180 days from the date of filing** an individual or class complaint if an appeal has not been filed and final action has not been taken;

c.   Within **90 days of receipt** of the EEOC's final decision on the appeal; or

d.   After **180 days from the date of filing an appeal** with the EEOC if there has been no final decision by the EEOC.

2

-3-

Should you have any questions regarding any of the issues addressed in this letter, please contact Mr. Marcus Williams, Deputy Director, at (202) 616-4800.

Sincerely,

Vontell D. Frost Tucker
Director
Equal Employment Opportunity
    Staff

Enclosure

**3**

EXHIBIT 9



**U.S. Department of Justice**

Justice Management Division

*Equal Employment Opportunity Staff*

_____

*Washington, D.C. 20530*

MAY 2 2 2007

**Sent via Certified Mail # 7005 0390 0004 4547 4088**


Ms. Carolyn L. Davis
9215 Crosby Road
Silver Spring, Maryland 20910

**RE: NOTICE OF PARTIAL ACCEPTANCE OF COMPLAINT OF DISCRIMINATION
OF CAROLYN L. DAVIS, AGENCY DOCKET NUMBER: OBD-2007-00155**

Dear Ms. Davis:

This letter acknowledges partial acceptance of your Complaint of Discrimination, hand delivered on April 5, 2007, against the Antitrust Division, Litigation II Section, U.S. Department of Justice.

You allege that because of your race (black), sex (female), and age (55) you were removed from the lead attorney position concerning the "Amsted/FMI investigation" in May of 2006 and that you received a "minimally satisfactory" rating on your 2005/2006 annual performance appraisal (rating period October 1, 2005 - September 30, 2006). You maintain that you received your "minimally satisfactory" rating on December 12, 2006, and that management discussed the rating with you on December 13, 2006.

You also allege that management retaliated against you for initiating the EEO process on January 25, 2007, when your duties were changed on or about March 14, 2007, to include "the review of HSR filings."

Federal Regulations at 29 C.F.R. §1614.105(a)(1) provide that an aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 days of the effective date of the action.

Record evidence shows that the May, 2006, claim was brought to the attention of an EEO Counselor greater than 120 days beyond the statutory requirement for presenting a timely claim. 29 C.F.R. §1614.105(a)(1). Therefore, your claim of discrimination based on your being removed from the lead attorney position for the "Amsted/FMI investigation" in May, 2006, will not be investigated.

/

-2-

Federal Regulations at 29 C.F.R. §1614.107(a)(2) and (b) provide in relevant part:

(a)     Prior to a request for a hearing in a case, the agency shall dismiss an entire complaint:

        (2) ... that fails to comply with the applicable time limits contained in §1614.105, §1614.106, and §1614.204(c), unless the agency extends the time limits in accordance with §1614.604(c), or that raises a matter that has not been brought to the attention of a Counselor and is not like or related to a matter that has been brought to the attention of a Counselor; and

(b)     Where the agency believes that some but not all of the claims in a complaint should be dismissed for the reasons contained in paragraphs (a)(1) through (9) of this section, the agency shall notify the complainant in writing of its determination, the rationale for that determination and that those claims will not be investigated, and shall place a copy of the notice in the investigative file. A determination under this paragraph is reviewable by an administrative judge if a hearing is requested on the remainder of the complaint, but is not appealable until final action is taken on the remainder of the complaint.

After a careful review of the record, it has been determined that your claims concerning your 2005/2006 performance appraisal and your March 14, 2007, change of duties will be accepted for investigation. In accordance with the aforementioned statutory regulations, your claim of discrimination based on you being removed from the lead attorney position for the "Amsted/FMI investigation" in May, 2006, will not be accepted for investigation. However, this information will be regarded as background material to the extent it is relevant to the timely presented claims of alleged discrimination.

If you believe that the issues in your complaint are not correctly identified, please notify me, in writing, within **7 days** after your receipt of this notice and specify why you believe that the issues are not correctly identified.

A Contract EEO Investigator will be contacting you when the inquiry is to begin. For your information, I am enclosing an outline of your rights and responsibilities under the formal stages of the EEO complaint process as set forth in 29 CFR Part 1614. Furthermore, the following options are available to you pursuant to the Age Discrimination in Employment Act (ADEA) of 1967, as amended.

(1)     You may file an administrative age discrimination complaint with the Federal agency pursuant to Title 29 CFR Part 1614. If you elect to file an administrative complaint you must exhaust administrative remedies before filing a civil action in U.S. District Court.

-3-

    (2)      You may bypass the administrative complaint process and file a civil action directly in U.S. District Court provided that you first provide the Equal Employment Opportunity Commission (EEOC) with a written notice of intent to sue under the ADEA.

The notice to EEOC must be filed <u>within 180 calendar days of the date of the alleged discriminatory action(s)</u>. Once a timely notice of intent to sue is filed, you must wait at least 30 calendar days before filing a civil action. Whether you pursue an administrative complaint or elect to bypass the administrative process, no specific statutory limitation applies to those federal employee complainants seeking federal court redress. As the law now stands, each jurisdiction fashions its own time limit and they range anywhere from two to six years.

The U.S. District Court where you plan to file your notice of intent to sue can apprise you of the statute of limitations for that particular jurisdiction.

Also, you should be aware that attorney's fees at the administrative level are not available in age discrimination complaints. If you choose to bypass the administrative process, it is your responsibility to provide EEOC with a written notice of intent to sue that must be dated and contain the following information:

    (1)      Statement of intent to file a civil action under Section 15(d) of the ADEA, as amended;

    (2)      Your name, current address, and telephone number;

    (3)      Name, address, and telephone number of designated representative or attorney, if any;

    (4)      Name and location of the Federal agency where the alleged discriminatory action(s) occurred;

    (5)      Date(s) the alleged discriminatory action(s) occurred;

    (6)      Statement of the nature of the alleged discriminatory action(s); and

    (7)      Your signature or representative's or attorney's signature.

*3*

-4-

Notice of intent to sue under the ADEA must be delivered to the EEOC at the following address:

> Equal Employment Opportunity Commission
> Office of Federal Operations
> Federal Sector Programs
> 1801 L Street, N.W.
> Washington, DC  20507

or mailed to:

> Equal Employment Opportunity Commission
> Office of Federal Operations
> Federal Sector Programs
> P.O. Box 19848
> Washington, DC  20036

or faxed (if no more than 10 pages) to:

> (202) 663-7022

Finally, it is necessary that you specifically advise this office of your election to pursue your complaint through the Federal agency administrative process or through an appropriate U.S. District Court.  Written notification of your decision must be received in this office no later than fifteen (15) calendar days after receipt of this letter.  My address is:

> U.S. Department of Justice
> Equal Employment Opportunity Staff
> 1425 New York Avenue, N.W.
> Suite 10001
> Washington, DC  20530

Equal Employment Opportunity Commission regulations require that you notify this office of any prolonged absence from your current address and any change of address and/or telephone number.  Also, should you retain an attorney or representative, you must promptly notify this office in writing of his/her name, address, and telephone number in order that all communications regarding your complaint will reach that individual.

<u>NOTICE OF RIGHTS</u>

In view of the foregoing, it is the preliminary decision of the Department of Justice (DOJ), pursuant to 29 C.F.R. 1614.105(a)(1) not to investigate your claim of discrimination based on your being removed from the lead attorney position for the "Amsted/FMI investigation" in

*4*

-5-

<u>May, 2006</u>.  A copy of this decision will be included in the report of investigation which is issued on the remainder of your complaint.

Our decision not to investigate this allegation is reviewable by an Equal Employment Opportunity Commission (EEOC) Administrative Judge, if a hearing is requested on the remainder of the complaint, but is otherwise not appealable until a final agency action is taken on the remainder of the complaint.  If the Administrative Judge believes that all or a part of the Department of Justice's reasons are not sound, the entire complaint or all of the portions not meeting the standards for dismissal will continue in the hearing process.

The Administrative Judge's decision on the partial dismissal will become part of the Administrative Judge's final decision on the complaint and may be appealed by either party after final action is taken on the complaint.

If you elect a final agency decision by the Complaint Adjudication Office (CAO) without a hearing, the CAO will issue a decision addressing all claims in the complaint, including a review of the rationale for dismissing part of your claims and its findings on the merits of the remainder of the complaint.  You may appeal the final agency decision to the EEOC.

You also have the right to file a civil action in an appropriate United States District Court if 180 days have elapsed from the date you filed your complaint.  You must name the person who is the official agency head or the Department Head as the defendant.  In your case, you must name Attorney General Alberto R. Gonzales.  Failure to provide the name or official title of the agency head or department head may result in the dismissal of your case.

If you decide to file a civil action under Title VII and do not have or cannot afford an attorney, you may request the court to appoint counsel for you.  Also, the court may permit you to file the action without payment of fees, costs or other security.  <u>The granting or denial of the request is within the sole discretion of the court</u>.  Filing a request for an attorney does not extend your time in which to file a civil action.  Both the request and the civil action <u>MUST BE FILED WITHIN 90 DAYS</u> of the date you receive the Commission's decision.

For the Department:


Vontell D. Frost-Tucker                    .5/21/07
Director                                    Date


Enclosure

EXHIBIT 10

U.S. Department of Justice

Antitrust Division

*Patrick Henry Building*
*601 D Street, NW*
*Washington, DC 20530*

November 2, 2006

# MEMORANDUM

TO:     Maribeth Petrizzi, Chief
        Litigation II Section

FROM:   Thomas D. King
        Executive Officer

SUBJECT:    Incentive Awards - Call for Nominations

Similar to 2005, the 2006 awards process in the Antitrust Division will closely tie awards to accomplishments during the performance rating cycle (October 1, 2005 to September 30, 2006) with larger award allocations and amounts going to those Sections/Offices and employees with the most significant achievements. For the 2006 awards cycle, there are two ways to nominate an employee for award. A separate funding pool has been identified for each set of nominations. These funding pools may not be combined. For Litigation II, the two award pools are:

Sustained Superior Performance (SSP): $29,000
Special Achievement (SA):            $44,500

Consistent with Departmental direction, the Division's total 2006 SSP award allocation is 0.6% of General Schedule (GS) employee salaries as calculated for the entire Division, for a total of $406,000. This has been further broken out within the Division based upon Section and Office accomplishments and a "performance multiplier" applied. The following standards generally are applicable. Fully Successful performance by a Section or Office merits a performance multiplier of zero; Excellent, a multiplier of 0.5; Outstanding, a multiplier of 1.25; and multipliers above 1.25 exceptional. Multipliers of 0.75 and 1.0 indicate performance between Excellent and Outstanding. The SSP performance multiplier for Litigation II is 1.25. Information on the determination of this value may be obtained from your supervisory Deputy Assistant Attorney General (DAAG).

In addition, this year the Division separately has identified funding for Special Act (SA) awards, allowing supervisors to nominate employees for specific acts, in particular those involving creative effort and/or special innovation, occurring throughout the rating period. This may be the case even if an employee's overall performance during the year may not have warranted an SSP award.

*9*

Award amounts for both SSP and SA awards may be proposed only in increments of $500. For individuals at grade GS-12 and above, awards may range from $500 to $5,000. For individuals at grade GS-11 and below, awards may range from $500 to $3,000. Quality Step Increases as a means of award will not be available this year for either category of award.

Consistent with Departmental Order 1451.1A, the maximum cash award amount that is within the authority of the Assistant Attorney General remains $5,000. For group awards, which must be in the form of SA nominations, the total amount of the cash awards for the group members must not exceed $5,000. An award higher than $5,000 may be proposed for individuals at grade GS-12 and above, but it is expected that any such nomination will be rare. Nominations for awards of over $5,000 must include compelling written justification that may be used to evaluate these requests in the Office of the Assistant Attorney General and, if approved, in seeking approval by the Attorney General. Approval by the Attorney General will be difficult to obtain.

*SSP awards may be proposed for employees rated as Excellent or Outstanding. SA awards, which require* a nomination memoranda, may not be proposed for employees rated Minimally Satisfactory or Unacceptable. As a general rule, awards should not be proposed for individuals whose performance during the last rating cycle has been at the bottom quarter of the Section or Office. Alternatively stated, only the top three-fourths of employees (as measured by performance) in any Section or Office should be nominated for any type of award. The percentage of award nominations made within a staff will be shared with Division senior management as nomination summaries are received, and any group with more than three-fourths of staff nominated should anticipate close questioning and a possible request for award reallocation. In considering nominations, monetary awards must reflect the relative value of the contributions to the Division of each nominee. Not every employee will merit a monetary award, and leave, *conduct, performance issues, and adherence with Division policies must be considered. In determining the* pool from which to nominate the top three-fourths of staff, chiefs should include all employees on their roles as of November 2, 2006, with the exception of those who were formally assigned to another Section or Office within the Division for the majority of the rating period. By Division policy, employees who left the Division are not eligible for cash awards. An award may not be proposed and will not be approved for an individual who is delinquent on entering his/her work time in the Time Reporting System as of the nomination deadline.

In addition to nominations for SSP and SA awards, nominations are solicited for Assistant Attorney General (AAG) Awards. An AAG Award consists of a plaque and a cash award of $3,000 for employees at GS-11 and below, and $5,000 for employees at GS-12 and above. Nominations must be based upon sustained superior performance. The format for these nominations is the same as Special Act Awards. The amount of an AAG Award will count against the Section or Office's SSP awards budget. Each Section or Office generally may nominate no more than one person for an AAG Award. Nomination memoranda are required for all SA, including group awards, and AAG Awards (Attachment 1) and must be submitted with your proposed list of award recipients. An AAG Award normally should be conferred only once in an employee's career, and justification must be strong and related to the accomplishment of the Division's mission

Funding for an award may be shared by two or more Sections or Offices. If employees have been on assignment to another Section or Office, the two chiefs should discuss award amounts and funding. The Paralegal Unit has its own awards budget, and awards for Unit paralegals normally will be funded by the

*10*

Unit. In unusual circumstances, a chief may offer to fund or augment an award for a Unit paralegal from his or her Section or Office budget.

A list in MS Excel format (Attachment 2) of the proposed award recipients in your Section or Office by last name must be sent by electronic mail to Michelle Ackley of the Personnel Staff **no later than COB Monday, November 27, 2006,** with a copy to Diane Gainey. This list must include:

    (1) employee name (last name first);
    (2) employee generic job title (e.g., attorney, economist, paralegal, secretary, administrative)
    .(3) current employee grade;
    (4) the type of award proposed --SSP, SA, AAG;
    (5) the proposed amount of each award, and;
    (6) if a shared award, the staffs involved and the amount to be contributed by each.

In addition, the following information must be submitted at the time of nomination:

    (7) SA Award nomination memo
    (8) AAG Award nomination memo

Once received, the Executive Office will work with each DAAG to review these nominations and then seek the approval of the Assistant Attorney General.

**You may not inform intended recipients of the proposed awards** until Michelle Ackley on the Division's Personnel Staff notifies you of the date that your employees will receive cash awards by Direct Deposit to their bank accounts. An appropriate ceremony will be held to present award plaques to AAG Award recipients.

For more detailed guidance on awards, please see Division Directive ATR 1451.1, Incentive Awards Program, on ATRnet under Administrative Center. Questions about awards may be directed to me, Diane Gainey, or Michelle Ackley by electronic mail.


cc:    David L. Meyer, Deputy Assistant Attorney General

H:\ADMIN\Personnel\AWARD\2006 Awards\2006 Lit II Call.wpd

*It*

EXHIBIT 11

## U.S. DEPARTMENT OF JUSTICE EMPLOYEE RATING FORM

**RATING PERIOD FROM:** 7/1/2003 **TO:** 6/30/2004

**POSITION TYPE:**

| | | |
|---|---|---|
| ☐ SUPERVISORY | ☒ ATTORNEY | ☒ RATING OF RECORD |
| ☒ NONSUPERVISORY | ☐ NON-ATTORNEY | ☐ INTERIM RATING |

| NAME OF EMPLOYEE:<br>Davis, Carolyn | SOCIAL SECURITY NUMBER:<br>███████ | GRADE/STEP/SALARY:<br>GS 15/10 |
|---|---|---|
| POSITION:<br>Attorney | ORGANIZATION:<br>Antitrust Division<br>Litigation II Section | DUTY STATION:<br>Washington, D.C. |

Performance Elements and Achievements:

C       JOB ELEMENT 1:  RESEARCH AND INVESTIGATION

Ms. Davis is currently leading the investigation of ███████████████████ both of which manufacture vacuum sewage systems used in air, marine, rail and possibly road transportation. Thus far, Ms. Davis has prepared an investigative agenda and interviewed customers and competitors. Ms. Davis was al    valuable contributor on the███████ and ███████ investigations. On ███████, Ms. D.    ad primary responsibility for issues related to the HSR reportability of the transaction, including analysis of financial documents, Second Request negotiation, and drafting a portion of the recommendation memo. In███████, Ms. Davis led the team that investigated the medical and food packaging product areas. Finally, Ms. Davis resolved ███████ request for termination of its consent decree.

In Ms. Davis' investigations, all major issues of fact, law and economics are adequately considered and analyzed. Where Ms. Davis has primary responsibility for all or a portion of an investigation, she adopts clear plans that are designed to achieve the objectives of the investigation. Her requests for information are appropriately drafted to obtain relevant information and minimize the production of extraneous material.

| | |
|---|---|
| ☐ UNACCEPTABLE | ☒ EXCEEDS or MEETS EXPECTATIONS |

C       JOB ELEMENT 2:  QUALITY OF ANALYSIS.

Ms. Davis exercises good judgment in formulating recommendations for action. Her recommendations analyze the appropriate legal and economic issues and reflect a good understanding of the Division's objectives and policies.

| | |
|---|---|
| ☐ NACCEPTABLE | ☒ EXCEEDS or MEETS EXPECTATIONS |

7

<u>C</u>    JOB ELEMENT 3:  <u>WRITING.</u>

Ms. Davis' writing is clear and concise and significant facts and issues are covered.  Her writing is well-organized and arguments are presented in a logical and persuasive manner.  Stylist and grammatical errors are minor and her written work does not require major revision.

| | UNACCEPTABLE        |X| EXCEEDS or MEETS EXPECTATIONS

<u>C</u>    JOB ELEMENT 4:  <u>NEGOTIATIONS AND ORAL PRESENTATIONS.</u>

Ms. Davis has demonstrated sound negotiation skills and her demeanor with outside counsel is appropriate and effective. Ms. Davis' oral presentations are articulate and persuasive, and she addresses satisfactorily questions raised by others.  She exercises the appropriate degree of tact, courtesy and discretion in her dealings with superiors, staff and outside counsel.

| | INACCEPTABLE        |X| EXCEEDS or MEETS EXPECTATIONS

<u>C</u>    JOB ELEMENT 5:  <u>REPRESENTATIONS OF DIVISION INTERESTS.</u>

Ms. Davis understands the Division's mission and she is able to effectively further those interests in all dealings with people inside and outside the Division.

| | UNACCEPTABLE        |X| EXCEEDS or MEETS EXPECTATIONS

<u>C</u>    JOB ELEMENT 6:  <u>DILIGENCE, DEPENDABILITY AND ADHERENCE TO OFFICE POLICIES.</u>

Ms. Davis is a diligent and dependable member of the Section.  She understands the Section's overall goals, policies and procedures, and works to achieve them.  She keeps supervisors informed of important developments, and her matters are handled in compliance with all policies and procedures.  Ms. Davis has also made contributions to the Division through her participation in the Merger Review Project whose purpose was to establish a database of merger investigations to facilitate merger analysis.  The team reviewed over 50 merger investigations, analyzing and documenting all signicient aspects of each i       gation (*e.g.*, relevant product and geographic markets, effects, defenses) all of which required tedious at,     on to detail on a short deadline.

☐ UNACCEPTABLE     ☒ EXCEEDS or MEETS EXPECTATIONS

---

<u>C</u>     JOB ELEMENT 7: <u>SERVICES TO VICTIMS AND WITNESSES.</u>

Not applicable in rating period.

☐ UNACCEPTABLE     ☐ EXCEEDS or MEETS EXPECTATIONS

---

OVERALL PERFORMANCE RATING:  Please check the block which best characterizes the employee's overall performance during the rating cycle.  Refer to instructions to insure that the rating assigned is in accord with the rating level descriptions in the order.

☐ UNACCEPTABLE     ☒ EXCEEDS or MEETS EXPECTATIONS

---

F     NG OFFICIAL (Signature and Date)

_Maurbrell__ 8/13/04_

REVIEWING OFFICIAL (Signature and Date)

_Thomas O Bausch_ 8-16-04

EMPLOYEE (Signature and Date) Acknowledges that the final rating has been discussed.

_Carolyn S Davis_ 8/25/04

9

EXHIBIT 12

**From:** Petrizzi, Maribeth
**Sent:** Monday, April 16, 2007 2:38 PM
**To:** Fountain, Dorothy; Davis, Carolyn
**Subject:** RE: No Interest Forms for HSRs 07-1107 and 1109

Carolyn,

Thank you for reviewing the HSRs in Suzanne's absence. We had hoped that a matter would have come in that would have required further investigation. Had that been the case, we would have assigned that matter to you for your further review. Although that did not happen, now that you have completed reviewing the HSRs, we will continue to endeavor to give you an assignment wherein you will be given the opportunity to lead new investigations or lead portions of investigations. Thank you,

Maribeth

----Original Message----
**From:** Fountain, Dorothy
**Sent:** Monday, April 16, 2007 1:52 PM
**To:** Davis, Carolyn; Petrizzi, Maribeth
**Subject:** RE: No Interest Forms for HSRs 07-1107 and 1109

Thanks, Carolyn. For any transactions cleared to the FTC, though, please prepare a no-interest form stating, at a minimum, that the reason we are no-interesting the transaction is that the FTC is conducting the investigation. -- Dorothy

----Original Message----
**From:** Davis, Carolyn
**Sent:** Monday, April 16, 2007 1:44 PM
**To:** Fountain, Dorothy; Petrizzi, Maribeth
**Subject:** RE: No Interest Forms for HSRs 07-1107 and 1109

<< File: HSR07-1107NoInterestAirgas.wpd >>  << File: HSR07-1109NoInterestChampion.wpd >>

*Dorothy,*

*Attached are completed No Interest Forms for transactions 07-1107 and 07-1109.*
*This completes all 13 of the transactions for which I completed No-Interest forms. Transaction 07-1108 was given to ███████ and transaction 07-1083 was given to ███████. The ███████ filing also is not included in this list, as it was cleared to the FTC.*

*Carolyn*

6

EXHIBIT 13

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296–33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) <br> **DAVIS, CAROLYN L** | | | 2. Social Security Number | 3. Date of Birth <br> /51 | 4. Effective Date <br> **01/07/07** |
|---|---|---|---|---|---|

| **FIRST ACTION** | | **SECOND ACTION** | |
|---|---|---|---|
| 5–A. Code <br> **894** | 5–B. Nature of Action <br> **GEN ADJ** | 6–A. Code | 6–B. Nature of Action |
| 5–C. Code <br> **QWM** | 5–D. Legal Authority <br> **REG 531.207** | 6–C. Code | 6–D. Legal Authority |
| 5–E. Code <br> **ZLM** | 5–F. Legal Authority <br> **E O 13420** | 6–E. Code | 6–F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number <br> **TRIAL ATTY** <br> **00100872  6A002A** |
|---|---|

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary <br> **139,774.00** | 13. Pay Basis <br> **PA** | 16. Pay Plan <br> **GS** | 17. Occ. Code <br> **0905** | 18. Grade/Level <br> **15** | 19. Step/Rate <br> **10** | 20. Total Salary/Award <br> **143,471.00** | 21. Pay Basis <br> **PA** |
|---|---|---|---|---|---|---|---|---|---|---|---|

| 12A. Basic Pay <br> **118,957.00** | 12B. Locality Adj. <br> **20,817.00** | 12C. Adj. Basic Pay <br> **139,774.00** | 12D. Other Pay <br> **.00** | 20A. Basic Pay <br> **120,981.00** | 20B. Locality Adj. <br> **22,490.00** | 20C. Adj. Basic Pay <br> **143,471.00** | 20D. Other Pay <br> **.00** |
|---|---|---|---|---|---|---|---|

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization <br> **ANTITRUST DIVISION** <br> **LITIGATION II SECTION** <br><br> **DJ HC1420390000000000  PP 01 2007** |
|---|---|

### EMPLOYEE DATA

| 23. Veterans Preference <br> **1** | 1 – None          3 – 10–Point/Disability          5 – 10–Point/Other <br> 2 – 5–Point     4 – 10–Point/Compensable     6 – 10–Point/Compensable/30% | 24. Tenure <br> **1** | 0 – None          2 – Conditional <br> 1 – Permanent     3 – Indefinite | 25. Agency Use | 26. Veterans Preference for RIF <br> YES  **X**  NO |
|---|---|---|---|---|---|
| 27. FEGLI <br> **C0** | **BASIC** | 28. Annuitant Indicator <br> **9** | **NOT APPLICABLE** | | 29. Pay Rate Determinant <br> **0** |
| 30. Retirement Plan <br> **K** | **FERS AND FICA** | 31. Service Comp. Date (Leave) <br> **11/03/85** | 32. Work Schedule <br> **F**  **FULL TIME** | | 33. Part–Time Hours Per <br> Biweekly <br> Pay Period |

### POSITION DATA

| 34. Position Occupied <br> **2** | 1 – Competitive Service     3 – SES General <br> 2 – Excepted Service     4 – SES Career Reserved | 35. FLSA Category <br> **E** | E – Exempt <br> N – Nonexempt | 36. Appropriation Code | 37. Bargaining Unit Status <br> **7777** |
|---|---|---|---|---|---|
| 38. Duty Station Code <br> **11-0010-001** | | 39. Duty Station (City – County – State or Overseas Location) <br> **WASHINGTON  DIST OF COLUMBIA  DC** | | | |

| 40. Agency Data | 41. <br> **SEX: F** | 42. <br> **CITZ: 1** | 43. <br> **ET STAT: X** | 44. <br> **D LV:17 YR:91 INST PRG:2201** |
|---|---|---|---|---|

45. Remarks <br>
**FEDERAL PAY INCREASE DUE TO E.O. 13420 SIGNED 12/21/06.** <br>
**SALARY INCLUDES A GENERAL INCREASE OF 1.7% ROUNDED AND A LOCALITY** <br>
**PAY (OR OTHER GEOGRAPHIC ADJUSTMENT) APPLICABLE IN THIS AREA.**

| 46. Employing Department or Agency <br> **U.S. DEPARTMENT OF JUSTICE/HC** | | | 50. Signature/Authentication and Title of Approving Official <br><br> **DIANE GAINEY** <br> **PERSONNEL OFFICER** |
|---|---|---|---|
| 47. Agency Code <br> **DJ HC** | 48. Personnel Office ID <br> **1830** | 49. Approval Date <br> **12/21/06** | |

5–Part 50–316

Editions Prior to 7/91 Are Not Usable After 6/30/93 <br>
NSN 7540–01–333–6238

EXHIBIT 14

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAROLYN L. DAVIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case Number: 1:08CV00772 (HHK) |
| | ) |
| MICHAEL B. MUKASEY, United States | ) |
| Attorney General, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DECLARATION OF LHATOYA REED
HUMAN RESOURCES SPECIALIST
PERSONNEL STAFF, ANTITRUST DIVISION
UNITED STATES DEPARTMENT OF JUSTICE, WASHINGTON, DC**

1. I am employed by the Antitrust Division ("ATR"), United States Department of Justice, as a GS-14 Human Resources Specialist, located in Washington, DC. I have held this position since August 2005.

2. In my position, I have access to all ATR employee official personnel files. Employee personnel records for all ATR employees, including Official Personnel Folders (OPFs) and Employee Performance Folders (EPFs) are stored and maintained electronically.

3. Plaintiff Carolyn L. Davis received a Sustained Superior Performance award in the amount of $2000 on September 9, 2001. Between September 2001 and August 2008, she has not received any Sustained Superior Performance, Special Act, or other type of performance awards.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Lhatoya Reed